UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:

NATIONWIDE PHARMASSIST CORP.,                    Case No. 15-27804-RBR

        Debtor.                                Chapter 11

_____/

**_EXPEDITED_ MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING AND
SCHEDULING SALE OF THE ASSETS OF NATIONWIDE PHARMASSIST CORP.
FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES;
(B) APPROVING BREAKUP FEE; (C) APPROVING BIDDING PROCEDURES;
(D) APPROVING THE NOTICE OF SALE; (E) SCHEDULING AN AUCTION TO
ACCEPT HIGHER AND BETTER BIDS; AND (F) SCHEDULING HEARING
<u>TO APPROVE SALE ARISING OUT OF AUCTION</u>**

Debtor in Possession, Nationwide PharmAssist Corp. ("<u>Nationwide</u>" or the "<u>Debtor</u>"),

requests entry of an order (a) authorizing and scheduling the sale of substantially all of the

Debtor's assets free and clear of all liens, claims, and encumbrances; (b) approving breakup fee;

(c) approving bidding procedures; (d) approving a notice of sale; (e) scheduling an auction to

accept higher and better bids; and (f) scheduling a hearing to approve the sale arising out of the

auction.  In support of this motion (the "<u>Motion</u>") the Debtor states:

<u>**JURISDICTION**</u>

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is

a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

2.      The predicates for the relief sought herein are § 363 of title 11 of the United

States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure, and Local Rule 6004-1.

**INTRODUCTION**

3.      Through the Motion, the Debtor requests approval of a sale process through which the Debtor can expose substantially all of its assets (the "Assets"), which are defined as "Purchased Assets" in Article I of the Asset Purchase Agreement (the "APA") between the Debtor and HBS Corp. (the "Purchaser"), to competitive bids through an auction.  A true and correct copy of the APA is attached hereto as **EXHIBIT "A"**.

4.      **As further set forth in this Motion, the Debtor seeks the following proposed deadlines[1] in order to effectuate an expedited auction:**

    a.      **Deadline to conduct due diligence – November 19, 2015;**

    b.      **Deadline to submit Qualifying Bid Packet – November 19, 2015;**

    c.      **Deadline to tender deposit of $15,000 – November 19, 2015;**

    d.      **Deadline to approve Qualified Bidders – November 20, 2015;**

    e.      **Deadline to serve Qualified Bid Summary – November 20, 2015;**

    f.      **Proposed date for auction of Debtor's assets – November 23, 2015;**

    g.      **Proposed date for hearing to approve Sale – November 23, 2015; and**

    h.      **Proposed closing on Sale – on or before December 7, 2015.**

5.      **As further set forth in the Motion, the Debtor's Chief Restructuring Officer and principal, Frederick Schlosser, has a 100% ownership interest in the Purchaser.**

**FACTUAL BACKGROUND**

6.      The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 6, 2015.

7.      The Debtor is operating its business and managing its affairs as a debtor in

---

[1]      The proposed deadlines are sought by the Debtor in order to effectuate an expedited auction but alternative deadlines may be ordered by the Court.

possession.   As of the date hereof, no trustee, examiner, or statutory committee has been appointed.

8.     The Debtor's primary business is the preparation of pre-packaged units and dosages of pharmaceutical medications and vitamins, and selling the same to medical professionals and consumers.

9.     Through the Motion, the Debtor proposes to sell substantially all of its assets free and clear of all liens, claims and encumbrances to the Purchaser for one hundred thousand dollars ($100,000.00), subject to higher and better offers, pursuant to § 363(f) of the Bankruptcy Code (the "Sale").  The only remaining assets of the Debtor following the Sale will consist of those listed in § 1.3 of the APA (the "Excluded Assets").  The Sale does not incorporate the assumption of liabilities, as detailed in § 1.4 of the APA.

10.     The Sale is the best method of maximizing the Debtor's estate.  The Debtor is an administratively dissolved Florida corporation, whose primary value lies with its intellectual property and licenses.  In order to avoid the incurrence of additional administrative expenses and the further accumulation of accounts payable, the Debtor seeks to expose the Assets to higher and better offers at an auction that is discussed in detail below.

11.     The Debtor seeks to use the APA as the stalking horse bid (the "Stalking Horse Bid"), making the Purchaser the "Stalking Horse Bidder."  **Frederick Schlosser is an insider of the Debtor, as defined in § 101(31) of the Bankruptcy Code, and owns a 100% equity stake in the Purchaser.**

12.     Subject to this Court's approval, the Purchaser shall be entitled to a breakup fee of its actual expenses incurred relating to the Sale, to a maximum dollar amount of fifteen thousand dollars ($15,000.00) (the "Breakup Fee").

13.    The Debtor seeks to expose the Purchaser's offer to higher and better offers in order to maximize the value of the Sale.

### RELIEF REQUESTED

14.    The Debtor requests entry of an order (a) authorizing and scheduling the sale of the Assets free and clear of all liens, claims, and encumbrances to the extent described herein; (b) approving the Breakup Fee; (c) approving bidding procedures; (d) approving the notice of sale; (e) scheduling an auction to accept higher and better bids; and (f) scheduling a hearing to approve the Sale arising out of the auction, pursuant to 11 U.S.C. § 363, Rules 2002, 6004(a) and 9014 of the Federal Rules of Bankruptcy Procedure and Local Rule 6004-1.

15.    In addition, the Debtor requests that in order to expedite the sale of the Assets that the Court waives the requirement that any order approving the Sale be stayed for fourteen days as required by Federal Rule of Bankruptcy Procedure 6004(h).

16.    Courts interpreting § 363(b) have approved non-ordinary course sales even where substantially all of a debtor's assets were being sold prior to a plan of reorganization being proposed. *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2nd. Cir. 1983); *In re Parkstone Med. Info. Sys.*, 2001 Bankr. LEXIS 1356 (Bankr. S.D. Fla. 2001); *In re Baldwin United Corp.*, 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984). Following the guidelines established by the seminal decision of the Second Circuit in *Lionel* and its progeny, a debtor may sell all of the assets of the estate under the Bankruptcy Code § 363 outside of a plan. As *Lionel* states:

> Resolving the apparent conflict between Chapter 11 and section 363(b) does not require an all or nothing approach. Every sale under 363(b) does not automatically short-circuit or side step Chapter 11; nor are the two statutory provisions to be read as mutually exclusive. Instead, if a bankruptcy judge is to administer a business reorganization successfully under the Code, then… some plan for the operation of both 363(b) must be allowed for. …The rule we adopt requires that a judge determining a section

> 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.

722 F.2d at 1070–71.

17.     Courts have regularly held that approval of a proposed sale of property pursuant to § 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction represents the sound business judgment on the part of the debtor. *See, e.g.*, *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Lionel Corp.*, 722 F.2d at 1070.

18.     The Debtor respectfully submits that all of the factors demonstrating its sound business judgment are met, and that the Sale should be approved. The Sale appears to be the best manner in which to maximize value for the estate. The Debtor is administratively dissolved. There are also administrative costs associated with the continued operation of the Debtor. Therefore, an extended delay in the sale of the Assets will be to the detriment of the creditors of this estate. As a result, the Debtor has determined that the best way to maximize the value of its assets is to sell the Assets, for fair market value, to the highest and best bidder pursuant to a § 363 sale.

19.     Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (a) the sale price is fair and reasonable; (b) the debtor in possession has provided interested parties with adequate and reasonable notice; and (c) the purchaser is proceeding in good faith. *See In re Abbotts Dairies of Pennsylvania*, 788 F.2d 143, 147 (3d Cir. 1986) (noting that the phrase "good faith" encompasses one who purchases in good faith and for value); *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). All of the factors are or will be satisfied in this matter.

A.    **The Purchase Price is Fair and Reasonable.**

i.    **The Auction.**

20.    While the Debtor submits that the APA represents fair and reasonable consideration for the sale of the Assets, the Debtor believes that the auction and bidding procedures set forth below will ensure that the estate realizes the highest and best possible value for the Assets.

21.    Accordingly, the Debtor proposes to sell the Assets free and clear of all liens, claims, and encumbrances, and to expose the credit bid to higher and better offers at an auction (the "Auction") that will take place at the offices of counsel for the Debtor, Shraiberg, Ferrara & Landau, P.A., which are located at **2385 N.W. Executive Center Drive, Suite 300, Boca Raton, Florida 33431 on November 23, 2015** or as otherwise determined by the Court.

ii.    **Proposed Bidding Procedures.**

22.    A person may be qualified to participate in the Auction if by the bid deadline of **November 19, 2015** (the "Bid Deadline"), the following are provided:

a.    A deposit of $15,000.00 (the "Deposit") payable by bank cashier's check or wire transfer into the non-interest bearing escrow account of Shraiberg, Ferrara & Landau, P.A. along with the SSN or EIN of the bidding person or entity;

b.    An executed asset purchase agreement and a redline version showing changes from the APA attached hereto as Exhibit "A".  Any competing bid must not contain any contingencies to the validity, effectiveness and/or binding nature of the offer, including without limitation, contingencies for financing, due diligence or inspection;

c.    The amount the person is willing to pay for the Assets, but in no event shall this amount be less than $125,000.00 (the "Initial Bid"), which shall be paid in cash at closing; and

d.    Reasonable financial information from which the Debtor can assess the wherewithal of the bidder to close on the Sale in the event that the bidder is the Successful Bidder.

(collectively, the "Qualifying Bid Packet").  The Qualifying Bid Packet must be delivered with the items described above no later than **5:00 P.M. E.S.T. on November 19, 2015** to:

    a.    Bradley Shraiberg, Esq., Shraiberg, Ferrara & Landau, P.A., Counsel for Debtor, 2385 NW Executive Center Dr., Suite 300, Boca Raton, Florida 33431, Telephone (561) 443-0800, Facsimile No. (561) 998-0047; and

    b.    Glenn Moses, Esq., Genovese Joblove & Battista, P.A., Counsel for the Purchaser, 100 Southeast Second Street, 44th Floor, Miami, Florida 33131, Telephone (305) 349-2300, Facsimile No. (305) 349-2310.

The bidder's Qualifying Bid Packet must include the bidder's address, telephone and facsimile numbers where the bidder may be contacted.

23.    The Purchaser shall be deemed a Qualified Bidder without regard to the preceding paragraphs.

24.    Prior to the Auction, the Debtor shall evaluate each Qualifying Bid Packet submitted in accordance with paragraph 22 and may then identify a person, persons, entity or entities from among those who submitted a Qualifying Bid Packet and deem those person(s) "Qualified Bidders" as well as their offer to purchase the Assets.  By participating in the Auction, each Qualified Bidder consents to its bid being designated as a back-up bid ("Back-Up Bid").

25.    The Debtor shall file and serve upon all interested parties entitled to receive notice, including the holders of qualified bids (the "Qualified Bids"), fully executed copies of the Qualified Bids to be considered at the Auction no later than **November 20, 2015** (the "Qualified Bid Summary").  This requirement is waived in the event that there are no Qualified Bids.  The Debtor shall notify all Qualified Bidders, no later than **5:00 P.M. E.S.T. on November 20, 2015** that they may participate in the Auction.

26.    The Auction shall be conducted in a forum in which the Qualified Bidders may make competing bids to purchase the Assets, in minimum bid increments of $5,000.00 or increments as otherwise decided by the Court.  The Auction shall conclude when the Debtor

receives what it considers to be the highest and best offer to purchase the Assets (the "Successful Bid"). The Debtor may also identify an acceptable Back-Up Bid.

27.     Except as otherwise stated herein, each Deposit shall be maintained in a **non-interest** bearing account and subject to the jurisdiction of this Court. Within five (5) business days from the entry of an order approving the Sale, the Debtor shall return all Deposits to all Qualified Bidders except the person who submitted the Successful Bid (the "Successful Bidder" or the person who submitted the Back-Up Bid (the "Back-Up Bidder"), whose Deposit shall be applied by the Debtor against the purchase price at the closing. In the event that the Successful Bidder closes the Sale, the Debtor shall return the Back-Up Bidder's Deposit within five (5) business days from the closing. In the event the Back-Up Bidder closes on the purchase of the Assets, its Deposit shall be applied by the Debtor against the purchase price.

28.     All Qualified Bidders and the Purchaser shall be deemed to have consented to the core jurisdiction of this Court and to have waived any right to a jury trial in connection with any disputes relating to the Auction and/or the Sale. All asset purchase agreements shall be governed by and construed in accordance with the laws of the State of Florida. All Qualified Bidders and the Purchaser shall be bound by their bids until conclusion of the Auction. If the Successful Bidder is unable or unwilling to close the Sale, the Successful Bidder shall forfeit its Deposit to the Debtor and the Debtor shall close the Sale with the Back-Up Bidder, without further notice or hearing, who shall then be obligated to close the Sale on the terms of the Back-Up Bid and the corresponding Bidder's asset purchase agreement no later than five (5) days thereafter. If the Back-Up Bidder, if any, is unable or unwilling to close the Sale in the time permitted, the Back-Up Bidder shall forfeit its Deposit to the Debtor.

29.    In the event the Debtor fails to receive a Qualified Bid, the Debtor shall cancel the Auction and seek the straight sale of the Assets to the Purchaser.

### iii.    Hearing to Approve Sale.

30.    Approving the sale of the Assets in an expeditious manner is important to both the Debtor and the Successful Bidder to prevent any further diminution of the Assets.

31.    For that reason, the Debtor requests that the Court conduct a hearing to approve the Sale arising out of the Auction on **November 23, 2015** (the "Sale Hearing").  Once approved, the closing is planned to occur seven (7) days after entry of an Order approving the Sale.

### iv.    Due Diligence.

32.    Due diligence should be coordinated through the Debtor's Counsel.

33.    The deadline for completing due diligence is **November 19, 2015**.

### B.    Adequate and Reasonable Notice.

34.    The Debtor shall provide by e-mail; facsimile and/or U.S. Mail written notice of the Auction, the bidding procedures, and the Sale Hearing within one (1) business day from the entry of order approving the Motion to: (a) those persons who in any way contacted Debtor or any of its representatives regarding the sale of the Assets; (b) those persons who the Debtor has reason to believe may possess an interest in purchasing the Assets; (c) the U.S. Trustee; (d) counsel to the Purchaser; (e) the Internal Revenue Service; (f) parties to executory contacts and leases with the Debtor; (g) all other parties who have filed a notice of appearance; and (h) all other creditors.  The notice shall be substantially in the form attached hereto as **EXHIBIT "B"** and shall include a copy of the APA.

35.    The Debtor submits that such notice constitutes good and sufficient notice of the Auction and related matters and that no further notice need be given.

36.    Notice of this Motion has been given to: (a) those persons who have presented bids to date; (b) the U.S. Trustee; (c) counsel to the Purchaser; (d) the Internal Revenue Service; (e) parties to executory contracts and leases with the Debtor; (f) all other parties who have filed a notice of appearance; and (g) all other creditors.

37.    The Debtor submits that such notice constitutes good and sufficient notice of the Motion and that no further notice need be given.

**C.    The Buyer is a Good Faith Purchaser.**

38.    The Debtor also requests that the Court find that the Successful Bidder (defined herein), constitutes a good faith purchaser of the Assets pursuant to 11 U.S.C. § 363(m) such that the reversal or modification on appeal of the sale of the Assets to the Successful Bidder shall not affect the validity of the sale to the Successful Bidder whether or not the Successful Bidder knew of the pendency of the appeal.

39.    Section 363(m) of the Bankruptcy Code provides that the reversal or modification on appeal of a transaction authorized under § 363(b) of the Bankruptcy Code does not affect the validity of the sale to an entity that acquired the property in good faith.  *See e.g.*, *In re Adamson Co., Inc.*, 159 F.3d 896 (4th Cir. 1998.); *In re Stadium Management Corp.*, 895 F2d 845 (1st Cir. 1990).

40.    The ultimate buyer will be a good faith purchaser, as the Sale will be negotiated at arms' length and will be subject to higher and better offers at the Auction.

## CONCLUSION

41.    The Sale should be approved because all of the requirements exist for the Court to authorize the proposed sale.

**WHEREFORE**, the Debtor respectfully requests entry of an Order granting the Motion, which: (a) authorizes and schedules the sale of the Debtor's Assets free and clear of all liens, claims, and encumbrances with liens to attach to the proceeds; (b) approves the Breakup Fee; (c) approves bidding procedures; (d) approves the notice of sale; (e) schedules an auction to accept higher and better bids; and (f) schedules a hearing to approve the sale arising out of the auction, pursuant to 11 U.S.C. § 363, Rules 2002, 6004(a) and 9014 of the Federal Rules of Bankruptcy Procedure and Local Rule 6004-1; and (g) grants any and all such further relief as this Court deems appropriate under the circumstances.

Respectfully Submitted,

**SHRAIBERG, FERRARA & LANDAU, P.A.**
Attorneys for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email: bshraiberg@sfl-pa.com
Email: pdorsey@sfl-pa.com

By:    /s/ Bradley S. Shraiberg
         Bradley S. Shraiberg, Esq.
         Florida Bar. No. 121622
         Patrick Dorsey, Esq.
         Florida Bar. No. 0085841

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing by CM/ECF to all parties registered to receive such service in this case on this the 9th day of October, 2015.


    /s/ Bradley S. Shraiberg
    Bradley S. Shraiberg, Esq.

# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**HBS CORP.**

**AND**

**NATIONWIDE PHARMASSIST CORP.**

{2021/000/00305384}

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made and entered into on this __ day of September, 2015 (the "**Effective Date**"), by and between HBS Corp, a Delaware corporation with its address at 5800 N.W. 2nd Ave, Unit #114, Boca Raton, FL 33487 (the "**Buyer**"), and Nationwide PharmAssist Corp., a Florida corporation with its address at 1011 S.W. 30th Ave., Deerfield Beach, FL 33442 (the "**Seller**").

## RECITALS

WHEREAS, the Seller is engaged in the business of preparing pre-packaged units and dosages of pharmaceutical medications and vitamins, and selling the same to medical professionals and consumers, including its related operations (the "**Business**");

WHEREAS, on October ___, 2015 (the "**Petition Date**"), Seller commenced a voluntary case under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Florida (the "**Bankruptcy Court**"), Case No. 15-_____ (the "**Bankruptcy Case**");

WHEREAS, the Buyer acknowledges that pursuant to section 363 of the Bankruptcy Code, the sale contemplated herein is subject to higher and better offers and that the Seller, pursuant to a motion to be filed by the Seller in the Bankruptcy Case, will be seeking an order from the Bankruptcy Court (the "**Sale Procedures Order**") (a) approving certain procedures governing the marketing and sale of all or substantially all of the Seller's property and assets and the assumption and assignment of the Seller's executory contracts and unexpired leases, and (b) granting certain related relief ("**Sale Procedures**");

WHEREAS, this Agreement shall constitute a Qualified Bid for all purposes with respect to any Sale Procedures approved pursuant to the Sale Procedures Order;

WHEREAS, Buyer has made, or will make within two (2) business days from execution of this Agreement, an earnest money deposit in the amount of $10,070.00 plus, as soon as the foregoing information is available, the amount necessary to fund the initial cost to retain an accountant to prepare the Seller's tax returns and fund necessary insurance in an amount not to exceed $5,000.00, which amount will be supplemented with a notice of filing with Bankruptcy Court (the "**Deposit**") into an escrow account (the "**Deposit Escrow Account**") with Shraiberg Ferrara & Landau P.A. (the "**Deposit Escrow Agent**").

WHEREAS, the Buyer wishes to purchase certain of the assets which are used by the Seller to conduct the Business, for the purchase consideration set forth herein and upon and subject to the terms and conditions set forth herein;

WHEREAS, Buyer desires to purchase the Purchased Assets from Seller, and Seller desires to sell, assign, transfer, convey and deliver to Buyer the Purchased Assets, all in the manner and subject to the terms and conditions set forth in this Agreement and any final Sale Order and in accordance with sections 105, 363, 365, 1146 and all other applicable provisions of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

# ARTICLE I
# PURCHASE AND SALE

1.1     **Purchased Assets**.  At the Closing (as defined herein), and upon the terms and conditions herein and as set forth in the Sale Order, the Seller will, validly and effectively, grant, sell, convey and assign to the Buyer, upon and subject to the terms and conditions of this Agreement, all right, title and interest in and to the following assets used in the Business (the "**Purchased Assets**"), free and clear of all liens, pledges, security interests, charges, claims, restrictions and other encumbrances or defects of title of any nature whatsoever:

(a)     <u>Fixed Assets and Other Property</u>.  All of the Seller's fixed assets, including but not limited to all inventory, equipment, machines, signs, apparatus, tools, appliances, implements, spare parts, office equipment, supplies, furniture fixtures and all other personal property or additional privileges, rights, interests, properties and assets, used or usable in the Business, including without limitation those which are listed on Part A of <u>Schedule 1.1</u> attached hereto and made a part hereof;

(b)     <u>Contracts</u>.  Any and all contracts (i) under which the Seller has or may acquire any rights or benefits, (ii) under which the Seller has or may become subject to any obligation or liability or (iii) which the Seller or any of the assets owned or used by the Seller in the Business is or may become bound, if any, including those which are listed on Part B of <u>Schedule 1.1,</u> including all contractual rights (including rights to indemnification, exculpation, advancement or reimbursement of expenses), claims, causes of action, choses in action, lawsuits, demands and judgments in law or in equity, of every kind and nature, that Seller has or may have against any other person and that are related to the Acquired Contracts (the "**Acquired Contracts**");

(c)     <u>Intellectual Property</u>.  All of the Seller's rights with respect to all mailing lists, designs, computer code, the name of Seller (Nationwide PharmAssist), software, schematics, business processes, telephone and fax numbers and all intellectual property used in the Seller's operation of the Business, including without limitation all trade secrets, proprietary and technical information, business process, research and development, processes, formulas, marketing plans, Web/internet assets, white papers, and other domain knowledge as well as know-how and other trade rights, together with all rights to, and all applications, registrations and licenses for, any of the foregoing in any form or media, and any other intangible assets of the Seller used in the Business (all assets included or referenced in this <u>Section 1.1(c)</u> being hereinafter collectively referred to as the "**Intellectual Property**"), including without limitation (i) any such Intellectual Property that may be in the possession of third parties as well as all claims, causes of action and rights with respect to such property and such third parties, and (ii) those items of Intellectual Property which are listed on Part C of <u>Schedule 1.1</u>; and

(e)    <u>Other Intangible Property</u>.  All other intangible rights and property of the Seller to the extent not already covered in this <u>Section 1.1</u>, if any, including without limitation those items which are listed on Part D of <u>Schedule 1.1</u>.

1.2    **Purchase Price**.

(a)    The purchase price for the Purchased Assets shall be One Hundred Thousand ($100,000.00) Dollars (the "**Purchase Price**").

(b)    Prior to the hearing to approve the sale, Purchaser shall deliver the Purchase Price, less the Deposit, to it's counsel trust account.  On the Closing Date (as defined herein), the Purchaser shall deliver, by wire transfer pursuant to wire transfer instructions provided by Seller at least two Business Days prior to the Closing Date, in immediately available funds, the Purchase Price less the Deposit.

1.3    **Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement, Seller shall retain all rights, title and interests in, to and under the following assets, properties and rights of Seller (collectively, the "**Excluded Assets**"):

(a)    All of Seller's cash, checks, cash equivalents, cash and deposits in Seller's bank accounts, cash-in-transit and all accounts receivable of Seller earned as of the Closing Date.

(b)    All equity ownership interests in Seller;

(c)    All avoidance claims and causes of action arising under chapter 5 of the Bankruptcy Code or any other fraudulent transfer statue and any related claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds from any of the foregoing; and

(d)    Contracts that Buyer has identified prior to the Closing that Buyer will not assume at Closing.

1.4    **No Assumption of Liabilities**.  The Buyer shall assume no liabilities, obligations or commitments of the Seller, including without limitation any trade obligations, bank debt, convertible debt or claims of any kind, either pre-petition or post-petition.  The Seller retains all liabilities that relate to the Business or the Purchased Assets that result from or arise out of any event, occurrence, transaction, action or inaction occurring prior to the Closing, including without limitation liabilities under any "employee pension benefit plan" or "employee welfare benefit plan" as those terms are defined in Sections 3(1) and 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), any product liability, warranty or other claims arising out of or relating to any product manufactured, distributed or sold by the Seller at any time before Closing, any claims by any third party under any bulk sales law, and any claims relating to patent or trademark infringement, taxes, workers compensation, real estate or environmental, health or safety matters.

1.5    **Use of Deposit – Nonrefundable.**  The Deposit shall be nonrefundable provided that it shall be used by Seller in the Bankruptcy Case solely for (a) the initial fee to Seller's

investment banker in the amount of $7,5000, (b) Seller's rent obligation for the months of November and December in the total amount of $2,120, (c) utilities in the amount of $450, (c) the amount necessary to fund the initial cost to retain an accountant to prepare the Seller's tax returns, (d) Seller's necessary insurance, but shall be a credit towards the Purchase Price at Closing.

1.6    **Break-Up Fee**.  In the event Buyer is not in default hereunder, has not terminated this Agreement pursuant to the terms hereof and is ready, willing, and able to close on the purchase of the Purchased Assets, and should Seller accept a higher or better offer to sell the Purchased Assets to another Buyer (an "Alternative Buyer"), which sale is approved by the Bankruptcy Court in the Bankruptcy Case, and such transaction closes, then Seller agrees that Buyer shall be entitled to receive as a break-up fee in the amount of the Deposit to reimburse Buyer for the value of its time, costs, and expenses incurred in connection with this transaction, including Buyer's agreement to (a) consider the Deposit nonrefundable and to allow the Seller to use the Deposit for certain administrative expenses in connection with the Bankruptcy Case, and (b) serve and participate as the "stalking horse" bidder under the Sale Procedures Order (the "Break-Up Fee").  The Break-Up Fee shall be entitled to status as an administrative expense under Bankruptcy Code section 503(b)(1), shall be secured by a Lien on the deposit of the Alternative Buyer or the closing proceeds in the event the transaction with the Alternative Buyer closes, and shall be paid solely and exclusively from such forfeited deposit or closing proceeds. Any sums becoming payable to Buyer pursuant to this section shall be paid to Buyer promptly after the closing with any such Alternative Buyer approved in the Bankruptcy Case or, if applicable, promptly after the deposit on such transaction is forfeited.

## ARTICLE II
## CLOSING

2.1    **Closing**.  Subject to all conditions precedent herein having been met, the Buyer and the Seller agree to close the sale and purchase of the Purchased Assets (the "**Closing**") on a date that is mutually agreed upon by the parties hereto which is no later than fifteen (15) days after the entry of a final, non-appealable Order of the Bankruptcy Court approving this transaction (the "**Sale Order**"), and shall take place at the offices of the Buyer, or at such other time and place as the parties may mutually agree upon in writing (the "Closing Date").

2.2    **Seller Closing Deliveries**.  At the Closing and subject to the terms and conditions herein contained, the Seller shall deliver to the Buyer the following:

(a)    Instrument of Sale.  A general instrument of sale, and conveyance, assignment, transfer and delivery with respect to all of the Purchased Assets (the "**Bill of Sale**"), such instrument to be in substantially the form attached hereto as Exhibit A and made a part hereof;

(b)    Sale Order.  The Sale Order, which shall be in a form and content agreeable to Buyer, which shall provide, among other things, that Buyer shall acquire the Purchased Assets free and clear of all liens, claims and encumbrances of any kind, and findings of good faith and protections consistent with sections 363(m) and (n) of the Bankruptcy Code;

(c)    Purchased Assets.  All of the Purchased Assets; and

(d)    Assignment of Contracts.  A duly-executed counterpart of the Assignment and Assumption Agreement, in substantially the form attached hereto as Exhibit B

and made a part hereof, assigning the Seller's right, title and interest in and to the Acquired Contracts and the Intellectual Property listed on Part C of <u>Schedule 1.1</u>; and any other instruments of assignment and transfer in form satisfactory to the parties duly executed by the Seller transferring to the Buyer title to the Purchased Assets not otherwise covered by the Bill of Sale or the Assignment and Assumption Agreement.

2.3    **Buyer Closing Deliveries**.  At the Closing and subject to the terms and conditions herein contained, the Buyer shall deliver to the Seller the following:

(a)    <u>Purchase Consideration</u>.  The Purchase Price, less the Deposit;

(b)    <u>Assignment and Assumption Agreement</u>.  A duly-executed counterpart of the Assignment and Assumption Agreement;

(c)    <u>Closing Documents</u>.  Such other closing documents as reasonably requested by the Seller; and

(d)    <u>Resolutions</u>.  If requested by Seller, a certified copy of the resolutions adopted by the Board of Directors of the Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

2.4    **Further Assurances**.  The Seller from time to time after the Closing, at the Buyer's reasonable request and at the Buyer's expense, will execute, acknowledge and deliver to the Buyer such other instruments of conveyance and transfer and will take such other actions and execute and deliver such other documents, certifications and further assurances as the Buyer may reasonably request in order to vest more effectively in the Buyer, or to put the Buyer more fully in possession of any of the Purchased Assets.

2.5    **Cure Costs.**  The Seller shall be responsible for the payment of any costs to cure any defaults related to the assumption and assignment of the Acquired Contracts (the "Cure Costs"), as determined by the Bankruptcy Court in the Sale Order or such other Order regarding the payment of Cure Costs associated with an Acquired Contract.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as disclosed to the Buyer in the disclosure schedule delivered by the Seller simultaneously with the execution of this Agreement, the Seller hereby represents and warrants to the Buyer as of the Closing Date as follows (with the understanding that the Buyer is relying on each such representation and warranty in entering into and performing this Agreement):

3.1    **Corporate Status**.  The Seller is a corporation duly incorporated under the laws of Florida and is in good standing as of the date of the execution of this Agreement.

3.2    **Corporate Power and Authority**.  Subject to the entry of the Sale Order, (a) the Seller has the full power, authority and legal right to execute, deliver and perform this Agreement and (b) this Agreement constitutes, and when executed and delivered will constitute,

legal, valid and binding agreement of the Seller enforceable against the Seller in accordance with its terms.

3.3 **Title to and Sufficiency of Properties**. The Seller has good, valid and marketable title to all of the Purchased Assets free and clear of all liens, pledges, security interests, charges, claims, restrictions and other encumbrances and defects of title of any nature whatsoever, and subject to the Sale Order, has the unrestricted right to sell the Purchased Assets as herein provided.

3.4 **Condition of Purchased Assets**. All tangible Purchased Assets are in all material respects in good operating condition and repair (reasonable wear and tear excepted) and are suitable for the purposes for which they are presently being used. Such assets and properties conform in all material respects to all applicable laws, ordinances and regulations, except for such variations as do not materially impair or interfere with the use of such property and assets for the purposes for which they are employed, and the Seller has not received any written notice to the contrary.

3.5 **Use of Purchased Assets**. The Purchased Assets being conveyed have been used only in the lawful conduct of the Business. Conveyance as contemplated by this Agreement will not violate any federal statute or local law, ordinance, rule or regulation or any corporate article of incorporation, bylaw, or resolution.

3.6 **Validity of Contemplated Transactions**. The execution, delivery and performance of this Agreement and the transactions contemplated hereby by the Seller will not contravene or violate (a) any law, rule or regulation to which the Seller is subject, (b) any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to the Seller, or (c) the charter documents of the Seller or any securities issued by the Seller; nor will such execution, delivery or performance violate, be in conflict with or result in the breach (with or without the giving of notice or lapse of time, or both) of any term, condition or provision of, or require the consent of any other party, to, any indenture, agreement, contract, commitment, lease, plan, license, permit, authorization or other instrument, document or understanding, oral or written, to which the Seller is a party, by which the Seller may have rights or by which any of the Purchased Assets may be bound or affected, or give any party with rights thereunder the right to terminate, modify, accelerate or otherwise change the existing rights or obligations of the Seller thereunder except in each case for any such item which would not have a material adverse effect.

3.7 **Consents**. Except for the Sale Order, no authorization, approval or consent of, and no registration or filing with, any governmental or regulatory official, body or authority is required in connection with the execution, delivery and performance of this Agreement by the Seller. All consents, authorizations and approvals of any person or entity to or as a result of the consummation of the transaction contemplated hereby, that are necessary or advisable in connection with the transaction contemplated hereunder have been lawfully and validly obtained by the Seller. The Buyer shall fully cooperate with and assist the Seller in obtaining any consents necessary or advisable hereunder.

3.8    **Assignability of Contracts and Commitments**.  Each of the Acquired Contracts disclosed on Schedule 1.1 hereto is a legal, valid and binding agreement enforceable in accordance with its terms, and to the knowledge of the Seller, the parties thereto are in compliance with the provisions thereof, no party has made or received any prepayments or credits with respect thereto, to the knowledge of the Seller, no party is in default in the performance, observance or fulfillment of any material obligation, covenant or condition contained therein, and to the knowledge of the Seller, no event has occurred which with or without the giving of notice or lapse of time, or both, would constitute a default thereunder. Following the Closing each Acquired Contract shall be in full force and effect; and Buyer shall, following the Closing, have the same rights under each Acquired Contract that Seller had under such Acquired Contract prior to the Closing.  .

3.9    **Tax Liabilities**.  There are no taxes, liens or governmental charges owed, pending or threatened which affect the Purchased Assets.  There are no tax liabilities arising from the Purchased Assets or the Business.  Notwithstanding the foregoing, the Sale of the Purchased Assets shall be free and clear of any such taxes, liens or obligations.  The Seller shall be responsible for any transfer taxes which are payable as a result of the sale of the Purchased Assets of the Seller to the Buyer.

3.10    **Employee Benefit Matters**.  The Seller has not been and currently is not a party to any "employee benefit plan", as defined in Section 3(3) of ERISA, personnel policy, collective bargaining agreement, profit sharing, stock option, stock purchase, pension, bonus, incentive, retirement, incentive award plan or arrangement, vacation policy, severance pay policy or agreement, deferred compensation agreement or arrangement, consulting agreement, employment contract, medical reimbursement, life insurance or other benefit plan, agreement, arrangement, program, practice or understanding.

3.11    **Compliance with Applicable Laws**.  The Seller has complied with all laws, regulations, injunctions, decrees and orders applicable to the Business and has received no written notice of any alleged violation of any such law, regulation, injunction, decree or order for which the failure to comply would, in any individual case or in the aggregate, have an adverse effect on the Business, except where the failure to comply would not have a material adverse effect on the financial condition of the Seller.  Neither the ownership or the use of the Seller's properties in the Business nor the conduct of the Business conflicts with the rights of any other person, firm or corporation or violates, with or without the giving of notice or the passage of time, or both, or will violate, conflict with or result in a default, right to accelerate or loss of rights under, any terms or provisions of its articles of incorporation or bylaws as presently in effect, or any lien, encumbrance, mortgage, deed of trust, lease, license, agreement, understanding, law, ordinance, rule or regulation, or any order, judgment or decree to which the Seller is a party or by which the Seller may be bound or affected.  The Seller has not received any written notice from any person alleging any violation by the Business of any law, ordinance, code, rule or regulation or requiring or calling attention to the necessity of any work, repairs, new construction, installation or alteration in connection with the Business.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

Except as disclosed to the Seller on the disclosure schedules delivered by the Buyer simultaneously with the execution of this Agreement, the Buyer hereby represents and warrants to the Seller as of the Closing Date as follows (with the understanding that the Seller is relying on each such representation and warranty in entering into and performing this Agreement):

4.1 **Corporate Existence**. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

4.2 **Corporate Power and Authority**. The Buyer has the power, authority and legal right to execute, deliver and perform this Agreement. The Buyer warrants that all corporate action on the part of the Buyer, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and the authorization, issuance (or reservation for issuance), has been taken or will be taken prior to the Closing Date. This Agreement has been, and any document to be delivered at the Closing will be, duly executed and delivered by the Buyer and constitutes the legal, valid and binding agreement of the Buyer enforceable against it in accordance with its terms.

4.3 **Validity of Contemplated Transactions**. The execution, delivery and performance of this Agreement by the Buyer will not contravene or violate (a) any law, rule or regulation to which the Buyer is subject, (b) any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to the Buyer, or (c) the bylaws of the Buyer or any securities issued by the Buyer; nor will such execution, delivery or performance violate, be in conflict with or result in the breach (with or without the giving of notice or lapse of time, or both) of any term, condition or provision of, or require the consent of any other party, to, any indenture, agreement, contract, commitment, lease, plan, license, permit, authorization or other instrument, document or understanding, oral or written, to which the Buyer is a party, by which the Buyer may have rights or by which any of the Purchased Assets may be bound or affected, or give any party with rights thereunder the right to terminate, modify, accelerate or otherwise change the existing rights or obligations of the Buyer thereunder. No authorization, approval or consent, and no registration or filing with any governmental or regulatory official, body or authority is required in connection with the execution, delivery and performance of this Agreement by the Buyer except in each case for any item which would not have a material adverse effect.

4.4 **Ability to Close**. The Buyer has the ability and financial wherewithal to close the transaction contemplated by this Agreement on the Closing Date.

4.5 **Consents**. All consents, authorizations and approvals of any person or entity to or as a result of the consummation of the transaction contemplated hereby, that are necessary or advisable in connection with the operations and business of the Buyer as currently conducted and as proposed to be conducted, or for which the failure to obtain the same might have, individually or in the aggregate, a material adverse effect on the Buyer, have been lawfully and validly obtained by the Buyer. The Seller shall fully cooperate with and assist the Buyer in obtaining any consents necessary or advisable hereunder.

## ARTICLE V
## CONDITIONS PRECEDENT TO CLOSING

5.1    <u>**Conditions Precedent to the Buyer's Obligations**</u>.  All obligations of the Buyer under this Agreement are subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent:

(a)    <u>Compliance with this Agreement</u>.  The Seller shall have performed and complied in all material respects, with all agreements and conditions required by this Agreement to be performed by it prior to or at the Closing.

(b)    <u>No Threatened or Pending Litigation</u>.  Except as set forth on <u>Schedule **Error! Reference source not found.**</u>, on the Closing Date, to the Seller's knowledge, no suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened or be pending before any court or governmental or regulatory official, body or authority in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transaction contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened.

(c)    <u>No Material Damage</u>.  The Purchased Assets have not been damaged or destroyed.

(d)    <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered the Sale Procedures Orders and entered the Sale Order authorizing the transactions contemplated by this Agreement to Buyer in form and substance acceptable to Buyer, and such Order shall be in full force and effect, and no Order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date.

(f)    <u>Certificates</u>. If requested by the Buyer, the Seller shall have furnished the Buyer with such certificates of its officers and others to evidence compliance with the conditions set forth in this <u>Section 5.1</u> as may be reasonably requested by the Buyer.

(g)    <u>Seller Deliveries</u>.  The Seller shall have delivered all items as required by <u>Section 2.2</u> hereof.

(h)    <u>Accuracy of Representations and Warranties</u>.  Except for changes contemplated or permitted by this Agreement, the representations and warranties of the Seller included in this Agreement, and Schedules to this Agreement and in any Exhibit or other document delivered by the Seller pursuant hereto, shall be true and correct in all material respects on and as of the Closing with the same effect as though such representations and warranties are being been made as of such date.  The Buyer in its sole discretion, shall have the right to waive or defer compliance by the Seller at Closing with any representation or warranty.

(i)    <u>Performance of Covenants and Agreements</u>.  Each agreement, covenant or obligation of the Seller to be performed at or before Closing under the terms hereof shall have been duly performed in all material respects or waived by the Buyer in its sole and absolute discretion.

(j)    Consents.  The Seller shall have received all consents, authorizations, approvals, filings, exemptions and waivers from government entities and all material consents, authorizations, approvals, filings, exemptions and waivers from other persons necessary or advisable to permit the Seller to consummate the transaction contemplated hereunder and/or convey the Purchased Assets.

Notwithstanding anything to the contrary in this Section 5.1, the Buyer may waive any condition specified in this Section 5.1 if it executes a writing so stating at or prior to the Closing.

5.2    **Conditions Precedent to the Seller's Obligations**.  All obligations of the Seller under this Agreement are subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent:

(a)    Compliance with this Agreement.  The Buyer shall have performed and complied in all material respects, with all agreements and conditions required by this Agreement to be performed by it prior to or at the Closing.

(b)    Bankruptcy Court Approval. The Bankruptcy Court shall have entered the Sale Procedures Orders and entered the Sale Order authorizing the transactions contemplated by this Agreement to Buyer in form and substance acceptable to Buyer, and such Order shall be in full force and effect, and no Order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date.

(c)    Accuracy of Representations and Warranties.  The representations, warranties and agreements made by the Buyer herein shall be true in all material respects on and as of the Closing Date with the same effect as though such representations and warranties are being made or given on and as of the Closing Date, except as affected by transaction contemplated hereby.

(d)    Performance of Covenants and Agreements.  Each agreement, covenant or obligation of the Buyer to be performed at or before Closing under the terms hereof shall have been duly performed in all material respects or waived by the Seller in its sole discretion.

(e)    Buyer Deliveries.  The Buyer shall have delivered all items as required by Section 2.3 hereof.

Notwithstanding anything to the contrary in this Section 5.2, the Seller may waive any condition specified in this Section 5.2 if it executes a writing so stating at or prior to the Closing.

**ARTICLE VI**
**COVENANTS OF THE PARTIES**

6.1    **Reasonable Efforts and Cooperation; Accomplish Transaction**.  The Seller shall use commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws to consummate the transactions contemplated hereunder, including, without limitation, (i) cooperating with the Buyer in the preparation and filing of all forms, notifications, reports and

information, if any, required or reasonably deemed advisable pursuant to any law, statute, rule or regulation, (ii) using commercially reasonable efforts to obtain all licenses, permits, consents, approvals, authorizations, qualifications and orders of any government entity or other persons, including the Sale Procedures Order and the Sale Order, and (iii) executing and delivering such additional instruments and other documents and taking such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement and the transactions contemplated hereunder.

**ARTICLE VII**
**TERMINATION**

7.1    <u>**Conditions and Effect of Termination.**</u>  This Agreement may be terminated only in accordance with this <u>Section 7.1</u>.  This Agreement may be terminated at any time before the Closing as follows:

(a)    By mutual consent of Seller and Buyer;

(b)    By Seller, upon written notice to Buyer, if Seller has provided Buyer with notice of any material inaccuracy of any representation or warranty contained in <u>Article 4</u>, or of a material failure to perform any pre-Closing covenant or obligation of any Buyer contained in this Agreement and Buyer has failed, within five (5) days after giving of such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Seller of Buyer's ability to remedy such inaccuracy or perform such covenant or obligation; <u>provided</u>, <u>however</u>, that Seller shall not have the right to terminate this Agreement under this <u>Section 7.1(b)</u> if Seller is then in material breach of this Agreement;

(c)    ByBuyer, if the Bankruptcy Court dismisses the Bankruptcy Case, directs the appointment of a chapter 11 trustee or examiner, converts the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code prior to Closing, or fails to grant the Sale Procedures Order or enter the Sale Order;

(d)    By Buyer, upon written notice to Seller, if Buyer have previously provided Seller with notice of any material inaccuracy of any representation or warranty of Seller contained in <u>Article 3</u> or a material failure to perform any pre-Closing covenant of Seller contained in this Agreement or any Ancillary Agreement to which Seller is party, and Seller has failed, within five (5) days after giving of such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Seller's ability to remedy such inaccuracy or perform such covenant; <u>provided</u>, <u>however</u>, that Buyer shall not have the right to terminate this Agreement under this <u>Section 7.1(d)</u> if Buyer is then in material breach of this Agreement;

(e)    By Buyer, if (i) the Bankruptcy Court designates any Person other than Buyer as the successful bidder at the conclusion of the Auction as defined in the Sale Procedures and (ii) such Sale closes;

(f)     By either the Seller or Buyer, if the Bankruptcy Court has entered a final Sale Order approving the sale of all or substantially all of the Purchased Assets to any Person other than Buyer and such sale closes;

(g)     By Seller on any day on or after the Buyer's Termination Date provided that 30 days' written notice is given no earlier than the Buyer's Termination Date(the "**Seller's Termination Date**"), if the Closing shall not have been consummated by such date, unless the Closing has not occurred due to a material failure of the terminating party to perform or observe its covenants or obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date; or

(h)     By Buyer on any day on or after December 31, 2015 (the "**Buyer's Termination Date**" and, with the Seller' Termination Date, the "**Termination Date**"), if the Closing shall not have been consummated by such date, unless the Closing has not occurred due to a material failure of the terminating party to perform or observe its covenants or obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date.

(i)     In the event any Person other than Buyer is either the successful bidder at the conclusion of the Auction as defined in the Sale Procedures Order or the Bankruptcy Court has entered a Sale Order approving the sale of all or substantially all of the Purchased Assets to any Person other than Buyer, Buyer shall be deemed a backup bidder (the "**Backup Bidder**") and this Agreement shall be enforceable until a Closing with a Person other than Buyer shall occur. Accordingly, the Deposit Escrow Agent shall retain the Deposit and not refund to Buyer until a Closing takes place with a Person other than Buyer.

(j)     In the event of termination pursuant to Section 7.1, this Agreement shall become null and void and have no effect, with no liability on the part of Seller, Buyer, or their respective affiliates, with respect to this Agreement.

**ARTICLE XIII**
**POST-CLOSING MATTERS AND COVENANTS**

**Access to Records and Persons**.  The Seller and the Buyer agree that, both before and after the Closing, each will have access, upon prior reasonable written request and at any reasonable time during normal business hours, to the other's officers and employees and to its books and records relating to the Purchased Assets, and each shall have the right to make copies of such books and records; provided, however, that such access shall be solely for the purpose of enabling such party to prepare financial statements and tax returns, and any litigation, claims, collection or arbitration matters and for such other business purposes as the Seller and the Buyer may agree.  Neither party to this Agreement shall destroy or discard any books and records of the Seller for a period of three (3) years after the date of Closing without first providing the other party adequate opportunity to retrieve such books and records.

**ARTICLE IX**
**INDEMNIFICATION**

6.2     **Survival; Indemnification.**  None of the representations and warranties of Seller and of Buyer made in this Agreement shall survive the Closing Date, and all of such representations and warranties shall be extinguished by the Closing.   All covenants and agreements of the parties contained in this Agreement shall survive the Closing, unless otherwise expressly stated therein.

**ARTICLE X**
**MISCELLANEOUS**

6.7     **Recitals**.   The Recitals herein are true and correct and incorporated in this Agreement by reference.

6.8     **Expenses**.  Except as expressly provided herein, the parties hereto shall pay their own expenses, including without limitation their legal fees and expenses, incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby.

6.9     **Contents of Agreement; Parties in Interest**.  This Agreement, the Schedules, all of the agreements attached hereto as Exhibits, and such other documents which may be delivered pursuant to this Agreement, set forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby.  This Agreement shall not be amended or modified except by written instrument duly executed by each of the parties hereto.   Any and all previous agreements and understandings between or among the parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

6.10     **Assignment and Binding Effect**.   All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and assigns of the Seller and the Buyer.

6.11     **Waiver**.  Any term or provision of this Agreement may be waived at any time by the party or parties entitled to the benefit thereof but only by a written instrument duly executed by such party or parties.

6.12     **Notices**.   Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given only if delivered personally or sent by registered or certified mail, postage prepaid, to the address of the parties set forth below or to such other address as the addressee may have specified in a notice duly given to the sender as provided herein.  Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have been given as of the date so delivered, facsimiled or mailed.

If to the Buyer:

HBS Corp.
5800 N.W. 2nd Ave, Unit #114,

Boca Raton, FL 33487
Attn:  Mr. Frederick Schlosser
e-mail fschlosser@solsticestrategies.com

<u>with a copy to:</u>

Genovese, Joblove & Battista, P.A.
100 S.E. 2nd Street, 44th Floor
Miami, FL 33131
Attn:  Glenn D. Moses, Esq.
e-mail:  gmoses@gjb-law.com

<u>If to the Seller</u>:

Nationwide PharmAssist Corp.
1471 S.W. 30th Ave.
Deerfield Beach, FL 33442
Attn:  Mr. Frederick Schlosser
e-mail fschlosser@solsticestrategies.com

<u>with a copy to:</u>

Shraiberg, Ferrara & Landau, P.A.
2385 N.W. Executive Center Dr.
Suite 300
Boca Raton, FL 33431
Attn:  Brad Shraiberg, Esq.
e-mail:  gmoses@sfl-pa.com

6.13   **No Benefit to Others**.   The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto and their successors and assigns, and they shall not be construed as conferring any rights on any other persons.

6.14   **Schedules and Exhibits**.   All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement.  If a document or matter is disclosed in any Exhibit or Schedule of this Agreement, it shall be deemed to be disclosed for all purposes of this Agreement without the necessity of specific repetition or cross-reference.

6.15   **Severability**.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

6.16    **Cooperation**.  Each party to this Agreement shall cooperate and take such action as may be reasonably requested by any other party in order to carry out the provisions and purposes of this Agreement.

6.17    **Counterparts**.  This Agreement may be executed in any number of counterparts, any party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  This Agreement shall become binding when one or more counterparts taken together shall been executed and delivered by the parties.  It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

6.18    **Governing Law**.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Florida (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

6.19    **Delivery by Facsimile**.  This Agreement and any signed agreement or instrument entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such other agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of facsimile machine as a defense to the formation of a contract and each such party forever waives any such defense.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the Effective Date.

**BUYER:**

**HBS CORP.**

By: _Frederick Schlosser_
Name: _Frederick Schlosser_
Title: _President_

**SELLER:**

**NATIONWIDE PHARMASSIST CORP.**

By: _Frederick Schlosser_
Title~~Name:~~ _Chief Restructuring Officer_
NAME ~~Title:~~ _Frederick Schlosser_

**Schedule 1.1**
**Purchased Assets**

*NOTE: The listing of any asset on this schedule is for identification purposes and shall not serve to limit the meaning of the provisions of* <u>*Section 1.1*</u> *or any other provision of this Agreement.*

**Machinery, Tools, Equipment, Furnishings, Computers and Similar Assets**

| | |
|---|---|
| JSI "Lancelot Series" wood 72"x36" table desks. | 2 |
| JSI "Vision Wood Series" 72"x24" full storage credenza. | 2 |
| JSI "Vision Laminate Series" 6'x8'x8' Wood curved U-shape BBF & FF pedestal. | 2 |
| Lancelot 96"x48" wood rectangular conference room table. Includes two new laminate cube/drum bases to match top. | 1 |
| Pre-owned 48"x48" Visual Aid board with new laminate front to match conference room table. Finish: Medium Cherry | 1 |
| Halcon "Mitre Series" 7'x9'x14' Executive U-shape office with a bow front desk and lateral file credenza's. Finish: Dark Vintage Cherry | 1 |
| Cherryman "Jade Series" 6'x6-1/2' L-shape reception desk with a BBF & FF pedestal and glass transaction top. | 1 |
| New OTG11633B high back executive chair. | 1 |
| Used AIS Element mesh back executive chair. | 1 |
| Global "Alero Series" 1961-3 high back conference room chair with mesh back. Fabric: Oxygen OX-05 Navy | 1 2 |
| Executive L-Shaped Desk | 1 |
| Small conference table | 1 |

| | |
|---|---|
| White Boards | 5 |
| Refrigerator | 1 |
| Large Copier Machine | 1 |
| Computer Workstations and Monitors | 3 |
| IBM "Big" Network Servers | 2 |
| Server Rack | 1 |
| Personal Printer/Copier | 1 |
| Whiteboards | 5 |
| HP ProCurve Networking device | 1 |
| AdTran Networking device | 1 |
| WatchGuard XTM 5 Series Networking device | 1 |
| Cisco 2800 Data Device | 1 |
| Netbotz Security Camera | 1 |
| Overtrue ISG-24-Rev B Networks device | 1 |
| Cyber Power 1350 AVR | 1 |
| D-Link wireless device | 1 |

**Part B – <u>Contracts</u>**

- AmerisourceBergen: Pharmacy Packaging and Services Agreement for Nationwide PharmAssist for Prescription Fulfillment Services October 2012 (executed 10/5/12)

- Pharmacy Healthcare Solutions: Master Pharmacy Services Agreement for Nationwide PharmAssist for Pharmacy Services October 2012 (executed 10/5/12)

- Lease Agreement by and between Facilities Investments, LLC and Nationwide PharmAssist of Florida, Inc. dated December 23, 2013.

## Part C – <u>Patents, Trademarks, Domain Names and Other Intellectual Property</u>

- No registered patents or trademarks –

- Seller will deliver business process, schematics, design and architecture, specifications for implementation and development

- Seller transfers all rights to the name Nationwide PharmAssist

## Part D – <u>Other Intangible Property</u>

- Branding document and marketing strategy
- Website architecture
- Creation of 3 white papers
- Social media network build out
- Banner ads
- PPC ads
- Creative print ads
- Social Media ads
- Leave behind brochure
- Commercial script
- Collateral fulfillment insert
- Dispenser box design
- PR Schedule

**Schedule** Error! Reference source not found.
### Litigation

1.  Payment of fine to the Securities and Exchange Commission with respect to litigation relating to Nationwide PharmAssist Corp. in the amount of $20,000.


2.  Litigation with shareholders of the Seller relating to Nationwide PharmAssist Corp. and Nationwide PharmAssist Corp. of Florida.

**Exhibit A**
**Form of Bill of Sale**

This Bill of Sale and Assignment (this "**Bill of Sale**") is made as of October __, 2015 (the "**Effective Date**") from Nationwide PharmAssist Corp., a Florida corporation (the "**Seller**"), to HBS Corp., a Delaware corporation (the "**Buyer**").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller hereby assigns and transfers to the Buyer all of the Seller's right, title and interest in and to all trade fixtures, and equipment located at the business of the Seller at 1011 S.W. 30th Ave., Deerfield Beach, FL 33442 (the "**Business**"), and other tangible property owned by the Seller that is located at and used in connection with the operation of the Business, and shall specifically include all furniture, furnishings and fixtures (collectively, the "**Property**").

Except for the Assumed Liabilities (as defined in the Asset Purchase Agreement, dated as of October __, 2015, by and between the Buyer and the Seller) which the Buyer expressly agrees to assume, the Seller warrants that the Property is free from all liens and encumbrances arising by, through or under the Seller, that the Seller is the lawful owner of the Property, that the Seller has good right to sell the Property and that the Seller will warrant and defend the sale of said Property unto the Buyer against the lawful claims and demands of all persons whomsoever.

**THIS BILL OF SALE SHALL BE INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF FLORIDA**.

IN WITNESS WHEREOF, this Bill of Sale is dated and delivered on the Effective Date.


**SELLER:**

**NATIONWIDE PHARMASSIST CORP.**



_____
By:
Title:   President

**Exhibit B**
**Form of Assignment and Assumption Agreement**

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:

NATIONWIDE PHARMASSIST CORP.,           Case No. 15-27804-RBR

      Debtor.                              Chapter 11

_____/

**NOTICE OF OPPORTUNITY TO SUBMIT BIDS
FOR THE ASSETS OF NATIONWIDE PHARMASSIST CORP.**

**PLEASE TAKE NOTICE that:**

1.      On October [_____], 2015, the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division (the "**Bankruptcy Court**"), entered an Order: (a) authorizing and scheduling the sale of substantially all of the assets of Debtor in Possession, Nationwide PharmAssist Corp. (the "**Debtor**") free and clear of all liens, claims, and encumbrances; (b) approving the breakup fee to HBS Corp. ("**HBS**") as the stalking horse bidder; (c) authorizing the Debtor to enter into the Asset Purchase Agreement with HBS; (d) approving bidding procedures; (e) approving this notice of sale; (f) scheduling an auction to accept higher and better bids; and (g) scheduling a hearing to approve the sale arising out of the auction, pursuant to 11 U.S.C. § 363, Rules 2002, 6004(a) and 9014 of the Federal Rules of Bankruptcy Procedure and Local Rule 6004-1  (the "**Bid Procedures Order**").[1]

2.      Pursuant to the Bid Procedures Order[2], the Debtor has received authorization from the Bankruptcy Court to employ the procedures set forth herein for consideration of competitive

---

[1]      A copy of the Bid Procedures Order may be obtained: (a) in person, during regular business hours, from the Office of the Clerk of the Bankruptcy Court, 299 E. Broward Blvd., Fort Lauderdale, FL 33301; (b) downloaded from the Bankruptcy Court's electronic docket (CM/ECF); or (c) upon written request to Debtor's counsel listed below.

[2]      In the event of any discrepancy between the terms of this Notice and the terms of the Bid Procedures Order, the Bid Procedures Order shall govern and control.

bids for purchase of substantially all of the assets of the Debtor (the "**Assets**"); establishing deadlines and certain criteria for submitting Qualified Bids; the selection of HBS (the "**Purchaser**") as Stalking Horse Bidder; approval of bidding protections and bidding requirements; and the scheduling of the auction referenced above (the "**Auction**").

3.       The Debtor shall provide by e-mail; facsimile and/or U.S. Mail written notice of the Auction, the bidding procedures, and the Sale Hearing within one (1) business day from the entry of order approving the Sale Procedure Motion to: (a) those persons who in any way contacted Debtor or any of its representatives regarding the sale of the Assets; (b) those persons who the Debtor has reason to believe may possess an interest in purchasing the Assets; (c) the U.S. Trustee; (d) counsel to HBS; (e) the Internal Revenue Service; (f) parties to executory contacts and leases with the Debtor; (g) all other parties who have filed a notice of appearance; and (h) all other creditors.

## STALKING HORSE BID

4.       The Debtor seeks to use the APA as the stalking horse bid (the "**Stalking Horse Bid**"), making HBS the "**Stalking Horse Bidder.**"  **As the Chief Restructuring Officer of the Debtor, Frederick Schlosser is an insider of the Debtor, as defined in § 101(31) of the Bankruptcy Code, and owns a 100% equity stake in HBS.**

5.       The Purchaser proposes to pay $100,000.00 in exchange for the Assets, as set foth in § 1.2 of the APA.

6.       Subject to this Court's approval, HBS shall be entitled to a breakup fee of its actual expenses incurred relating to the Sale, to a maximum dollar amount of $15,000.00 (the "**Breakup Fee**"), which shall constitute an allowed administrative expense claim.  The Breakup Fee is calculated, in part, based on the total enterprise value of this transaction.  The Breakup Fee

shall be paid at closing from the cash consideration of the purchase price in the event that HBS is not the successful bidder.

**ELIGIBILITY TO MAKE BIDS**

7.     Any person who wishes to participate in a competitive bidding process for the purchase of the Assets (the "**Auction**"), must satisfy the requirements set forth below to become a Qualified Bidder.  Neither the Debtor nor the Court shall consider bids that are not proposed by a Qualified Bidder.

**BIDDING PROCESS**

8.     A person may be qualified to participate in the Auction if by the bid deadline of **November 19, 2015** (the "**Bid Deadline**"), the following are provided:

   a.     A deposit of $15,000.00 (the "Deposit") payable by bank cashier's check or wire transfer into the non-interest bearing escrow account of Shraiberg, Ferrara & Landau, P.A. along with the SSN or EIN of the bidding person or entity;

   b.     An executed asset purchase agreement and a redline version showing changes from the APA attached hereto as Exhibit "A".  Any competing bid must not contain any contingencies to the validity, effectiveness and/or binding nature of the offer, including without limitation, contingencies for financing, due diligence or inspection;

   c.     The amount the person is willing to pay for the Assets, but in no event shall this amount be less than $125,000.00 (the "Initial Bid"), which shall be paid in cash at closing; and

   d.     Reasonable financial information from which the Debtor can assess the wherewithal of the bidder to close on the Sale in the event that the bidder is the Successful Bidder.

(collectively, the "**Qualifying Bid Packet**").  The Qualifying Bid Packet must be delivered with the items described above no later than **5:00 p.m. E.S.T. on November 19, 2015** to:

   a.     Bradley Shraiberg, Esq., Shraiberg, Ferrara & Landau, P.A., Counsel for Debtor, 2385 NW Executive Center Dr., Suite 300, Boca Raton, Florida 33431, Telephone (561) 443-0800, Facsimile No. (561) 998-0047; and

      b.      Glenn Moses, Esq., Genovese Joblove & Battista, P.A., Counsel for the Purchaser, 100 Southeast Second Street, 44th Floor, Miami, Florida 33131, Telephone (305) 349-2300, Facsimile No. (305) 349-2310.

The bidder's Qualifying Bid Packet must include the bidder's address, telephone and facsimile numbers where the bidder may be contacted.

9.      Prior to the Auction, the Debtor shall evaluate each Qualifying Bid Packet submitted in accordance with paragraph 8 and may then identify a person, persons, entity or entities from among those who submitted a Qualifying Bid Packet and deem those person(s) **"Qualified Bidders"** as well as their offer to purchase the Assets.  By participating in the Auction, each Qualified Bidder consents to its bid being designated as a back-up bid.

10.      A Qualified Bid will be valued based upon the following factors: (a) the purported amount of the Qualified Bid, including any benefit to the Debtor's bankruptcy estate from any assumption of liabilities of the Debtor; (b) the ability to close the proposed sale transaction without delay and within the time frames contemplated by the APA; and (c) any other factors the Debtor may deem relevant.

11.      The Debtor shall file and serve upon all interested parties entitled to receive notice, including the holders of qualified bids (the **"Qualified Bids"**), fully executed copies of the Qualified Bids to be considered at the Auction no later than **November 20, 2015** (the **"Qualified Bid Summary"**).  This requirement is waived in the event that there are no Qualified Bids.  The Debtor shall notify all Qualified Bidders, no later than **5:00 P.M. E.S.T. on November 20, 2015**, that they may participate in the Auction.

## <u>THE AUCTION</u>

12.      In the event that there are one or more Qualified Bidders on or before the Bid Deadline, then the Auction will take place at the offices of counsel for the Debtor, Shraiberg,

Ferrara & Landau, P.A., which are located at **2385 N.W. Executive Center Drive, Suite 300, Boca Raton, Florida 33431 on November 23, 2015** or as otherwise determined by the Court

13.    The Auction shall be conducted by the Court and shall be a forum in which the Qualified Bidders may make competing bids to purchase the Assets, with an initial over-bid of $50,000 and then minimum bid increments of $25,000.00 or increments as otherwise decided by the Court.  The Auction shall conclude when the Court receives what is determined by the Debtor to be the highest and best offer to purchase the Assets (the "**Successful Bid**").  The Court may also identify an acceptable Back-Up Bid.

14.    Except as otherwise stated herein, each Deposit shall be maintained in a **non-interest** bearing account and subject to the jurisdiction of this Court.  Within five (5) business days from the entry of an order approving the Sale, the Debtor shall return all Deposits to all Qualified Bidders except the Successful Bidder or the person who submitted the Back-Up Bid (the "**Back-Up Bidder**"), whose Deposit shall be applied by the Debtor against the purchase price at the closing.  In the event that the Successful Bidder closes the Sale, the Debtor shall return the Back-Up Bidder's Deposit within five (5) business days from the closing.  In the event the Back-Up Bidder closes on the purchase of the Assets, its Deposit shall be applied by the Debtor against the purchase price.

15.    All Qualified Bidders and HBS shall be deemed to have consented to the core jurisdiction of this Court and to have waived any right to a jury trial in connection with any disputes relating to the Auction and/or the Sale.  All asset purchase agreements shall be governed by and construed in accordance with the laws of the State of Florida.  All Qualified Bidders and HBS shall be bound by their bids until conclusion of the Auction.  If the Successful Bidder is unable or unwilling to close the Sale, the Successful Bidder shall forfeit its Deposit to the Debtor

and the Debtor shall close the Sale with the Back-Up Bidder, without further notice or hearing, who shall then be obligated to close the Sale on the terms of the Back-Up Bid and the corresponding Bidder's asset purchase agreement no later than five (5) days thereafter.  If the Back-Up Bidder, if any, is unable or unwilling to close the Sale in the time permitted, the Back-Up Bidder shall forfeit its Deposit to the Debtor.

16.     In the event the Debtor fails to receive a Qualified Bid, the Debtor shall cancel the Auction and seek final approval of the sale to HBS at the final hearing scheduled by the Court as set forth below.

## SUBMISSION OF INITIAL BIDS

17.     The Qualifying Bid Packet and any related materials must: (a) be in writing; (b) contain all materials set forth in Paragraph 8 above; and (c) be submitted to the following parties, so that it is received no later than **5:00 p.m. E.S.T. on November 19, 2015**, as follows:

(a)    Bradley Shraiberg, Esq., Shraiberg, Ferrara & Landau, P.A., Counsel for Debtor, 2385 NW Executive Center Dr., Suite 300, Boca Raton, Florida 33431, Telephone (561) 443-0800, Facsimile No. (561) 998-0047;

(b)    D. Brett Marks, Esq., Akerman Senterfitt, Counsel for HBS, 350 E. Las Olas Blvd., Suite 1600, Fort Lauderdale, Florida 33301, Telephone (954) 463-2700, Facsimile No. (954) 463-2224;

(c)    Lisa Schiller, Esq., Rice, Pugatch Robinson and Schiller, P.A., Counsel for Regions Bank, 101 N.E. 3rd Ave., Suite 1800, Fort Lauderdale, Florida 33301, Telephone (954) 462-8000, Facsimile No. (954) 462-4300; and

(d)    Glenn Moses, Esq., Genovese Joblove & Battista, P.A., Counsel for the Creditors' Committee, 100 Southeast Second Street, 44th Floor, Miami, Florida 33131, Telephone (305) 349-2300, Facsimile No. (305) 349-2310.

**PLEASE TAKE FURTHER NOTICE THAT** any inquiries regarding the foregoing should be directed to Debtor's counsel listed below.

(Remainder of page intentionally left blank.)

**SHRAIBERG, FERRARA & LANDAU, P.A.**
Attorney for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047

By:   /s/ Bradley S. Shraiberg
       Bradley S. Shraiberg
       Florida Bar. No. 121622
       bshraiberg@sfl-pa.com