**EXHIBIT "A"**

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

Case No: 06-2014-003891-XXXXCE

NORMA JENNINGS, an individual;
PATRICE COLES, an individual;
DEBRA LEUE, an individual;
LESLIE EMERSON, an individual;
NORMA MOBLEY, an individual; and
BRIAN BULFER, an individual,

       Plaintiffs,

v.

NATIONWIDE PHARMASSIST CORP., a Florida corporation;
MTM HEALTHCARE SOLUTIONS, INC., a Florida corporation;
STEPHEN F. MOLINARI, an individual;
PETER MOLINARI, an individual;
FREDERICK SCHLOSSER, an individual;
WARREN K. TROWBRIDGE, an individual;
MARY JO THIBOULT, an individual;
VAR CONSULTANTS, INC., a Florida corporation;
and VIJAY RAMSARRAN, an individual,

       Defendants.

_____/

## AMENDED COMPLAINT

Plaintiffs, NORMA JENNINGS, an individual (hereinafter "JENNINGS"); PATRICE

COLES, an individual ("COLES"); DEBRA LEUE, an individual ("LEUE"); LESLIE EMERSON,

an individual, ("EMERSON"); NORMA MOBLEY, an individual ("MOBLEY"); and BRIAN

BULFER, an individual ("BULFER"), by and through undersigned counsel, hereby sue Defendants,

NATIONWIDE PHARMASSIST CORP., a Florida corporation; MTM HEALTHCARE

SOLUTIONS, INC., a Florida corporation; STEPHEN F. MOLINARI, an individual ("STEPHEN

F. MOLINARI"); PETER MOLINARI, an individual ("PETER MOLINARI"); FREDERICK

SCHLOSSER, an individual ("SCHLOSSER"); WARREN K. TROWBRIDGE, an individual

("TROWBRIDGE"); MARY JO THIBOULT, an individual ("THIBOULT"); VAR CONSULTANTS, INC., a Florida corporation; and VIJAY RAMSARRAN, an individual ("RAMSARRAN") (collectively "Defendants"); for damages. In support thereof, Plaintiffs state as follows:

## PRELIMINARY STATEMENT

1.     This action seeks to compensate Plaintiffs for the fraudulent investment scheme perpetrated upon them by Defendants under the guise of raising capital to fund a start-up business whose stated purpose was to serve patients with acute medical needs and eliminate the dangerous practice of accidental overdosing of prescription medication.

2.     Contrary to the seemingly-sound, if not somewhat altruistic, stated purpose of the new business venture; Defendants' true goal in raising funds from investors was to line their own pockets and live extravagant lives with the funding provided by the unsuspecting investors, including Plaintiffs.

3.     Whereas Plaintiffs thought their investments would bring them financial, if not a moderate spiritual, reward; their investments actually brought them financial devastation as their retirement accounts and life savings accounts were plundered by greedy scam artists who preyed upon Plaintiffs in the name of gross avarice.

4.     Defendants are liable because:

    (a)     The sales agent who procured Plaintiffs' investments was not registered to sell securities;

    (b)     The securities sold to Plaintiffs were not properly registered for private sale;

    (c)     The sales materials and offering documents used to procure Plaintiffs' investments contained multiple false or misrepresented statements of fact on which Plaintiffs relied in deciding to invest in NATIONWIDE;

    (d)     The sales materials and offering documents used to procure Plaintiffs' investments omitted several highly material facts that would have swayed Plaintiffs to not invest in NATIONWIDE;

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

(e) NATIONWIDE's Chief Executive Officer paid illegal kickbacks to undisclosed investors, one of whom ultimately turned out to be an undercover FBI agent; and

(f) NATIONWIDE improperly transferred its assets to a new enterprise (MTM HEALTHCARE) in an effort to cheat those who initially invested in NATIONWIDE, including Plaintiffs.

## GENERAL ALLEGATIONS

### THE PARTIES

#### Plaintiffs

5.    Plaintiff JENNINGS is an individual domiciled in Plantation, Florida; is a citizen of the State of Florida; and is *sui juris*.

6.    Plaintiff COLES is an individual domiciled in Pembroke Pines, Florida; is a citizen of the State of Florida; and is *sui juris*.

7.    Plaintiff LEUE is an individual domiciled in Boca Raton, Florida; is a citizen of the State of Florida; and is *sui juris*.

8.    Plaintiffs EMERSON is an individual domiciled in Spring, Texas; is a citizen of the State of Texas; and is *sui juris*.

9.    Plaintiff MOBLEY is an individual domiciled in Macon, Georgia; is a citizen of the State of Georgia; and is *sui juris*.

10.    Plaintiff BULFER is an individual domiciled in Miami Shores, Florida; is a citizen of the State of Florida; and is *sui juris*.

#### The Corporate Defendants

11.    Defendant NATIONWIDE PHARMASSIST CORP. ("NATIONWIDE") is a Florida corporation with its principal place of business in Deerfield Beach, Florida.  At all times material hereto, NATIONWIDE solicited and accepted investors located in this jurisdiction, including Plaintiffs.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

12.     Defendant MTM HEALTHCARE SOLUTIONS, INC. ("MTM HEALTHCARE") is a Florida corporation with its principal place of business in Deerfield Beach, Florida.  Upon information and belief, MTM HEALTHCARE -- which was organized and registered with the State of Florida as a for-profit corporation in December 2013 -- either owns, or is in the process of purchasing, substantially all of the assets of NATIONWIDE as well as all of NATIONWIDE's business activities, which MTM HEALTHCARE intends to extend into the future.  Upon further information and belief, MTM HEALTHCARE either owns, or is in the process of purchasing, all of NATIONWIDE's liabilities, including the contracts at issue in this lawsuit.

13.     Defendant SCHLOSSER was, for a large portion of the time period relevant to this dispute, NATIONWIDE'S Chief Financial Officer -- having only removed himself from the position after this litigation commenced.  During that same time period and continuing through the present day, SCHLOSSER has served as MTM HEALTHCARE's Chief Financial Officer.

14.     According to professional biographies prepared and published by both STEPHEN F. MOLINARI and SCHLOSSER which are intended for public consumption, each of them manages a "pharmacy specializing in medication management"; and they each identically describe their company's services and corporate function as follows:

> We package all medications together in an easy to use packet that is labeled by name, date, time, and dose via a high-speed automated packaging machine that dispenses them sequentially in a perforated strip. All the patient or caregiver does is read the date and time, rip off the packet, and all the mediations are there. There's no more juggling pill bottles or filling little boxes with medications for days or weeks, which all are time-consuming and a source of many medication errors. Providing the right drugs, in the right quantities at the right time, with virtually 100% accuracy.

15.     As of the date of filing this pleading, NATIONWIDE and MTM HEALTHCARE are essentially one-and-the-same business, regardless of the name under which the company(ies)'s operations are conducted.  The two companies are dominated by the same individuals; and both

- 4 -

companies utilize the same corporate decision-makers, the same resources, the same business connections, and the same business model. NATIONWIDE and MTM HEALTHCARE both operate their pharmacies -- which STEPHEN F. MOLINARI publicly touts as something "no one else can provide" -- out of the same office suite in Deerfield Beach, FL.

16.     Upon information and belief, MTM HEALTHCARE was formed as a corporate fiction for the improper purpose of assuming NATIONWIDE's business operations without justly satisfying all of NATIONWIDE's debts and liabilities.

17.     Defendant VAR CONSULTANTS, INC. is a dissolved Florida corporation formed in 2005 which has continued to provide wealth and insurance planning services to clients (including Plaintiffs) at its principal place of business in Boca Raton, Florida even after being administratively dissolved by the State of Florida in 2011. At all times material hereto, VAR CONSULTANTS, INC. operated through its President, Director, and founder RAMSARRAN and served as RAMSARRAN's corporate alter ego, notwithstanding that it was not legally authorized to conduct business in the State of Florida following the company's administrative dissolution in September 2011.

18.     Upon information and belief, VAR CONSULTANTS, INC. is wholly owned, operated, and entirely dominated by RAMSARRAN, who continues to operate the business through the present day in an attempt to shield himself from personal liability for his wrongful conduct. The company does not exist separate or apart from RAMSARRAN and is merely a pass-through entity from which RAMSARRAN takes all profits.

19.     When Plaintiffs engaged in the investments detailed herein, Plaintiffs were unaware of the company's September 2011 dissolution, as RAMSARRAN withheld that material fact from them.

20.     Because they are essentially inseparable, VAR CONSULTANTS, INC. and RAMSARRAN are collectively referred to herein as "the RAMSARRAN Defendants."

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

### The Individual Defendants

21.     Defendant STEPHEN F. MOLINARI is an individual domiciled in Boca Raton, Florida; is a citizen of the State of Florida; and is *sui juris*. At times material hereto, STEPHEN F. MOLINARI was the Chairman and Chief Executive Officer of NATIONWIDE.

22.     Defendant TROWBRIDGE is an individual domiciled in Stuart, Florida; is a citizen of the State of Florida; and is *sui juris*. At times material hereto, TROWBRIDGE was the President and Chief Operating Officer of NATIONWIDE.

23.     Defendant THIBOULT is an individual domiciled in Palm City, Florida; is a citizen of the State of Florida; and is *sui juris*. At times material hereto, THIBOULT was the Chief Compliance Officer of NATIONWIDE.

24.     Defendant SCHLOSSER is an individual domiciled in Stamford, Connecticut; is a citizen of the State of Connecticut; and is *sui juris*. At times material hereto, SCHLOSSER was the Chief Financial Officer and Chief Operating Officer of NATIONWIDE.

25.     Defendant PETER MOLINARI is an individual domiciled in Lighthouse Point, Florida; is a citizen of the State of Florida; and is *sui juris*. At times material hereto, PETER MOLINARI was the President and Secretary of all of the NATIONWIDE entities. In addition, he currently holds the title of Chief Social Media Officer of NATIONWIDE.

26.     Defendant RAMSARRAN is an individual domiciled in Boca Raton, FL; is a citizen of the State of Florida; and is *sui juris*. At all times material hereto, RAMSARRAN was a self-employed investment advisor who served as a "finder" for NATIONWIDE and steered Plaintiffs into their investments with Defendants.

### Other Liable Persons/Entities

27.     In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiffs, but respecting whom Plaintiffs currently lack specific

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

facts to permit them to name such person or persons as a party defendant. By not naming such persons or entities at this time, Plaintiffs are not waiving their right to amend this pleading to add such parties, should the facts warrant adding such parties.

## JURISDICTION AND VENUE

28.     This is an action for damages in excess of Fifteen Thousand Dollars ($15,000.00), exclusive of interest, costs and attorneys' fees; and in all respects meets or exceeds the jurisdictional requirements of this Court pursuant to Florida Statutes § 26.012.

29.     This Court has personal jurisdiction over Defendants because: (a) the corporate defendants are business entities operating, present, and/or doing business within this jurisdiction, (b) at least one of the individual defendants resides within this jurisdiction, and (c) Defendants' contractual breaches occurred within this jurisdiction.

30.     Venue of this action is proper in this Court pursuant to Florida Statutes §§ 47.011, *et seq.*, as the causes of action alleged herein arose in Broward County, Florida.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### The Nationwide PharmAssist Publicly-Touted Business Model

31.     In August 2011, NATIONWIDE was organized and registered with the State of Florida as a for-profit corporation.

32.     According to its own internal paperwork and marketing materials, NATIONWIDE was established as a brick-and-mortar, retail pharmacy that provides prescription and over-the-counter medications as well as a full range of pharmaceutical supplies and related products that are delivered to customers, primarily by mail.

33.     NATIONWIDE prided itself, and touted itself, as being able to serve three primary, purportedly underserved markets in America's pharmaceutical dispensing marketplace: (1) patients with acute medical needs who often take multiple doses of multiple medications at many specific times

- 7 -

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

throughout the day, (2) caregivers who administer medications to patients, such as the elderly, the disabled, or the severely ill, who cannot reliably do this by themselves, and (3) professional caregivers who administer medications to patients in Extended Care Facilities or in the home healthcare environment.

34.     By packaging its clients' medications in such a way that the clients would be less prone to making serious mistakes when taking multiple medications (in the case of patients themselves) or administering medications to the patients they serve (in the case of caregivers), NATIONWIDE would satisfy a highly-valued consumer demand and would position itself for potential business growth and profitability.

35.     Despite its mission statement and impressive-sounding marketing materials, NATIONWIDE's true business model was nothing more than a paper-driven fraud whose real goal was to steal money from unsuspecting investors and afford NATIONWIDE's principals luxurious lifestyles without actually conducting the business touted in the company's written materials.

36.     Upon information and belief, NATIONWIDE did not even possess the physical equipment or many of the tangible assets touted in the offering documents NATIONWIDE used to procure Plaintiffs' investments -- equipment and tangible assets that were necessary for NATIONWIDE to actually operate the business on which it sold Plaintiffs to secure their funds.

### The Nationwide PharmAssist Management Team

37.     Leading the charge for NATIONWIDE was a team of executives that promoted itself to investors as having a proven track record of operating and growing direct-to-consumer pharmacy and Extended Care Facility businesses.  According to NATIONWIDE, each team member possessed the vision, integrity, industry knowledge, leadership skills and decision-making confidence needed to successfully compete and thrive in the ever-changing pharmaceutical services marketplace.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

38.     Notwithstanding NATIONWIDE's self-congratulatory promotion of its executive team, the executives managing NATIONWIDE's operations were actually a collection of industry ne'er-do-wells who had been the targets of numerous civil and regulatory lawsuits accusing them of repeated acts of fraud, dishonesty, and violations of multiple state and federal laws relating to investments.

### Stephen F. Molinari

39.     At the head of the NATIONWIDE team was STEPHEN F. MOLINARI, NATIONWIDE's co-founder, Chairman, and Chief Executive Officer. STEPHEN F. MOLINARI was touted by NATIONWIDE as someone who had a history of being instrumental in raising substantial amounts of capital, both through debt and equity, to further the business plans of many of his clients.

40.     Unbeknownst to Plaintiffs, STEPHEN F. MOLINARI utilized illegal means to raise capital, including his efforts to raise funds for NATIONWIDE's purportedly planned public offering.

41.     According to a lawsuit recently filed by the U.S. Securities and Exchange Commission:

- STEPHEN F. MOLINARI engaged in a scheme involving the payment of an undisclosed kickback to a pension fund manager or hedge fund principal in exchange for the fund's purchase of restricted shares of stock in NATIONWIDE.

- STEPHEN F. MOLINARI attempted to conceal the kickback by making it appear as if the kickback were payment of an invoice for services purportedly rendered which, in fact, were never rendered.

- The pension fund manager and hedge fund principal were actually undercover operatives working for the U.S. Federal Bureau of Investigation.

42.     As a result of his illegal activity as it directly relates to NATIONWIDE, STEPHEN F. MOLINARI was criminally sentenced in September 2013 to serve six (6) months in a federal

penitentiary followed by three years of supervised release and has been ordered to make restitution to the United States government in an amount totaling $40,000.00.

43.     In addition to his recent incarceration, STEPHEN F. MOLINARI has an extensive history of running afoul of securities laws and securities industry regulations. Prior to his illegal activity with NATIONWIDE, STEPHEN F. MOLINARI had been charged in different securities arbitration proceedings for acting as a general securities representative without the necessary licensure, intentionally or recklessly misrepresenting and failing to disclose material facts in connection with securities transactions, engaging in unauthorized private securities transactions for compensation, and intentionally defrauding a customer with regard to the sale of securities.

44.     None of the above-referenced, highly relevant facts relating to STEPHEN F. MOLINARI's history were disclosed in NATIONWIDE's offering documents.

### Peter Molinari

45.     PETER MOLINARI co-founded NATIONWIDE along with his father, STEPHEN F. MOLINARI.

46.     As noted above, PETER MOLINARI holds the titles of President and Secretary of NATIONWIDE and MTM HEALTHCARE.

47.     In addition, PETER MOLINARI holds the title of Chief Social Media Officer of NATIONWIDE, a role in which he is responsible for creating the company's social media content and controlling the factual representations made by the company to the consuming public through social media.

48.     While NATIONWIDE promoted to investors the company's executives' long history in the medical services industry, those statements to investors concealed all of the crimes and misdeeds for which NATIONWIDE's executives were responsible.

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

### Schlosser

49.     SCHLOSSER, the Chief Financial Officer of NATIONWIDE and of MTM HEALTHCARE, is a Certified Public Accountant licensed in the State of New York.

50.     Having worked side-by-side with STEPHEN F. MOLINARI since NATIONWIDE was founded, SCHLOSSER has been intimately familiar with the inner-workings of the company and has a detailed knowledge of its finances.

51.     In fact, after STEPHEN F. MOLINARI was arrested, SCHLOSSER assumed many of STEPHEN F. MOLINARI ostensible corporate duties at NATIONWIDE and solicited additional investor funds.

### Trowbridge

52.     Serving alongside STEPHEN F. MOLINARI was TROWBRIDGE. Commencing in or about August 2012, TROWBRIDGE served as NATIONWIDE's President and Chief Operating Officer and was responsible for, *inter alia*: structuring and managing the operational side of NATIONWIDE's business, securing a leased property at which NATIONWIDE could conduct its business, securing the necessary approvals and licenses required for NATIONWIDE to operate its business, and raising funds from investors to finance NATIONWIDE's operations.

53.     Prior to his work at NATIONWIDE, TROWBRIDGE served as an executive with Support Plus Medical, Inc. and Call Center Connections. He also served as:

- President and Director of Liberty Medical Supply, Inc. ("Liberty Medical"), a wholly-owned subsidiary of PolyMedica Corp.;

- Vice President of PolyMedica Corp. itself; and

- President of U.S. Operations of Transworld Healthcare ("Transworld")

among other positions in his professional career.

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

54.     Much like STEPHEN F. MOLINARI, TROWBRIDGE's professional career was checkered with numerous allegations of wrongdoing and fraud.

55.     In 2001, TROWBRIDGE was investigated for Medicare fraud in connection with his executive position at Liberty Medical -- a case ultimately settled, along with a related *qui tam* action -- for $35 Million.

56.     In addition, during the time TROWBRIDGE served as Transworld's President of U.S. Operations, Transworld paid $10 Million to settle a False Claims Act case involving Medicare fraud.

57.     Furthermore, TROWBRIDGE was sued in 2008 for allegedly surreptitiously establishing Support Plus while still employed as CEO and Vice President of Operations of ActivStyle, Inc., a competing durable medical equipment (DME) supplier.  That case was resolved for an undisclosed sum.

58.     None of the above-referenced, highly relevant facts relating to TROWBRIDGE's history were disclosed in NATIONWIDE's offering documents.

59.     Upon information and belief, TROWBRIDGE resigned from his executive officer position with NATIONWIDE, and left NATIONWIDE, in or about November 2012.

### Thiboult

60.     Also serving in a key management role at NATIONWIDE was THIBOULT, who had worked with TROWBRIDGE at Liberty Medical Supply.

61.     Commencing in or about August 2012, THIBOULT served as NATIONWIDE's Chief Compliance Officer and, upon information and belief, worked closely with TROWBRIDGE in, *inter alia*: structuring and managing the operational side of NATIONWIDE's business, securing the necessary approvals and licenses required for NATIONWIDE to operate its business, and raising funds from investors to finance NATIONWIDE's operations.

- 12 -

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

62.    During their tenure working together at Liberty Medical Supply -- a time when THIBOULT served as Senior Director of Regulatory Affairs and Corporate Compliance Officer at Liberty Medical -- the company agreed to the aforementioned $35 Million settlement of Medicare fraud and *qui tam* actions.

63.    Likewise, THIBOULT sat alongside TROWBRIDGE when the pair was sued for establishing Support Plus as a direct competitor to, and in violation of their obligation of loyalty to, ActivStyle, Inc.

64.    None of the above-referenced, highly relevant facts relating to THIBOULT's history were disclosed in NATIONWIDE's offering documents.

65.    Upon information and belief, THIBOULT resigned from her executive officer position with NATIONWIDE, and left NATIONWIDE, in or about November 2012.

**Ramsarran**

66.    Though not a NATIONWIDE executive, RAMSARRAN was equally important in inducing Plaintiffs to invest their funds with NATIONWIDE.

67.    RAMSARRAN had a relationship with members of NATIONWIDE's management team -- primarily with STEPHEN F. MOLINARI -- that pre-dated the events described herein, which is how he was aware of NATIONWIDE's search for investors in its business operations. RAMSARRAN and STEPHEN F. MOLINARI were both securities brokers registered with Protective Group Securities Corp. from 1998 to 2001, where they worked together and got to know one another.

68.    Upon information and belief, the RAMSARRAN Defendants were a third party who received fees paid by NATIONWIDE for serving as a "finder" and ushering Plaintiffs to invest their funds with NATIONWIDE, though the RAMSARRAN Defendants never disclosed to Plaintiffs that they accepted a fee from NATIONWIDE for directing Plaintiffs to invest with the company.

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

### The Private Placement Offering -- Common Stock and Convertible Notes

69.     In or about April 2012, NATIONWIDE, as a means of raising capital to fund NATIONWIDE's purported operations, offered to numerous investors a private placement of shares of NATIONWIDE's stock for $1.70 per share.

70.     That fundraising effort continued through the years 2012 and 2013 and included vital participation from STEPHEN F. MOLINARI, PETER MOLINARI, SCHLOSSER, TROWBRIDGE and THIBOULT.

71.     To memorialize the terms of its offering, NATIONWIDE issued a Confidential Private Placement Memorandum.

72.     In the Confidential Private Placement Memorandum and the offering documents that were promoted alongside it, NATIONWIDE touted its business operations in terms that were materially misleading to investors, including Plaintiffs.

73.     Upon information and belief, NATIONWIDE did not possess the physical equipment or many of the tangible assets described, and in some cases even pictured, in the offering documents NATIONWIDE used to procure Plaintiffs' investments -- equipment and tangible assets that were necessary for NATIONWIDE to actually operate the business on which it sold Plaintiffs to secure their funds.

74.     To memorialize their acceptance of NATIONWIDE's offer, each Plaintiff executed a Subscription Agreement by which each individual purchased from NATIONWIDE a certain number of shares of NATIONWIDE stock for the price listed above.

75.     In addition, two of the Plaintiffs loaned money to NATIONWIDE, with each loan memorialized by a Convertible Promissory Note (the "Convertible Note") that entitled each such Plaintiff an annual return of eight percent (8%) of his/her principal investment and the option to

convert the entire principal amount of the loan -- along with all accrued interest thereon -- into fully paid and non-assessable shares of NATIONWIDE common stock.

76.    The following chart summarizes Plaintiffs' investments in NATIONWIDE:

| NAME(S) OF INVESTOR(S) | INVESTMENT DATE(S) | AMOUNT INVESTED | SHARES OF COMMON STOCK | VALUE OF CONVERTIBLE NOTES |
|---|---|---|---|---|
| JENNINGS | October 2012 | $76,500.00 | 45,000 | ---------- |
| COLES | October 2012 | $51,000.00 | 30,000 | ---------- |
| LEUE | June 2012 | $52,700.00 | 31,000 | ---------- |
| | August 2012 | $25,500.00 | 15,000 | ---------- |
| | October 2012 | $71,400.00 | 42,000 | ---------- |
| | November 2012 | $45,900.00 | 27,000 | ---------- |
| | February 2013 | ---------- | ---------- | $200,000.00 |
| EMERSON | August 2012 | $51,000.00 | 30,000 | ---------- |
| | May 2013 | ---------- | ---------- | $50,000.00 |
| MOBLEY | September 2012 | $46,920.00 | 27,600 | ---------- |
| BULFER | August 2012 | $102,000.00 | 60,000 | ---------- |
| | February 2013 | ---------- | ---------- | $65,000.00 |
| TOTAL | | $522,920.00 for 307,600 shares of common stock | | $315,000.00 for convertible notes |

77.    Above and beyond the investment totals itemized above, Plaintiffs have also suffered the following damages in reliance on the representations made to them:

(a)    JENNINGS was required to pay a $1,000.00 fee, and suffered an additional damage of a $2,955.47 surrender charge, when she liquidated an IRA so she could fund her investments with NATIONWIDE;

(b)    COLES suffered an additional damage presently valued at approximately $65,000.00 (a figure that will grow over time), including

a $4,439.25 surrender charge, when she liquidated an annuity so she could fund her investments with NATIONWIDE; and

(c)    LEUE suffered an additional damage of $27,684.00 when she liquidated an annuity so she could fund her investments with NATIONWIDE.

## Nationwide's Fraud and Breach of Its Written Obligations

78.    Notwithstanding the covenants, rights, and obligations set forth in the Confidential Private Placement Memorandum, the Subscription Agreement, and the Convertible Notes; no viable shares of NATIONWIDE common stock were ever issued to Plaintiffs, nor were any payments made to Plaintiffs in accordance with the terms of the Convertible Notes.

79.    In addition, as noted above, NATIONWIDE did not even possess the physical equipment or many of the tangible assets that would have been required for NATIONWIDE to actually operate the business on which it sold Plaintiffs to secure their funds.

80.    It is apparent NATIONWIDE never intended to fulfill any of its payment or stock-issuance obligations to Plaintiffs and that NATIONWIDE was not running the business it claimed; rather, NATIONWIDE and its executive officers intended all along to dupe investors, including Plaintiffs, into transferring funds to NATIONWIDE that NATIONWIDE and its principals then used for their own personal interests.

81.    As a result of the above-cited actions and omissions, Plaintiffs have been damaged.

82.    Plaintiffs have duly performed all of their duties and obligations, and any conditions precedent to Plaintiffs bringing this action have occurred, have been performed, or else have been excused or waived.

83.    To enforce their rights, Plaintiffs have retained undersigned counsel and are obligated to pay counsel a reasonable fee for its services, for which Defendants are liable in accordance with the terms of Section 4(b) of the convertible notes, as a result of Defendants' bad faith, and otherwise.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

Case No: 06-2014-003891-XXXXXCE

## COUNT I – BREACH OF CONTRACT: SUBSCRIPTION AGREEMENTS
### [BY ALL PLAINTIFFS AGAINST NATIONWIDE PHARMASSIST CORP.
### AND MTM HEALTHCARE SOLUTIONS, INC.]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 83 above, and further allege:

84.    Attached hereto as **Composite Exhibit "A"** are copies of the Subscription Agreements entered into by Plaintiffs and NATIONWIDE.

85.    Each Subscription Agreement constitutes a contract between Plaintiffs and NATIONWIDE.

86.    NATIONWIDE has breached the express terms of the Subscription Agreements by failing to issue viable common stock thereunder and, despite repeated demand, has failed to cure its breach.

87.    Likewise, by its fraudulent acts and the fraudulent acts of its principals -- including but not limited to the criminal activity of STEPHEN F. MOLINARI -- any stock issued by NATIONWIDE has been rendered worthless and provides no value for the investments made by Plaintiffs.

88.    As a direct and proximate result of NATIONWIDE's breach of the Subscription Agreements, Plaintiffs have been damaged.

89.    MTM HEALTHCARE is an alter ego of, and successor to the legal interests and liability of, NATIONWIDE and should therefore be held liable for any and all tortious conduct or contractual breaches committed by its predecessor entity.

WHEREFORE, Plaintiffs NORMA JENNINGS, an individual; PATRICE COLES, an individual; DEBRA LEUE, an individual; LESLIE EMERSON, an individual, and NORMA MOBLEY, an individual; demand entry of a judgment against Defendants NATIONWIDE PHARMASSIST CORP., a Florida corporation; and MTM HEALTHCARE SOLUTIONS, INC., a

- 17 -

Florida corporation; for an amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs.

### COUNT II – BREACH OF CONTRACT: CONVERTIBLE NOTE
**[BY LEUE AGAINST NATIONWIDE PHARMASSIST CORP.
AND MTM HEALTHCARE SOLUTIONS, INC.]**

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 83 above, and further allege:

90.    On or about February 18, 2013, NATIONWIDE issued to LEUE a Convertible Note in the principal amount of Two Hundred Thousand Dollars ($200,000.00).   Attached hereto as **Exhibit "B"** is a true and correct copy of the Convertible Note.

91.    The Convertible Note constitutes a contract between Plaintiff LEUE and NATIONWIDE.

92.    NATIONWIDE has breached the express terms of the Convertible Note by failing to make the necessary payments thereunder and, despite repeated demand, has failed to cure its breach.

93.    As a direct and proximate result of NATIONWIDE's breach of the Convertible Note, Plaintiff LEUE has been damaged.

94.    MTM HEALTHCARE is an alter ego of, and successor to the legal interests and liability of, NATIONWIDE and should therefore be held liable for any and all tortious conduct or contractual breaches committed by its predecessor entity.

WHEREFORE, Plaintiff DEBRA LEUE, an individual; demands entry of a judgment against Defendants NATIONWIDE PHARMASSIST CORP., a Florida corporation; and MTM HEALTHCARE SOLUTIONS, INC., a Florida corporation; for an amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs.

## COUNT III – BREACH OF CONTRACT: CONVERTIBLE NOTE
### [BY EMERSON AGAINST NATIONWIDE PHARMASSIST CORP. AND MTM HEALTHCARE SOLUTIONS, INC.]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 83 above, and further allege:

95.    On or about May 29, 2013, NATIONWIDE issued to EMERSON a Convertible Note in the principal amount of Fifty Thousand Dollars ($50,000.00). Attached hereto as **Exhibit "C"** is a true and correct copy of the Convertible Note.

96.    The Convertible Note constitutes a contract between Plaintiff EMERSON and NATIONWIDE.

97.    NATIONWIDE has breached the express terms of the Convertible Note by failing to make the necessary payments thereunder and, despite repeated demand, has failed to cure its breach.

98.    As a direct and proximate result of NATIONWIDE's breach of the Convertible Note, Plaintiff EMERSON has been damaged.

99.    MTM HEALTHCARE is an alter ego of, and successor to the legal interests and liability of, NATIONWIDE and should therefore be held liable for any and all tortious conduct or contractual breaches committed by its predecessor entity.

WHEREFORE, Plaintiff LESLIE EMERSON, an individual; demands entry of a judgment against Defendants NATIONWIDE PHARMASSIST CORP., a Florida corporation; and MTM HEALTHCARE SOLUTIONS, INC., a Florida corporation; for an amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

Case No: 06-2014-003891-XXXXCE

## COUNT IV – BREACH OF CONTRACT: CONVERTIBLE NOTE
### [BY BULFER AGAINST NATIONWIDE PHARMASSIST CORP.
### AND MTM HEALTHCARE SOLUTIONS, INC.]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 83 above, and further allege:

100.    On or about February 13, 2013, NATIONWIDE issued to BULFER a Convertible Note in the principal amount of Sixty Five Thousand Dollars ($65,000.00).  Attached hereto as **Exhibit "D"** is a true and correct copy of the Convertible Note.

101.    The Convertible Note constitutes a contract between Plaintiff BULFER and NATIONWIDE.

102.    NATIONWIDE has breached the express terms of the Convertible Note by failing to make the necessary payments thereunder and, despite repeated demand, has failed to cure its breach.

103.    As a direct and proximate result of NATIONWIDE's breach of the Convertible Note, Plaintiff BULFER has been damaged.

104.    MTM HEALTHCARE is an alter ego of, and successor to the legal interests and liability of, NATIONWIDE and should therefore be held liable for any and all tortious conduct or contractual breaches committed by its predecessor entity.

WHEREFORE, Plaintiff BRIAN BULFER, an individual; demands entry of a judgment against Defendants NATIONWIDE PHARMASSIST CORP., a Florida corporation; and MTM HEALTHCARE SOLUTIONS, INC., a Florida corporation; for an amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs.

## COUNT V – FRAUDULENT INDUCEMENT
### [BY ALL PLAINTIFFS AGAINST NATIONWIDE PHARMASSIST CORP.
### AND MTM HEALTHCARE SOLUTIONS, INC.]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 83 above, and further allege:

105.    NATIONWIDE, by acts of both omission and commission, made false statements to Plaintiffs concerning material facts about their investments.

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

106.   Specifically, NATIONWIDE's representations to Plaintiffs in the April 2012 Confidential Private Placement Memorandum and in the subsequent Subscription Agreements and Convertible Notes that, among other things:

    (a)    Plaintiffs would be provided shares of common stock in NATIONWIDE commensurate with the amount of the capital investment each Plaintiff made in the company,

    (b)    Each Plaintiff who loaned money to NATIONWIDE and executed a Convertible Note would be provided an annual return of eight percent (8%) of his/her principal investment and the option to convert the entire principal amount of the loan -- along with all accrued interest thereon -- into fully paid and non-assessable shares of NATIONWIDE common stock, and

    (c)    NATIONWIDE possessed certain physical equipment and tangible assets required for NATIONWIDE to operate the business touted in the offering documents

were false; and NATIONWIDE knew at the time the statements were made that the statements were false.

107.   NATIONWIDE intended that Plaintiffs would be induced into action by relying upon the statements of fact made to them by NATIONWIDE.

108.   In the course of investing their money with NATIONWIDE and entrusting NATIONWIDE to properly allocate those funds to meet NATIONWIDE's corporate operating needs, Plaintiffs reasonably and justifiably relied on the statements of fact made to them by NATIONWIDE.

109.   As a direct and proximate result of Plaintiffs' reliance on the statements made to them by NATIONWIDE, Plaintiffs have suffered damage.

110.   MTM HEALTHCARE is an alter ego of, and successor to the legal interests and liability of, NATIONWIDE and should therefore be held liable for any and all tortious conduct or contractual breaches committed by its predecessor entity.

**SILVER LAW GROUP**
11780 West Sample Road ● Coral Springs, Florida 33065 ● Telephone (954) 755-4799 ● Facsimile (954) 755-4684
www.silverlaw.com

WHEREFORE, Plaintiffs NORMA JENNINGS, an individual; PATRICE COLES, an individual; DEBRA LEUE, an individual; LESLIE EMERSON, an individual; and NORMA MOBLEY, an individual; demand entry of a judgment against Defendants NATIONWIDE PHARMASSIST CORP., a Florida corporation; and MTM HEALTHCARE SOLUTIONS, INC., a Florida corporation; for an amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs.

### COUNT VI – VIOLATION OF FLORIDA'S SECURITIES AND INVESTOR PROTECTION ACT (FLA. STAT. §§ 517.011, et seq.)
**[BY ALL PLAINTIFFS AGAINST NATIONWIDE PHARMASSIST CORP. AND MTM HEALTHCARE SOLUTIONS, INC.]**

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 83 above, and further allege:

111.    Fla. Stat. § 517.301 makes it unlawful for anyone, in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security: (a) to employ any device, scheme, or artifice to defraud; (b) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

112.    Defendants conducted an unlawful sale of securities, and obtained Plaintiffs' property, by engaging in fraudulent activity as defined in Fla. Stat. §§ 517.011, et seq.

113.    More specifically, in connection with the offer to sell a security or investment to Plaintiffs through a private placement memorandum, NATIONWIDE:

    (a)    employed a scheme to defraud Plaintiff;

    (b)    obtained Plaintiffs' investment funds by means of untrue statements of material fact contained within the private placement memorandum; and

    (c)    engaged in transactions and a course of business which operated as a fraud or deceit upon Plaintiffs.

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

114.    As NATIONWIDE intended, Plaintiffs justifiably relied on the material misrepresentations NATIONWIDE made to Plaintiffs in the private placement memorandum to secure Plaintiffs' investments in NATIONWIDE.

115.    As a direct and proximate result of NATIONWIDE's violations of Fla. Stat. §§ 517.011, *et seq.*, Plaintiffs were deceived into investing their money with a company that functioned solely as an engine of theft -- thus causing significant economic damage to Plaintiffs.

116.    Plaintiffs are entitled to an award of attorneys' fees pursuant to Fla. Stat. § 517.211.

117.    MTM HEALTHCARE is an alter ego of, and successor to the legal interests and liability of, NATIONWIDE and should therefore be held liable for any and all statutory violations committed by its predecessor entity.

WHEREFORE, Plaintiffs NORMA JENNINGS, an individual; PATRICE COLES, an individual; DEBRA LEUE, an individual; LESLIE EMERSON, an individual; and NORMA MOBLEY, an individual; demand entry of a judgment against Defendants NATIONWIDE PHARMASSIST CORP., a Florida corporation; and MTM HEALTHCARE SOLUTIONS, INC., a Florida corporation; for an amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs.

## COUNT VII – BREACH OF FIDUCIARY DUTY
[BY ALL PLAINTIFFS AGAINST STEPHEN F. MOLINARI, PETER MOLINARI, FREDERICK SCHLOSSER, WARREN TROWBRIDGE AND MARY JO THIBOULT]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 83 above, and further allege:

118.    The relationship between Plaintiffs and STEPHEN F. MOLINARI (NATIONWIDE's co-founder, Chairman, and CEO), PETER MOLINARI (President and Secretary of NATIONWIDE), SCHLOSSER (the company's Chief Financial Officer), TROWBRIDGE (NATIONWIDE's President and Chief Operating Officer), and THIBOULT (NATIONWIDE's Chief Compliance Officer) constituted a relationship in which deep trust, dependence, confidence,

- 23 -

counsel, and reliance was placed in and existed with STEPHEN F. MOLINARI, PETER MOLINARI, SCHLOSSER, TROWBRIDGE and THBOULT -- as high-ranking officers at NATIONWIDE -- such that a fiduciary relationship was established.

119.    The Confidential Private Placement Memorandum used by NATIONWIDE to solicit each Plaintiff's investments in NATIONWIDE specifically provides:

> [T]he success of the Company will be substantially dependent upon the discretion and judgment of Management with respect to application and allocation of the net proceeds of this Offering. Investors for the Shares offered hereby will be entrusting their funds to the Company's Management, upon whose judgment and discretion the investors must depend.

In light of the foregoing, NATIONWIDE and its corporate management team knew that investors would be relying and depending upon the management team and the prudence of their judgments with regard to the funds the investors were supplying.

120.    During the tenure of their professional relationship, Plaintiffs grew accustomed to relying upon STEPHEN F. MOLINARI, PETER MOLINARI, SCHLOSSER, TROWBRIDGE and THBOULT's financial judgment and decision-making with regard to the fortunes of NATIONWIDE's business and, concomitantly, the fortunes of the shareholder-investors in the business.

121.    STEPHEN F. MOLINARI, PETER MOLINARI, SCHLOSSER, TROWBRIDGE and THBOULT were all aware of Plaintiffs' reliance, dependence upon, and trust of them as principals of the company.

122.    STEPHEN F. MOLINARI, PETER MOLINARI, SCHLOSSER, TROWBRIDGE and THBOULT breached their fiduciary duty to Plaintiffs by concealing material information about NATIONWIDE's financial condition, its lack of the necessary equipment to operate a functional business, and the disreputable backgrounds of several of the key decision-makers at NATIONWIDE -- facts that, had they been known to Plaintiffs before they invested, would have caused Plaintiffs to

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

refrain from ever investing in NATIONWIDE; and, had they been known following Plaintiffs' investments, would have compelled Plaintiffs to demand immediate returns of their investment funds.

123.    As a result of the foregoing breaches of fiduciary duty committed against Plaintiffs, Plaintiffs have suffered actual and special damages.

WHEREFORE, Plaintiffs NORMA JENNINGS, an individual; PATRICE COLES, an individual; DEBRA LEUE, an individual; LESLIE EMERSON, an individual; and NORMA MOBLEY, an individual; demand entry of a judgment against Defendants STEPHEN F. MOLINARI, an individual; PETER MOLINARI, an individual; FREDERICK SCHLOSSER, an individual; WARREN K. TROWBRIDGE, an individual; and MARY JO THIBOULT, an individual; for an amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs.

## COUNT VIII – BREACH OF FIDUCIARY DUTY
### [BY ALL PLAINTIFFS AGAINST VAR CONSULTANTS, INC. AND VIJAY RAMSARRAN]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 83 above, and further allege:

124.    The relationship between Plaintiffs and the RAMSARRAN Defendants constituted a relationship in which deep trust, dependence, confidence, counsel, and reliance was placed in and existed with the RAMSARRAN Defendants -- Plaintiffs' investment advisor -- such that a fiduciary relationship was established.

125.    During the tenure of their professional relationship, Plaintiffs grew accustomed to relying upon the RAMSARRAN Defendants' judgment and decision-making with regard to investments into which Plaintiffs should place their money.

126.    The RAMSARRAN Defendants were aware of Plaintiffs' reliance, dependence upon, and trust of them as Plaintiffs' investment advisor.

127.    The RAMSARRAN Defendants breached their fiduciary duty to Plaintiffs by concealing material information about NATIONWIDE's financial condition, its lack of the necessary

- 25 -

equipment to operate a functional business, and the disreputable backgrounds of several of the key decision-makers at NATIONWIDE -- facts that, had they been known to Plaintiffs before they invested, would have caused Plaintiffs to refrain from ever investing in NATIONWIDE; and, had they been known following Plaintiffs' investments, would have compelled Plaintiffs to demand immediate returns of their investment funds.

128.    The RAMSARRAN Defendants further breached their fiduciary duty to Plaintiffs by failing to reveal to Plaintiffs that the RAMSARRAN Defendants held a direct financial interest in Plaintiffs' investments.

129.    As a result of the foregoing breaches of fiduciary duty committed against Plaintiffs, Plaintiffs have suffered actual and special damages.

WHEREFORE, Plaintiffs NORMA JENNINGS, an individual; PATRICE COLES, an individual; DEBRA LEUE, an individual; LESLIE EMERSON, an individual; and NORMA MOBLEY, an individual; demand entry of a judgment against Defendants VAR CONSULTANTS, INC., a Florida corporation; and VIJAY RAMSARRAN, an individual; for an amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs.

## COUNT IX – CIVIL CONSPIRACY
### [BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 83, 105-129 above, and further allege:

130.    Defendants conspired with one another to perpetrate an unlawful act upon Plaintiffs or to perpetrate a lawful act by unlawful means, *to wit*: they made multiple misrepresentations of fact to Plaintiffs in an effort to extract from Plaintiffs investment capital to fund the individual defendants' personal financial interests, not the corporate purpose to which Plaintiffs were told by Defendants that their investment principal was being applied – all of which put Defendants' own pecuniary interest ahead of Plaintiffs' welfare and economic safety.

- 26 -

131.    Defendants NATIONWIDE, STEPHEN F. MOLINARI, PETER MOLINARI, SCHLOSSER, TROWBRIDGE, and THIBOULT solicited and/or accepted from Plaintiffs large sums of investment funds while withholding from Plaintiffs certain material facts, including:

    (a)    NATIONWIDE had no intent to provide Plaintiffs shares of common stock that represented any real value for Plaintiffs;

    (b)    NATIONWIDE had no intent to satisfy the payment obligations NATIONWIDE undertook when entering into the Convertible Notes;

    (c)    NATIONWIDE did not possess the physical equipment and tangible assets required to operate the business touted in the investment offering documents; and

    (d)    Several members of the NATIONWIDE executive team had disreputable backgrounds which, had that information been disclosed, would have discouraged Plaintiffs from investing any money with NATIONWIDE.

132.    Defendants VAR CONSULTANTS, INC. and RAMSARRAN ushered Plaintiffs into investing large sums of money with NATIONWIDE while withholding from Plaintiffs certain material facts, including:

    (a)    NATIONWIDE had no intent to provide Plaintiffs shares of common stock that represented any real value for Plaintiffs;

    (b)    NATIONWIDE had no intent to satisfy the payment obligations NATIONWIDE undertook when entering into the Convertible Notes;

    (c)    NATIONWIDE did not possess the physical equipment and tangible assets required to operate the business touted in the investment offering documents;

    (d)    Several members of the NATIONWIDE executive team had disreputable backgrounds which, had that information been disclosed, would have discouraged Plaintiffs from investing any money with NATIONWIDE; and

    (e)    VAR CONSULTANTS, INC. and RAMSARRAN held a direct financial interest in Plaintiffs' investments.

133.    All Defendants agreed to the illicit purpose for garnering investment monies from Plaintiffs so that the individual defendants could enjoy lavish lifestyles with Plaintiffs' money. According to NATIONWIDE's profit and loss statement for the year 2013, nearly half of the

- 27 -

company's assets were allocated to executive compensation and consulting fees -- virtually all of which is believed to have been paid to the individual defendants.

134.    Defendants were each aware of, and consented to, the misrepresentations detailed above and knew that the efforts to raise capital from Plaintiffs was all part of a fraud aimed solely at enriching themselves without any intent to issue common stock or remunerate Plaintiffs in any way.

135.    In furtherance of their conspiracy, Defendants made to Plaintiffs, or agreed to have someone make on their behalf, the false statements of fact detailed above and purposefully withheld from Plaintiffs certain material facts detailed above in a concerted effort to obtain Plaintiffs' investment funds.

136.    NATIONWIDE conducted no legitimate business -- something of which the individual defendants were aware and which they accepted as part of their scheme to defraud investors, including Plaintiffs.

137.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs have suffered damage.

138.    MTM HEALTHCARE is an alter ego of, and successor to the legal interests and liability of, NATIONWIDE and should therefore be held liable for any and all violations committed by its predecessor entity.

WHEREFORE, Plaintiffs NORMA JENNINGS, an individual; PATRICE COLES, an individual; DEBRA LEUE, an individual; LESLIE EMERSON, an individual; and NORMA MOBLEY, an individual; demand entry of a judgment against Defendants NATIONWIDE PHARMASSIST CORP., a Florida corporation; MTM HEALTHCARE SOLUTIONS, INC., a Florida corporation; STEPHEN F. MOLINARI, an individual; PETER MOLINARI, an individual; FREDERICK SCHLOSSER, an individual; WARREN K. TROWBRIDGE, an individual; MARY JO THIBOULT, an individual; VAR CONSULTANTS, INC., a Florida corporation; and VIJAY

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

RAMSARRAN, an individual; for an amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs.

## PLAINTIFFS' DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury in this action of all issues so triable.

## RESERVATION OF RIGHTS

Plaintiffs reserve their right to further amend this Amended Complaint, upon completion of their investigation and discovery, to assert any additional claims for relief against Defendants or other parties as may be warranted under the circumstances and as allowed by law.

Respectfully submitted,

**SILVER LAW GROUP**
*Counsel for Plaintiff*
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:      (954) 755-4799
Facsimile:      (954) 755-4684

By: _____
        DAVID C. SILVER
        Florida Bar No. 572764
        E-mail: DSilver@silverlaw.com
        SCOTT L. SILVER
        Florida Bar No. 095631
        E-mail: SSilver@silverlaw.com
        JASON S. MILLER
        Florida Bar No. 072206
        E-mail: JMiller@silverlaw.com

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed with the Clerk of Court on this ___25th___ day of November 2014 by using the Florida Courts eFiling Portal and that a copy will be sent via transmission of Notices of Electronic Filing generated by the Florida Courts eFiling Portal to: **GEOFFREY M. CAHEN, ESQ.**, *Counsel for Defendant, Nationwide PharmAssist Corp.*, CAHEN LAW, P.A., 150 E. Palmetto Park Road - Suite 700, Boca Raton, FL 33432-4829; E-mail: geoff@cahenlaw.com; **STEPHEN A. MENDELSOHN, ESQ.**, GREENBERG TRAURIG, P.A., *Counsel for Defendant, MTM Healthcare Solutions, Inc.*, 5100 Town Center Circle – Suite 400, Boca Raton, FL 33486; E-mail: mendelsohns@gtlaw.com; **DOLORES K. SANCHEZ, ESQ.**, *Counsel for Defendants, Steven F. Molinari, Peter Molinari, and Frederick Schlosser*, 4701 N. Federal Highway, Suite 316, Box B-1, Lighthouse Point, FL 33064; E-mail: dolores@bizhall.net; **JOHN P. FISCHER, ESQ.**, FISCHER LAW FIRM, PLLC, *Counsel for Defendants Warren Trowbridge and Mary Jo Thibault*, 2888 E. Oakland Park Blvd., Fort Lauderdale, FL 33306; E-mail: jfischer@jpfischerlaw.com; rperez@jpfischerlaw.com.

**WE HEREBY FURTHER CERTIFY** that a copy of the foregoing will be served in accordance with the Florida Rules of Civil Procedure and/or the Local Rules of Court to: **VAR CONSULTANTS, INC.**, c/o **VIJAY RAMSARRAN**, 9256 Sable Ridge Circle - Suite C, Boca Raton, FL 33428.

DAVID C. SILVER

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

10/25/12   cut 38                                      201208253

## Exhibit A
## To Private Placement Memorandum

### Subscription Agreement



**NATIONWIDE PHARMASSIST CORP.**
Boca Raton, FL

You have informed the undersigned (the "Purchaser") that Nationwide PharmAssist Corp., a Florida corporation, (the "Corporation" or the "Company") wishes to raise a maximum of Nine Hundred and Thirty Five Thousand Dollars ($935,000.00) from various persons by selling up to 550,000 Shares of its securities at a price of $1.70 per Share.

1.      I have received, read, and understand the Confidential Private Placement Memorandum dated April 3, 2012 (the "Memorandum"). I further understand that my rights and responsibilities as a Purchaser will be governed by the terms and conditions of this Subscription Agreement, the Memorandum and the Shares of Nationwide PharmAssist Corp. I understand that you will rely on the following information to confirm that I am an "Accredited Investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), or that I am a "Non-Accredited" investor that will be allowed to purchase Shares in this Offering (subject to Corporation approval), and that I am qualified to be a Purchaser.

2.      This Subscription Agreement is one of a number of such subscription agreements for Shares. By signing this Subscription Agreement, I offer to purchase and subscribe from the Corporation the number of Shares set forth below on the terms specified herein. The Corporation reserves the right, in its complete discretion, to reject any subscription offer or to reduce the number of Shares allotted to me. If this offer is accepted, the Corporation will execute a copy of this Subscription Agreement and return it to me.

I understand that all funds received by the Corporation in full payment of subscriptions for Shares will be immediately available to the Corporation, and that no escrow will be established.

3.      **Accredited Investor.** I am an Accredited Investor because I qualify within one of the following categories:

**Please Check The Appropriate Category**

___✓___ $1,000,000 Net Worth.

A natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000, excluding the equity value of that person's principal residence.

_____ $200,000/$300,000 Income.

A natural person who had an individual income in excess of $200,000 (including contributions to qualified employee benefit plans) or joint income with such person's spouse in excess of $300,000 per year in each of the two most recent years and who reasonably expects to attain the same individual or joint levels of income (including such contributions) in the current year.

# COMPOSITE EXHIBIT "A"

_____ Director or Officer of Issuer.

Any director or executive officer of the Corporation

_____ All Equity Owners In Entity Are Accredited.

An entity, (i.e. corporation, partnership, trust, IRA, etc.) in which all of the equity owners are Accredited Investors as defined herein.

_____ Corporation.

A corporation not formed for the specific purpose of acquiring the Shares offered, with total assets in excess of $5,000,000.

_____ Other Accredited Investor.

Any natural person or entity which qualifies as an Accredited Investor pursuant to Rule 501(a) of Regulation D promulgated under the Act; specify basis for qualification:

_____

_____

_____ Non-Accredited Investor.

I am a "Non-Accredited Investor" that may be allowed to purchase Shares in this Offering.

4.      I represent and warrant to the Corporation that I:

(A)      (i)      have adequate means of providing for my current needs and possible contingencies and I have no need for liquidity of my investment in the Shares,

(ii)      can bear the economic risk of losing the entire amount of my investment in Shares,

(iii)      have such knowledge and experience that I am capable of evaluating the relative risks and merits of this investment; and

(iv)      acknowledge that the purchase of Shares is consistent, in both nature and amount, with my overall investment program and financial condition.

(B)      The address set forth below is my true and correct residence, and I have no intention of becoming a resident of any other state or jurisdiction.

(C)      I have not utilized the services of a "Purchaser Representative" (as defined in Regulation D promulgated under the Securities Act) because I am an experienced investor, capable of determining and understanding the risks and merits of this investment.

(D)      I have received and read, and am familiar with the Offering Documents, including the Memorandum and Subscription Agreement of the Corporation. All documents, records and

2

books pertaining to the Corporation and the Shares requested by me, including all pertinent records of the Corporation, financial and otherwise, have been made available or delivered to me.

(E)    I have had the opportunity to ask questions of and receive answers from the Corporation's officers and representatives concerning the Corporation's affairs generally and the terms and conditions of my proposed investment in the Shares;

(F)    I understand the risks implicit in the business of the Corporation. Among other things, I understand that there can be no assurance that the Corporation will be successful in obtaining the funds necessary for its success. If only a fraction of the amount of the Offering is raised, the Corporation may not be able to expand as rapidly as anticipated, and proceeds from this Offering may not be sufficient for the Corporation's long term needs.

(G)    Other than as set forth in the Memorandum, no person or entity has made any representation or warranty whatsoever with respect to any matter or thing concerning the Corporation and this Offering, and I am purchasing the Shares based solely upon my own investigation and evaluation.

(H)    I understand that no Shares have been registered under the Securities Act of 1933, as amended, nor have they been registered pursuant to the provisions of the securities or other laws of applicable jurisdictions.

(I)    The Shares for which I subscribe are being acquired solely for my own account, for investment and are not being purchased with a view to or for their resale or distribution. In order to induce the Corporation to sell Shares to me, the Corporation will have no obligation to recognize the ownership, beneficial or otherwise, of the Shares by anyone but me.

(J)    I am aware of the following:

    (i)    The Shares are a speculative investment that involves a high degree of risk;

    (ii)    My investment in the Shares is not readily transferable; it may not be possible for me to liquidate my investment.

    (iii)    The financial statements of the Corporation have merely been compiled, and have not been reviewed or audited.

    (iv)    There are substantial restrictions on the transferability of the Shares registered under the Securities Act and the securities laws of the appropriate jurisdictions; and

    (v)    No federal or state agency has made any finding or determination as to the fairness of the Offering or the Shares for public investment nor any recommendation or endorsement of the Shares.

    (vi)    The purchase of the Shares is for investment for my own account and without any view to the sale or distribution thereof.

(K)    Except as set forth in the Memorandum, none of the following information has ever been represented, guaranteed, or warranted to me expressly or by implication, by any broker, the Corporation, or agents or employees of the foregoing, or by any other person:

3

(i)     The appropriate or exact length of time that I will be required to hold the Shares;

(ii)    The percentage of profit and/or amount or type of consideration, distribution, profit, or loss to be realized, if any, as a result of an investment in the Shares; or

(iii)   That the past performance or experience of the Corporation, or associates, agents, affiliates, or employees of the Corporation or any other person, will in any way indicate or predict economic results in connection with the purchase of Shares;

(iv)    The amount of royalties available or distributions that the Corporation will make.

(L)     I have not distributed the Memorandum to anyone, no other person has used the Memorandum, and I have made no copies of the Memorandum.

(M)     I hereby agree to indemnify and hold harmless the Corporation, its managers, directors, and representatives from and against any and all liability, damage, cost or expense, including reasonable attorneys fees, incurred on account of or arising out of:

(i)     Any inaccuracy in the declarations, representations, and warranties set forth above;

(II)    The disposition of any of the Shares by me which is contrary to the foregoing declarations, representations, and warranties; and

(iii)   Any action, suit or proceeding based upon (1) the claim that said declarations, representations, or warranties were inaccurate or misleading or otherwise cause for obtaining damages or redress from the Corporation; or (2) the disposition of any of the Shares.

(N)     By entering into this Subscription Agreement, I acknowledge that the Corporation is relying on the truth and accuracy of my representations. The foregoing representation and warranties are true and accurate as of the date hereof, shall be true and accurate as of the date of the delivery of the funds to the Corporation and shall survive such delivery. If, in any respect, such representations and warranties are not true and accurate prior to delivery of the funds, I will give written notice of the fact to the Corporation, specifying which representations and warranties are not true and accurate and the reasons therefor.

5. I understand that I may sell or otherwise transfer the securities only if registered under the Securities Act or I provide the Corporation with an opinion of counsel acceptable to the Corporation to the effect that such sale or other transfer may be made in absence of registration under the Securities Act. I have no right to cause the Corporation to register the securities. Any certificates or other documents representing my securities will contain a restrictive legend reflecting this restriction, and stop transfer instructions will apply to my securities.

6.      I understand the meaning and legal consequences of the representations and warranties contained herein, and I will indemnify and hold harmless the Corporation, its officers, directors, and representatives involved in the offer or sale of the Shares to me, as well as each of the managers and representatives, employees and agents and other controlling persons of each of them, from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of mine contained in this Subscription Agreement.

7.    I will not cancel, terminate or revoke this Subscription Agreement or any agreement made by me hereunder and this Subscription Agreement shall survive my death or disability.

8.    If this subscription is rejected by the Corporation, then this Subscription Agreement shall be null and void and of no further force and effect, no party shall have any rights against any other party hereunder, and the Corporation shall promptly return to me the funds delivered with this Subscription Agreement.

9.    Miscellaneous.

(A)    THIS AGREEMENT REQUIRES THAT ALL INVESTORS ARBITRATE ANY DISPUTE ARISING OUT OF THEIR INVESTMENT IN THE SHARES IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION. YOU FURTHER AGREE THAT THE ARBITRATION WILL BE BINDING AND HELD IN NEW YORK COUNTY, NY. YOU AGREE THEREBY TO WAIVE ANY RIGHTS TO A JURY TRIAL. OUT OF STATE ARBITRATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO ARBITRATE A SETTLEMENT OF A DISPUTE. IT MAY ALSO COST YOU MORE TO ARBITRATE IN NEW YORK THAN IN YOUR HOME STATE. The arbitrator may award attorney fees to the winning party.

(B)    This Subscription Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only in writing and executed by all parties.

(C)    By Purchasing the Shares I hereby agree to the terms and provisions of the securities as included in the Memorandum.

B. I have hereby read and understand the Memorandum and understand how the corporation functions as a corporate entity.

10.    Ownership Information. Please print here the total number of Shares to be purchased, and the exact name(s) in which the Shares will be registered.

Total Shares Subscribed For: 45,000

Total Subscription Price: $ 1.70

Registered Name(s): NORMA Jennings
_____  Single Person
_____  Husband and Wife, as community property
_____  Joint Tenants (with right of survivorship)
_____  Tenants in Common
_____  A Married Person as separate property
_____  Corporation or other organization
_____  A Partnership
_____  Trust
__✓__  IRA
_____  Tax-Qualified Retirement Plan

5

(i) Trustee(s)/ Custodian_____

(ii) Trust Date_____

(iii) Name of Trust_____

(iv) For the Benefit of_____

_____ Other:_____

       (please explain)

Social Security or Tax I.D.#: ████████_____

Residence Address:

████████████

Street Address

████████████████

City               State             Zip

Mailing Address: (Complete only if different from residence)

Same

Street Address (If P.O.Box, include address for surface delivery if different than residence)

City              State             Zip

Phone Numbers

Home: (_____)_____

Business: (████████████

Facsimile: (████████████

Dated: _10/25/12_____

Purchaser Name: _SIMMONS TRUST CUSTODIAN FOR NORMA JENNINGS IRA

Purchaser Signature:_____

Accepted: NATIONWIDE PHARMASSIST CORP.

By:_____ Date: 10-26-12

6

## Exhibit A
## To Private Placement Memorandum

### Subscription Agreement

**NATIONWIDE PHARMASSIST CORP.**
Boca Raton, FL

You have informed the undersigned (the "Purchaser") that Nationwide PharmAssist Corp., a Florida corporation, (the "Corporation" or the "Company") wishes to raise a maximum of Nine Hundred and Thirty Five Thousand Dollars ($935,000.00) from various persons by selling up to 550,000 Shares of its securities at a price of $1.70 per Share.

1.    I have received, read, and understand the Confidential Private Placement Memorandum dated April 3, 2012 (the "Memorandum"). I further understand that my rights and responsibilities as a Purchaser will be governed by the terms and conditions of this Subscription Agreement, the Memorandum and the Shares of Nationwide PharmAssist Corp. I understand that you will rely on the following information to confirm that I am an "Accredited Investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), or that I am a "Non-Accredited" investor that will be allowed to purchase Shares in this Offering (subject to Corporation approval), and that I am qualified to be a Purchaser.

2.    This Subscription Agreement is one of a number of such subscription agreements for Shares. By signing this Subscription Agreement, I offer to purchase and subscribe from the Corporation the number of Shares set forth below on the terms specified herein. The Corporation reserves the right, in its complete discretion, to reject any subscription offer or to reduce the number of Shares allotted to me. If this offer is accepted, the Corporation will execute a copy of this Subscription Agreement and return it to me.

I understand that all funds received by the Corporation in full payment of subscriptions for Shares will be immediately available to the Corporation, and that no escrow will be established.

3.    Accredited Investor. I am an Accredited Investor because I qualify within one of the following categories:

**Please Check The Appropriate Category**



_____✓____ $1,000,000 Net Worth.

A natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000, excluding the equity value of that person's principal residence.

_____ $200,000/$300,000 Income.

A natural person who had an individual income in excess of $200,000 (including contributions to qualified employee benefit plans) or joint income with such person's spouse in excess of $300,000 per year in each of the two most recent years and who reasonably expects to attain the same individual or joint levels of income (including such contributions) in the current year.

_____ Director or Officer of Issuer.

Any director or executive officer of the Corporation

_____ All Equity Owners In Entity Are Accredited.

An entity, (i.e. corporation, partnership, trust, IRA, etc.) in which all of the equity owners are Accredited Investors as defined herein.

_____ Corporation.

A corporation not formed for the specific purpose of acquiring the Shares offered, with total assets in excess of $5,000,000.

_____ Other Accredited Investor.

Any natural person or entity which qualifies as an Accredited Investor pursuant to Rule 501(a) of Regulation D promulgated under the Act; specify basis for qualification:

_____

_____

_____ Non-Accredited Investor.

I am a "Non-Accredited Investor" that may be allowed to purchase Shares in this Offering.

4.      I represent and warrant to the Corporation that I:

    (A)      (i)      have adequate means of providing for my current needs and possible contingencies and I have no need for liquidity of my investment in the Shares,

        (ii)      can bear the economic risk of losing the entire amount of my investment in Shares,

        (iii)      have such knowledge and experience that I am capable of evaluating the relative risks and merits of this investment; and

        (iv)      acknowledge that the purchase of Shares is consistent, in both nature and amount, with my overall investment program and financial condition.

    (B)      The address set forth below is my true and correct residence, and I have no intention of becoming a resident of any other state or jurisdiction.

    (C)      I have not utilized the services of a "Purchaser Representative" (as defined in Regulation D promulgated under the Securities Act) because I am an experienced investor, capable of determining and understanding the risks and merits of this investment.

    (D)      I have received and read, and am familiar with the Offering Documents, including the Memorandum and Subscription Agreement of the Corporation. All documents, records and

2

books pertaining to the Corporation and the Shares requested by me, including all pertinent records of the Corporation, financial and otherwise, have been made available or delivered to me.

(E)    I have had the opportunity to ask questions of and receive answers from the Corporation's officers and representatives concerning the Corporation's affairs generally and the terms and conditions of my proposed investment in the Shares.

(F)    I understand the risks implicit in the business of the Corporation. Among other things, I understand that there can be no assurance that the Corporation will be successful in obtaining the funds necessary for its success. If only a fraction of the amount of the Offering is raised, the Corporation may not be able to expand as rapidly as anticipated, and proceeds from this Offering may not be sufficient for the Corporation's long term needs.

(G)    Other than as set forth in the Memorandum, no person or entity has made any representation or warranty whatsoever with respect to any matter or thing concerning the Corporation and this Offering, and I am purchasing the Shares based solely upon my own investigation and evaluation.

(H)    I understand that no Shares have been registered under the Securities Act of 1933, as amended, nor have they been registered pursuant to the provisions of the securities or other laws of applicable jurisdictions.

(I)    The Shares for which I subscribe are being acquired solely for my own account, for investment and are not being purchased with a view to or for their resale or distribution. In order to induce the Corporation to sell Shares to me, the Corporation will have no obligation to recognize the ownership, beneficial or otherwise, of the Shares by anyone but me.

(J)    I am aware of the following:

   (i)    The Shares are a speculative investment that involves a high degree of risk;

   (ii)    My investment in the Shares is not readily transferable; it may not be possible for me to liquidate my investment.

   (iii)    The financial statements of the Corporation have merely been compiled, and have not been reviewed or audited.

   (iv)    There are substantial restrictions on the transferability of the Shares registered under the Securities Act and the securities laws of the appropriate jurisdictions; and

   (v)    No federal or state agency has made any finding or determination as to the fairness of the Offering or the Shares for public investment nor any recommendation or endorsement of the Shares.

   (vi)    The purchase of the Shares is for investment for my own account and without any view to the sale or distribution thereof.

(K)    Except as set forth in the Memorandum, none of the following information has ever been represented, guaranteed, or warranted to me expressly or by implication, by any broker, the Corporation, or agents or employees of the foregoing, or by any other person:

    (i)     The appropriate or exact length of time that I will be required to hold the Shares;

    (ii)    The percentage of profit and/or amount or type of consideration, distribution, profit, or loss to be realized, if any, as a result of an investment in the Shares; or

    (iii)   That the past performance or experience of the Corporation, or associates, agents, affiliates, or employees of the Corporation or any other person, will in any way indicate or predict economic results in connection with the purchase of Shares;

    (iv)   The amount of royalties available or distributions that the Corporation will make.

(L)    I have not distributed the Memorandum to anyone, no other person has used the Memorandum, and I have made no copies of the Memorandum.

(M)    I hereby agree to indemnify and hold harmless the Corporation, its managers, directors, and representatives from and against any and all liability, damage, cost or expense, including reasonable attorneys fees, incurred on account of or arising out of:

    (i)     Any inaccuracy in the declarations, representations, and warranties set forth above;

    (ii)    The disposition of any of the Shares by me which is contrary to the foregoing declarations, representations, and warranties; and

    (iii)   Any action, suit or proceeding based upon (1) the claim that said declarations, representations, or warranties were inaccurate or misleading or otherwise cause for obtaining damages or redress from the Corporation; or (2) the disposition of any of the Shares.

(N)    By entering into this Subscription Agreement, I acknowledge that the Corporation is relying on the truth and accuracy of my representations. The foregoing representation and warranties are true and accurate as of the date hereof, shall be true and accurate as of the date of the delivery of the funds to the Corporation and shall survive such delivery. If, in any respect, such representations and warranties are not true and accurate prior to delivery of the funds, I will give written notice of the fact to the Corporation, specifying which representations and warranties are not true and accurate and the reasons therefor.

**5. I understand that I may sell or otherwise transfer the securities only if registered under the Securities Act or I provide the Corporation with an opinion of counsel acceptable to the Corporation to the effect that such sale or other transfer may be made in absence of registration under the Securities Act. I have no right to cause the Corporation to register the securities. Any certificates or other documents representing my securities will contain a restrictive legend reflecting this restriction, and stop transfer instructions will apply to my securities.**

6.    I understand the meaning and legal consequences of the representations and warranties contained herein, and I will indemnify and hold harmless the Corporation, its officers, directors, and representatives involved in the offer or sale of the Shares to me, as well as each of the managers and representatives, employees and agents and other controlling persons of each of them, from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of mine contained in this Subscription Agreement.

7.    I will not cancel, terminate or revoke this Subscription Agreement or any agreement made by me hereunder and this Subscription Agreement shall survive my death or disability.

8.    If this subscription is rejected by the Corporation, then this Subscription Agreement shall be null and void and of no further force and effect, no party shall have any rights against any other party hereunder, and the Corporation shall promptly return to me the funds delivered with this Subscription Agreement.

9.    Miscellaneous.

(A)    THIS AGREEMENT REQUIRES THAT ALL INVESTORS ARBITRATE ANY DISPUTE ARISING OUT OF THEIR INVESTMENT IN THE Shares IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION. YOU FURTHER AGREE THAT THE ARBITRATION WILL BE BINDING AND HELD IN NEW YORK COUNTY, NY. YOU AGREE THEREBY TO WAIVE ANY RIGHTS TO A JURY TRIAL. OUT OF STATE ARBITRATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO ARBITRATE A SETTLEMENT OF A DISPUTE. IT MAY ALSO COST YOU MORE TO ARBITRATE IN NEW YORK THAN IN YOUR HOME STATE.  The arbitrator may award attorney fees to the winning party.

(B)    This Subscription Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only in writing and executed by all parties.

(C)    By Purchasing the Shares I hereby agree to the terms and provisions of the securities as included in the Memorandum.

B.  I have hereby read and understand the Memorandum and understand how the corporation functions as a corporate entity.

10. Ownership Information. Please print here the total number of Shares to be purchased, and the exact name(s) in which the Shares will be registered.

Total Shares Subscribed For: _30,000_

Total Subscription Price: $ _51,000_

Registered Name(s): _SUNWEST TRUST CUSTODIAN FOR PATRICK M COLES IRA_

_____ Single Person
_____ Husband and Wife, as community property
_____ Joint Tenants (with right of survivorship)
_____ Tenants in Common
_____ A Married Person as separate property
_____ Corporation or other organization
_____ A Partnership
_____ Trust
___✓__ IRA
_____ Tax-Qualified Retirement Plan

5

(i)  Trustee(s)/ Custodian_____

(ii)  Trust Date_____

(iii)  Name of Trust_____

(iv)  For the Benefit of_____

_____ Other: _____
          (please explain)

Social Security or Tax I.D.#:_ ███████████_____

Residence Address:_
████████████████████_____

Street Address
██████████████████████_____

City                          State                          Zip

Mailing Address:  (Complete only if different from residence)
_____ SAME _____

Street Address  (If P.O.Box, include address for surface delivery if different than
                      residence)

_____
City                          State                          Zip

Phone Numbers
Home: (_____)_____
Business: (████████████_____
Facsimile: (█████████████_____

Dated: _____ 10/29/12 _____

Purchaser Name: SUNWEST TRUST FB PATRICK M COLES IRA

Purchaser Signature: _____

Accepted:  NATIONWIDE PHARMASSIST CORP.

By:_____ Date:_____

<u>Exhibit A</u>
<u>To Private Placement Memorandum</u>

Subscription Agreement

## NATIONWIDE PHARMASSIST CORP.
### Boca Raton, FL

You have informed the undersigned (the "Purchaser") that Nationwide PharmAssist Corp., a Florida corporation, (the "Corporation" or the "Company") wishes to raise a maximum of Eight Hundred and Fifty Thousand Dollars ($850,000.00) from various persons by selling up to 500,000 Shares of its securities at a price of $1.70 per Share.

1.      I have received, read, and understand the Confidential Private Placement Memorandum dated July 6, 2012 (the "Memorandum"). I further understand that my rights and responsibilities as a Purchaser will be governed by the terms and conditions of this Subscription Agreement, the Memorandum and the Shares of Nationwide PharmAssist Corp. I understand that you will rely on the following information to confirm that I am an "Accredited Investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), or that I am a "Non-Accredited" investor that will be allowed to purchase Shares in this Offering (subject to Corporation approval), and that I am qualified to be a Purchaser.

2.      This Subscription Agreement is one of a number of such subscription agreements for Shares. By signing this Subscription Agreement, I offer to purchase and subscribe from the Corporation the number of Shares set forth below on the terms specified herein. The Corporation reserves the right, in its complete discretion, to reject any subscription offer or to reduce the number of Shares allotted to me. If this offer is accepted, the Corporation will execute a copy of this Subscription Agreement and return it to me.

I understand that all funds received by the Corporation in full payment of subscriptions for Shares will be immediately available to the Corporation, and that no escrow will be established.

3.   <u>Accredited Investor</u>. I am an Accredited Investor because I qualify within one of the following categories:

**Please Check The Appropriate Category**

_____   $1,000,000 Net Worth.

A natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000, excluding the equity value of that person's principal residence.

_____   $200,000/$300,000 Income.

A natural person who had an individual income in excess of $200,000 (including contributions to qualified employee benefit plans) or joint income with such person's spouse in excess of $300,000 per year in each of the two most recent years and who reasonably expects to attain the same individual or joint levels of income (including such contributions) in the current year.

_____ Director or Officer of Issuer.

Any director or executive officer of the Corporation

___✓___ All Equity Owners In Entity Are Accredited.

An entity, (i.e. corporation, partnership, trust, IRA, etc.) in which all of the equity owners are Accredited Investors as defined herein.

_____ Corporation.

A corporation not formed for the specific purpose of acquiring the Shares offered, with total assets in excess of $5,000,000.

_____ Other Accredited Investor.

Any natural person or entity which qualifies as an Accredited Investor pursuant to Rule 501(a) of Regulation D promulgated under the Act; specify basis for qualification:

_____

_____

_____ Non-Accredited Investor.

I am a "Non-Accredited Investor" that may be allowed to purchase Shares in this Offering.

4.     I represent and warrant to the Corporation that I:

(A)     (i)     have adequate means of providing for my current needs and possible contingencies and I have no need for liquidity of my investment in the Shares,

(ii)     can bear the economic risk of losing the entire amount of my investment in Shares,

(iii)     have such knowledge and experience that I am capable of evaluating the relative risks and merits of this investment; and

(iv)     acknowledge that the purchase of Shares is consistent, in both nature and amount, with my overall investment program and financial condition.

(B)     The address set forth below is my true and correct residence, and I have no intention of becoming a resident of any other state or jurisdiction.

(C)     I have not utilized the services of a "Purchaser Representative" (as defined in Regulation D promulgated under the Securities Act) because I am an experienced investor, capable of determining and understanding the risks and merits of this investment.

(D)     I have received and read, and am familiar with the Offering Documents, including the Memorandum and Subscription Agreement of the Corporation. All documents, records and

2

books pertaining to the Corporation and the Shares requested by me, including all pertinent records of the Corporation, financial and otherwise, have been made available or delivered to me.

(E)    I have had the opportunity to ask questions of and receive answers from the Corporation's officers and representatives concerning the Corporation's affairs generally and the terms and conditions of my proposed investment in the Shares.

(F)    I understand the risks implicit in the business of the Corporation. Among other things, I understand that there can be no assurance that the Corporation will be successful in obtaining the funds necessary for its success. If only a fraction of the amount of the Offering is raised, the Corporation may not be able to expand as rapidly as anticipated, and proceeds from this Offering may not be sufficient for the Corporation's long term needs.

(G)    Other than as set forth in the Memorandum, no person or entity has made any representation or warranty whatsoever with respect to any matter or thing concerning the Corporation and this Offering, and I am purchasing the Shares based solely upon my own investigation and evaluation.

(H)    I understand that no Shares have been registered under the Securities Act of 1933, as amended, nor have they been registered pursuant to the provisions of the securities or other laws of applicable jurisdictions.

(I)    The Shares for which I subscribe are being acquired solely for my own account, for investment and are not being purchased with a view to or for their resale or distribution. In order to induce the Corporation to sell Shares to me, the Corporation will have no obligation to recognize the ownership, beneficial or otherwise, of the Shares by anyone but me.

(J)    I am aware of the following:

        (i)    The Shares are a speculative investment that involves a high degree of risk;

        (ii)    My investment in the Shares is not readily transferable; it may not be possible for me to liquidate my investment.

        (iii)    The financial statements of the Corporation have merely been compiled, and have not been reviewed or audited.

        (iv)    There are substantial restrictions on the transferability of the Shares registered under the Securities Act and the securities laws of the appropriate jurisdictions; and

        (v)    No federal or state agency has made any finding or determination as to the fairness of the Offering or the Shares for public investment nor any recommendation or endorsement of the Shares.

        (vi)    The purchase of the Shares is for investment for my own account and without any view to the sale or distribution thereof.

(K)    Except as set forth in the Memorandum, none of the following information has ever been represented, guaranteed, or warranted to me expressly or by implication, by any broker, the Corporation, or agents or employees of the foregoing, or by any other person:

3

(i)     The appropriate or exact length of time that I will be required to hold the Shares;

(ii)    The percentage of profit and/or amount or type of consideration, distribution, profit, or loss to be realized, if any, as a result of an investment in the Shares; or

(iii)   That the past performance or experience of the Corporation, or associates, agents, affiliates, or employees of the Corporation or any other person, will in any way indicate or predict economic results in connection with the purchase of Shares;

(iv)    The amount of royalties available or distributions that the Corporation will make.

(L)     I have not distributed the Memorandum to anyone, no other person has used the Memorandum, and I have made no copies of the Memorandum.

(M)     I hereby agree to indemnify and hold harmless the Corporation, its managers, directors, and representatives from and against any and all liability, damage, cost or expense, including reasonable attorneys fees, incurred on account of or arising out of:

(i)     Any inaccuracy in the declarations, representations, and warranties set forth above;

(ii)    The disposition of any of the Shares by me which is contrary to the foregoing declarations, representations, and warranties; and

(iii)   Any action, suit or proceeding based upon (1) the claim that said declarations, representations, or warranties were inaccurate or misleading or otherwise cause for obtaining damages or redress from the Corporation; or (2) the disposition of any of the Shares.

(N)     By entering into this Subscription Agreement, I acknowledge that the Corporation is relying on the truth and accuracy of my representations. The foregoing representation and warranties are true and accurate as of the date hereof, shall be true and accurate as of the date of the delivery of the funds to the Corporation and shall survive such delivery. If, in any respect, such representations and warranties are not true and accurate prior to delivery of the funds, I will give written notice of the fact to the Corporation, specifying which representations and warranties are not true and accurate and the reasons therefor.

**5. I understand that I may sell or otherwise transfer the securities only if registered under the Securities Act or I provide the Corporation with an opinion of counsel acceptable to the Corporation to the effect that such sale or other transfer may be made in absence of registration under the Securities Act. I have no right to cause the Corporation to register the securities. Any certificates or other documents representing my securities will contain a restrictive legend reflecting this restriction, and stop transfer instructions will apply to my securities.**

6.      I understand the meaning and legal consequences of the representations and warranties contained herein, and I will indemnify and hold harmless the Corporation, its officers, directors, and representatives involved in the offer or sale of the Shares to me, as well as each of the managers and representatives, employees and agents and other controlling persons of each of them, from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of mine contained in this Subscription Agreement.

4

7.    I will not cancel, terminate or revoke this Subscription Agreement or any agreement made by me hereunder and this Subscription Agreement shall survive my death or disability.

8.    If this subscription is rejected by the Corporation, then this Subscription Agreement shall be null and void and of no further force and effect, no party shall have any rights against any other party hereunder, and the Corporation shall promptly return to me the funds delivered with this Subscription Agreement.

9.    Miscellaneous.

(A)    THIS AGREEMENT REQUIRES THAT ALL INVESTORS ARBITRATE ANY DISPUTE ARISING OUT OF THEIR INVESTMENT IN THE Shares IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION. YOU FURTHER AGREE THAT THE ARBITRATION WILL BE BINDING AND HELD IN NEW YORK COUNTY, NY. YOU AGREE THEREBY TO WAIVE ANY RIGHTS TO A JURY TRIAL. OUT OF STATE ARBITRATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO ARBITRATE A SETTLEMENT OF A DISPUTE. IT MAY ALSO COST YOU MORE TO ARBITRATE IN NEW YORK THAN IN YOUR HOME STATE.  The arbitrator may award attorney fees to the winning party.

(B)    This Subscription Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only in writing and executed by all parties.

(C)    By Purchasing the Shares I hereby agree to the terms and provisions of the securities as included in the Memorandum.

B. I have hereby read and understand the Memorandum and understand how the corporation functions as a corporate entity.

10. <u>Ownership Information</u>. Please print here the total number of Shares to be purchased, and the exact name(s) in which the Shares will be registered.

Total Shares Subscribed For: *31,000*

Total Subscription Price: $ *1.70*

Registered Name(s): *The Debra Ann Leue Revocable Trust / Debra Ann Leue*

_____ _ Single Person
_____ Husband and Wife, as community property
_____ Joint Tenants (with right of survivorship)
_____ Tenants in Common
_____ A Married Person as separate property
_____ Corporation or other organization
_____ A Partnership
__✓__ Trust
_____ IRA
_____ Tax-Qualified Retirement Plan

5

(i) Trustee(s)/ Custodian _Debra Ann Leue_
(ii) Trust Date _August 15, 2002_
(iii) Name of Trust _The Debra Ann Leue Revocable Trust_
(iv) For the Benefit of _the Trust_

_____ Other:_____
(please explain)

Social Security or Tax I.D.#: ███████████

Residence Address: ███████████████

Street Address ████████████        ██████████
City                    State              Zip

Mailing Address:  (Complete only if different from residence)

_____ N/A _____
Street Address  (If P.O.Box, include address for surface delivery if different than
residence)

_____
City                    State              Zip

Phone Numbers
Home: (██████████████
Business: (████████████
Facsimile: (_____)_____

Dated: _July 31, 2012_

Purchaser Name: _Debra Ann Leue_

Purchaser Signature: x _Debra Ann Leue_

Accepted: NATIONWIDE PHARMASSIST CORP.

By: _Stephen H Molina_  Date _7/31/12_

6

8/24/12    Cert #36    2012008026

## Exhibit A
## To Private Placement Memorandum

### Subscription Agreement

**ORIGINAL**

## NATIONWIDE PHARMASSIST CORP.
Boca Raton, FL

You have informed the undersigned (the "Purchaser") that Nationwide PharmAssist Corp., a Florida corporation, (the "Corporation" or the "Company") wishes to raise a maximum of Nine Hundred and Thirty Five Thousand Dollars ($935,000.00) from various persons by selling up to 550,000 Shares of its securities at a price of $1.70 per Share.

1.    I have received, read, and understand the Confidential Private Placement Memorandum dated April 3, 2012 (the "Memorandum"). I further understand that my rights and responsibilities as a Purchaser will be governed by the terms and conditions of this Subscription Agreement, the Memorandum and the Shares of Nationwide PharmAssist Corp. I understand that you will rely on the following information to confirm that I am an "Accredited Investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), or that I am a "Non-Accredited" investor that will be allowed to purchase Shares in this Offering (subject to Corporation approval), and that I am qualified to be a Purchaser.

2.    This Subscription Agreement is one of a number of such subscription agreements for Shares. By signing this Subscription Agreement, I offer to purchase and subscribe from the Corporation the number of Shares set forth below on the terms specified herein. The Corporation reserves the right, in its complete discretion, to reject any subscription offer or to reduce the number of Shares allotted to me. If this offer is accepted, the Corporation will execute a copy of this Subscription Agreement and return it to me.

I understand that all funds received by the Corporation in full payment of subscriptions for Shares will be immediately available to the Corporation, and that no escrow will be established.

3.    Accredited Investor. I am an Accredited Investor because I qualify within one of the following categories:

**Please Check The Appropriate Category**

_____ $1,000,000 Net Worth.

A natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000, excluding the equity value of that person's principal residence.

_____ $200,000/$300,000 Income.

A natural person who had an individual income in excess of $200,000 (including contributions to qualified employee benefit plans) or joint income with such person's spouse in excess of $300,000 per year in each of the two most recent years and who reasonably expects to attain the same individual or joint levels of income (including such contributions) in the current year.

_____ Director or Officer of Issuer.

Any director or executive officer of the Corporation

_____ All Equity Owners In Entity Are Accredited.

An entity, (i.e. corporation, partnership, trust, IRA, etc.) in which all of the equity owners are Accredited Investors as defined herein.

_____ Corporation.

A corporation not formed for the specific purpose of acquiring the Shares offered, with total assets in excess of $5,000,000.

_____ Other Accredited Investor.

Any natural person or entity which qualifies as an Accredited Investor pursuant to Rule 501(a) of Regulation D promulgated under the Act; specify basis for qualification:

_____

_____

_____ Non-Accredited Investor.

I am a "Non-Accredited Investor" that may be allowed to purchase Shares in this Offering.

4.     I represent and warrant to the Corporation that I:

    (A)    (i)    have adequate means of providing for my current needs and possible contingencies and I have no need for liquidity of my investment in the Shares,

        (ii)    can bear the economic risk of losing the entire amount of my investment in Shares,

        (iii)    have such knowledge and experience that I am capable of evaluating the relative risks and merits of this investment; and

        (iv)    acknowledge that the purchase of Shares is consistent, in both nature and amount, with my overall investment program and financial condition.

    (B)    The address set forth below is my true and correct residence, and I have no intention of becoming a resident of any other state or jurisdiction.

    (C)    I have not utilized the services of a "Purchaser Representative" (as defined in Regulation D promulgated under the Securities Act) because I am an experienced investor, capable of determining and understanding the risks and merits of this investment.

    (D)    I have received and read, and am familiar with the Offering Documents, including the Memorandum and Subscription Agreement of the Corporation. All documents, records and

books pertaining to the Corporation and the Shares requested by me, including all pertinent records of the Corporation, financial and otherwise, have been made available or delivered to me.

(E)     I have had the opportunity to ask questions of and receive answers from the Corporation's officers and representatives concerning the Corporation's affairs generally and the terms and conditions of my proposed investment in the Shares.

(F)     I understand the risks implicit in the business of the Corporation. Among other things, I understand that there can be no assurance that the Corporation will be successful in obtaining the funds necessary for its success. If only a fraction of the amount of the Offering is raised, the Corporation may not be able to expand as rapidly as anticipated, and proceeds from this Offering may not be sufficient for the Corporation's long term needs.

(G)     Other than as set forth in the Memorandum, no person or entity has made any representation or warranty whatsoever with respect to any matter or thing concerning the Corporation and this Offering, and I am purchasing the Shares based solely upon my own investigation and evaluation.

(H)     I understand that no Shares have been registered under the Securities Act of 1933, as amended, nor have they been registered pursuant to the provisions of the securities or other laws of applicable jurisdictions.

(I)     The Shares for which I subscribe are being acquired solely for my own account, for investment and are not being purchased with a view to or for their resale or distribution. In order to induce the Corporation to sell Shares to me, the Corporation will have no obligation to recognize the ownership, beneficial or otherwise, of the Shares by anyone but me.

(J)     I am aware of the following:

        (i)     The Shares are a speculative investment that involves a high degree of risk;

        (ii)    My investment in the Shares is not readily transferable; it may not be possible for me to liquidate my investment.

        (iii)   The financial statements of the Corporation have merely been compiled, and have not been reviewed or audited.

        (iv)    There are substantial restrictions on the transferability of the Shares registered under the Securities Act and the securities laws of the appropriate jurisdictions; and

        (v)     No federal or state agency has made any finding or determination as to the fairness of the Offering or the Shares for public investment nor any recommendation or endorsement of the Shares.

        (vi)    The purchase of the Shares is for investment for my own account and without any view to the sale or distribution thereof.

(K)     Except as set forth in the Memorandum, none of the following information has ever been represented, guaranteed, or warranted to me expressly or by implication, by any broker, the Corporation, or agents or employees of the foregoing, or by any other person:

3

(i)     The appropriate or exact length of time that I will be required to hold the Shares;

(ii)    The percentage of profit and/or amount or type of consideration, distribution, profit, or loss to be realized, if any, as a result of an investment in the Shares; or

(iii)    That the past performance or experience of the Corporation, or associates, agents, affiliates, or employees of the Corporation or any other person, will in any way indicate or predict economic results in connection with the purchase of Shares;

(iv)    The amount of royalties available or distributions that the Corporation will make.

(L)    I have not distributed the Memorandum to anyone, no other person has used the Memorandum, and I have made no copies of the Memorandum.

(M)    I hereby agree to indemnify and hold harmless the Corporation, its managers, directors, and representatives from and against any and all liability, damage, cost or expense, including reasonable attorneys fees, incurred on account of or arising out of:

(i)    Any inaccuracy in the declarations, representations, and warranties set forth above;

(ii)    The disposition of any of the Shares by me which is contrary to the foregoing declarations, representations, and warranties; and

(iii)    Any action, suit or proceeding based upon (1) the claim that said declarations, representations, or warranties were inaccurate or misleading or otherwise cause for obtaining damages or redress from the Corporation; or (2) the disposition of any of the Shares.

(N)    By entering into this Subscription Agreement, I acknowledge that the Corporation is relying on the truth and accuracy of my representations. The foregoing representation and warranties are true and accurate as of the date hereof, shall be true and accurate as of the date of the delivery of the funds to the Corporation and shall survive such delivery. If, in any respect, such representations and warranties are not true and accurate prior to delivery of the funds, I will give written notice of the fact to the Corporation, specifying which representations and warranties are not true and accurate and the reasons therefor.

5.  I understand that I may sell or otherwise transfer the securities only if registered under the Securities Act or I provide the Corporation with an opinion of counsel acceptable to the Corporation to the effect that such sale or other transfer may be made in absence of registration under the Securities Act. I have no right to cause the Corporation to register the securities. Any certificates or other documents representing my securities will contain a restrictive legend reflecting this restriction, and stop transfer instructions will apply to my securities.

6.  I understand the meaning and legal consequences of the representations and warranties contained herein, and I will indemnify and hold harmless the Corporation, its officers, directors, and representatives involved in the offer or sale of the Shares to me, as well as each of the managers and representatives, employees and agents and other controlling persons of each of them, from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of mine contained in this Subscription Agreement.

4

7.     I will not cancel, terminate or revoke this Subscription Agreement or any agreement made by me hereunder and this Subscription Agreement shall survive my death or disability.

8.     If this subscription is rejected by the Corporation, then this Subscription Agreement shall be null and void and of no further force and effect, no party shall have any rights against any other party hereunder, and the Corporation shall promptly return to me the funds delivered with this Subscription Agreement.

9.     Miscellaneous.

(A)    THIS AGREEMENT REQUIRES THAT ALL INVESTORS ARBITRATE ANY DISPUTE ARISING OUT OF THEIR INVESTMENT IN THE Shares IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION. YOU FURTHER AGREE THAT THE ARBITRATION WILL BE BINDING AND HELD IN NEW YORK COUNTY, NY. YOU AGREE THEREBY TO WAIVE ANY RIGHTS TO A JURY TRIAL. OUT OF STATE ARBITRATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO ARBITRATE A SETTLEMENT OF A DISPUTE. IT MAY ALSO COST YOU MORE TO ARBITRATE IN NEW YORK THAN IN YOUR HOME STATE.  The arbitrator may award attorney fees to the winning party.

(B)    This Subscription Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only in writing and executed by all parties.

(C)    By Purchasing the Shares I hereby agree to the terms and provisions of the securities as included in the Memorandum.

B. I have hereby read and understand the Memorandum and understand how the corporation functions as a corporate entity.

10. Ownership Information. Please print here the total number of Shares to be purchased, and the exact name(s) in which the Shares will be registered.

Total Shares Subscribed For: _30,000_

Total Subscription Price: $ _51,000_

Registered Name(s): _Sunwest Trust Fbo Leslie Emerson IRA_
_____ Single Person
_____ Husband and Wife, as community property
_____ Joint Tenants (with right of survivorship)
_____ Tenants in Common
_____ A Married Person as separate property
_____ Corporation or other organization
_____ A Partnership
___✓__ Trust
_____ IRA
_____ Tax-Qualified Retirement Plan

5

(I) Trustee(s)/ Custodian _Sunwest Trust Inc_
(II) Trust Date _____
(III) Name of Trust _____
(IV) For the Benefit of _____

_____ Other: _____
           (please explain)

Social Security or Tax I.D.#: ████████████

Residence Address: ██████████████████████████

Street Address ████████████████████████████

City  _____  State  _____  Zip  _____

Mailing Address:  (Complete only if different from residence)

_____
Street Address (If P.O.Box, include address for surface delivery if different than
                residence)

City  _____  State  _____  Zip  _____

Phone Numbers
Home: (_____)_____
Business: (██████████████████)
Facsimile: (██████████████

Dated: ~~████~~ 8-24-12  _(fm)_

Purchaser Name: _Sunwest Trust FBO Leslie Emerson IRA_

Purchaser Signature: _____

Accepted: NATIONWIDE PHARMASSIST CORP.

By: _Steph. V. Molins_ Date: _8/26/12_

6

9/24/12   cut #46                                   2012084H

## Exhibit A
## To Private Placement Memorandum

### Subscription Agreement

**ORIGINAL**

**NATIONWIDE PHARMASSIST CORP.**
Boca Raton, FL

You have informed the undersigned (the "Purchaser") that Nationwide PharmAssist Corp., a Florida corporation, (the "Corporation" or the "Company") wishes to raise a maximum of Nine Hundred and Thirty Five Thousand Dollars ($935,000.00) from various persons by selling up to 550,000 Shares of its securities at a price of $1.70 per Share.

1.      I have received, read, and understand the Confidential Private Placement Memorandum dated April 3, 2012 (the "Memorandum"). I further understand that my rights and responsibilities as a Purchaser will be governed by the terms and conditions of this Subscription Agreement, the Memorandum and the Shares of Nationwide PharmAssist Corp. I understand that you will rely on the following information to confirm that I am an "Accredited Investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), or that I am a "Non-Accredited" investor that will be allowed to purchase Shares in this Offering (subject to Corporation approval), and that I am qualified to be a Purchaser.

2.      This Subscription Agreement is one of a number of such subscription agreements for Shares. By signing this Subscription Agreement, I offer to purchase and subscribe from the Corporation the number of Shares set forth below on the terms specified herein. The Corporation reserves the right, in its complete discretion, to reject any subscription offer or to reduce the number of Shares allotted to me. If this offer is accepted, the Corporation will execute a copy of this Subscription Agreement and return it to me.

I understand that all funds received by the Corporation in full payment of subscriptions for Shares will be immediately available to the Corporation, and that no escrow will be established.

3.      Accredited Investor. I am an Accredited Investor because I qualify within one of the following categories:

**Please Check The Appropriate Category**

_____✓___ $1,000,000 Net Worth.

A natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000, excluding the equity value of that person's principal residence.

_____ $200,000/$300,000 Income.

A natural person who had an individual income in excess of $200,000 (including contributions to qualified employee benefit plans) or joint income with such person's spouse in excess of $300,000 per year in each of the two most recent years and who reasonably expects to attain the same individual or joint levels of income (including such contributions) in the current year.

_____ Director or Officer of Issuer.

Any director or executive officer of the Corporation

_____ All Equity Owners In Entity Are Accredited.

An entity, (i.e. corporation, partnership, trust, IRA, etc.) in which all of the equity owners are Accredited Investors as defined herein.

_____ Corporation.

A corporation not formed for the specific purpose of acquiring the Shares offered, with total assets in excess of $5,000,000.

_____ Other Accredited Investor.

Any natural person or entity which qualifies as an Accredited Investor pursuant to Rule 501(a) of Regulation D promulgated under the Act; specify basis for qualification:

_____

_____

_____ Non-Accredited Investor.

I am a "Non-Accredited Investor" that may be allowed to purchase Shares in this Offering.

4.  I represent and warrant to the Corporation that I:

   (A)  (i)  have adequate means of providing for my current needs and possible contingencies and I have no need for liquidity of my investment in the Shares,

       (ii)  can bear the economic risk of losing the entire amount of my investment in Shares,

       (iii)  have such knowledge and experience that I am capable of evaluating the relative risks and merits of this investment; and

       (iv)  acknowledge that the purchase of Shares is consistent, in both nature and amount, with my overall investment program and financial condition.

   (B)  The address set forth below is my true and correct residence, and I have no intention of becoming a resident of any other state or jurisdiction.

   (C)  I have not utilized the services of a "Purchaser Representative" (as defined in Regulation D promulgated under the Securities Act) because I am an experienced investor, capable of determining and understanding the risks and merits of this investment.

   (D)  I have received and read, and am familiar with the Offering Documents, including the Memorandum and Subscription Agreement of the Corporation. All documents, records and

2

books pertaining to the Corporation and the Shares requested by me, including all pertinent records of the Corporation, financial and otherwise, have been made available or delivered to me.

(E)    I have had the opportunity to ask questions of and receive answers from the Corporation's officers and representatives concerning the Corporation's affairs generally and the terms and conditions of my proposed investment in the Shares.

(F)    I understand the risks implicit in the business of the Corporation. Among other things, I understand that there can be no assurance that the Corporation will be successful in obtaining the funds necessary for its success. If only a fraction of the amount of the Offering is raised, the Corporation may not be able to expand as rapidly as anticipated, and proceeds from this Offering may not be sufficient for the Corporation's long term needs.

(G)    Other than as set forth in the Memorandum, no person or entity has made any representation or warranty whatsoever with respect to any matter or thing concerning the Corporation and this Offering, and I am purchasing the Shares based solely upon my own investigation and evaluation.

(H)    I understand that no Shares have been registered under the Securities Act of 1933, as amended, nor have they been registered pursuant to the provisions of the securities or other laws of applicable jurisdictions.

(I)    The Shares for which I subscribe are being acquired solely for my own account, for investment and are not being purchased with a view to or for their resale or distribution. In order to induce the Corporation to sell Shares to me, the Corporation will have no obligation to recognize the ownership, beneficial or otherwise, of the Shares by anyone but me.

(J)    I am aware of the following:

   (i)    The Shares are a speculative investment that involves a high degree of risk;

   (ii)    My investment in the Shares is not readily transferable; it may not be possible for me to liquidate my investment.

   (iii)    The financial statements of the Corporation have merely been compiled, and have not been reviewed or audited.

   (iv)    There are substantial restrictions on the transferability of the Shares registered under the Securities Act and the securities laws of the appropriate jurisdictions; and

   (v)    No federal or state agency has made any finding or determination as to the fairness of the Offering or the Shares for public investment nor any recommendation or endorsement of the Shares.

   (vi)    The purchase of the Shares is for investment for my own account and without any view to the sale or distribution thereof.

(K)    Except as set forth in the Memorandum, none of the following information has ever been represented, guaranteed, or warranted to me expressly or by implication, by any broker, the Corporation, or agents or employees of the foregoing, or by any other person:

(i)       The appropriate or exact length of time that I will be required to hold the Shares;

(ii)      The percentage of profit and/or amount or type of consideration, distribution, profit, or loss to be realized, if any, as a result of an investment in the Shares; or

(iii)     That the past performance or experience of the Corporation, or associates, agents, affiliates, or employees of the Corporation or any other person, will in any way indicate or predict economic results in connection with the purchase of Shares;

(iv)      The amount of royalties available or distributions that the Corporation will make.

(L)      I have not distributed the Memorandum to anyone, no other person has used the Memorandum, and I have made no copies of the Memorandum.

(M)      I hereby agree to indemnify and hold harmless the Corporation, its managers, directors, and representatives from and against any and all liability, damage, cost or expense, including reasonable attorneys fees, incurred on account of or arising out of:

(i)       Any inaccuracy in the declarations, representations, and warranties set forth above;

(ii)      The disposition of any of the Shares by me which is contrary to the foregoing declarations, representations, and warranties; and

(iii)     Any action, suit or proceeding based upon (1) the claim that said declarations, representations, or warranties were inaccurate or misleading or otherwise cause for obtaining damages or redress from the Corporation; or (2) the disposition of any of the Shares.

(N)      By entering into this Subscription Agreement, I acknowledge that the Corporation is relying on the truth and accuracy of my representations. The foregoing representation and warranties are true and accurate as of the date hereof, shall be true and accurate as of the date of the delivery of the funds to the Corporation and shall survive such delivery. If, in any respect, such representations and warranties are not true and accurate prior to delivery of the funds, I will give written notice of the fact to the Corporation, specifying which representations and warranties are not true and accurate and the reasons therefor.

5. I understand that I may sell or otherwise transfer the securities only if registered under the Securities Act or I provide the Corporation with an opinion of counsel acceptable to the Corporation to the effect that such sale or other transfer may be made in absence of registration under the Securities Act. I have no right to cause the Corporation to register the securities. Any certificates or other documents representing my securities will contain a restrictive legend reflecting this restriction, and stop transfer instructions will apply to my securities.

6.       I understand the meaning and legal consequences of the representations and warranties contained herein, and I will indemnify and hold harmless the Corporation, its officers, directors, and representatives involved in the offer or sale of the Shares to me, as well as each of the managers and representatives, employees and agents and other controlling persons of each of them, from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of mine contained in this Subscription Agreement.

7.    I will not cancel, terminate or revoke this Subscription Agreement or any agreement made by me hereunder and this Subscription Agreement shall survive my death or disability.

8.    If this subscription is rejected by the Corporation, then this Subscription Agreement shall be null and void and of no further force and effect, no party shall have any rights against any other party hereunder, and the Corporation shall promptly return to me the funds delivered with this Subscription Agreement.

9.    Miscellaneous.

(A)    THIS AGREEMENT REQUIRES THAT ALL INVESTORS ARBITRATE ANY DISPUTE ARISING OUT OF THEIR INVESTMENT IN THE Shares IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION. YOU FURTHER AGREE THAT THE ARBITRATION WILL BE BINDING AND HELD IN NEW YORK COUNTY, NY. YOU AGREE THEREBY TO WAIVE ANY RIGHTS TO A JURY TRIAL. OUT OF STATE ARBITRATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO ARBITRATE A SETTLEMENT OF A DISPUTE. IT MAY ALSO COST YOU MORE TO ARBITRATE IN NEW YORK THAN IN YOUR HOME STATE. The arbitrator may award attorney fees to the winning party.

(B)    This Subscription Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only in writing and executed by all parties.

(C)    By Purchasing the Shares I hereby agree to the terms and provisions of the securities as included in the Memorandum.

B. I have hereby read and understand the Memorandum and understand how the corporation functions as a corporate entity.

10. Ownership Information. Please print here the total number of Shares to be purchased, and the exact name(s) in which the Shares will be registered.

Total Shares Subscribed For: _27,600_

Total Subscription Price: $ _46,970.00_

Registered Name(s): _SUNWEST TRUST CUSTODIAN FOR NORMA MOBLEY IRA_
_____ Single Person
_____ Husband and Wife, as community property
_____ Joint Tenants (with right of survivorship)
_____ Tenants in Common
_____ A Married Person as separate property
_____ Corporation or other organization
_____ A Partnership
_____ Trust
___✓__ IRA
_____ Tax-Qualified Retirement Plan

(i)  Trustee(s)/ Custodian_____
(ii)  Trust Date_____
(iii)  Name of Trust_____
(iv)  For the Benefit of_____

_____ Other:_____
        (please explain)

Social Security or Tax I.D.#: ███████████

Residence Address:
████████████████████
Street Address
████████████████████_____
City                        State                        Zip

Mailing Address:  (Complete only if different from residence)
_____
Street Address  (If P.O.Box, include address for surface delivery if different than
                residence)
_____
City                        State                        Zip

Phone Numbers
Home: (_____)
Business: (████████████████
Facsimile: (████████████

Dated: _9/21/12_____

Purchaser Name: _SUNWEST TRUST FBO NORMA MOBLEY IRA_

Purchaser Signature: _____

Accepted: NATIONWIDE PHARMASSIST CORP.

By:_____ Date: _9-23-12_

6

## Exhibit A

## To Private Placement Memorandum

### Subscription Agreement

## NATIONWIDE PHARMASSIST CORP.
**Boca Raton, FL**

You have informed the undersigned (the "Purchaser") that Nationwide PharmAssist Corp., a Florida corporation, (the "Corporation" or the "Company") wishes to raise a maximum of Eight Hundred and Fifty Thousand Dollars ($850,000.00) from various persons by selling up to 500,000 Shares of its securities at a price of $1.70 per Share.

1.      I have received, read, and understand the Confidential Private Placement Memorandum dated July 6, 2012 (the "Memorandum"). I further understand that my rights and responsibilities as a Purchaser will be governed by the terms and conditions of this Subscription Agreement, the Memorandum and the Shares of Nationwide PharmAssist Corp. I understand that you will rely on the following information to confirm that I am an "Accredited Investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), or that I am a "Non-Accredited" investor that will be allowed to purchase Shares in this Offering (subject to Corporation approval), and that I am qualified to be a Purchaser.

2.      This Subscription Agreement is one of a number of such subscription agreements for Shares. By signing this Subscription Agreement, I offer to purchase and subscribe from the Corporation the number of Shares set forth below on the terms specified herein. The Corporation reserves the right, in its complete discretion, to reject any subscription offer or to reduce the number of Shares allotted to me. If this offer is accepted, the Corporation will execute a copy of this Subscription Agreement and return it to me.

I understand that all funds received by the Corporation in full payment of subscriptions for Shares will be immediately available to the Corporation, and that no escrow will be established.

3.      Accredited Investor. I am an Accredited Investor because I qualify within one of the following categories:

**Please Check The Appropriate Category**

_✓_     $1,000,000 Net Worth.

A natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000, excluding the equity value of that person's principal residence.

_____ $200,000/$300,000 Income.

A natural person who had an individual income in excess of $200,000 (including contributions to qualified employee benefit plans) or joint income with such person's spouse in excess of $300,000 per year in each of the two most recent years and who reasonably expects to attain the same individual or joint levels of income (including such contributions) in the current year.

_____ Director or Officer of Issuer.

Any director or executive officer of the Corporation

28

_____ All Equity Owners In Entity Are Accredited.

An entity, (i.e. corporation, partnership, trust, IRA, etc.) in which all of the equity owners are Accredited Investors as defined herein.

_____ Corporation.

A corporation not formed for the specific purpose of acquiring the Shares offered, with total assets in excess of $5,000,000.

_____ Other Accredited Investor.

Any natural person or entity which qualifies as an Accredited Investor pursuant to Rule 501(a) of Regulation D promulgated under the Act; specify basis for qualification:

_____

_____

_____ Non-Accredited Investor.

I am a "Non-Accredited Investor" that may be allowed to purchase Shares in this Offering.

4.    I represent and warrant to the Corporation that I:

(A)    (i)    have adequate means of providing for my current needs and possible contingencies and I have no need for liquidity of my investment in the Shares,

(ii)    can bear the economic risk of losing the entire amount of my investment in Shares,

(iii)    have such knowledge and experience that I am capable of evaluating the relative risks and merits of this investment; and

(iv)    acknowledge that the purchase of Shares is consistent, in both nature and amount, with my overall investment program and financial condition.

(B)    The address set forth below is my true and correct residence, and I have no intention of becoming a resident of any other state or jurisdiction.

(C)    I have not utilized the services of a "Purchaser Representative" (as defined in Regulation D promulgated under the Securities Act) because I am an experienced investor, capable of determining and understanding the risks and merits of this investment.

(D)    I have received and read, and am familiar with the Offering Documents, including the Memorandum and Subscription Agreement of the Corporation. All documents, records and books pertaining to the Corporation and the Shares requested by me, including all pertinent records of the Corporation, financial and otherwise, have been made available or delivered to me.

(E)    I have had the opportunity to ask questions of and receive answers from the Corporation's officers and representatives concerning the Corporation's affairs generally and the

29

terms and conditions of my proposed investment in the Shares.

(F)    I understand the risks implicit in the business of the Corporation. Among other things, I understand that there can be no assurance that the Corporation will be successful in obtaining the funds necessary for its success. If only a fraction of the amount of the Offering is raised, the Corporation may not be able to expand as rapidly as anticipated, and proceeds from this Offering may not be sufficient for the Corporation's long term needs.

(G)    Other than as set forth in the Memorandum, no person or entity has made any representation or warranty whatsoever with respect to any matter or thing concerning the Corporation and this Offering, and I am purchasing the Shares based solely upon my own investigation and evaluation.

(H)    I understand that no Shares have been registered under the Securities Act of 1933, as amended, nor have they been registered pursuant to the provisions of the securities or other laws of applicable jurisdictions.

(I)    The Shares for which I subscribe are being acquired solely for my own account, for investment and are not being purchased with a view to or for their resale or distribution. In order to induce the Corporation to sell Shares to me, the Corporation will have no obligation to recognize the ownership, beneficial or otherwise, of the Shares by anyone but me.

(J)    I am aware of the following:

(i)    The Shares are a speculative investment that involves a high degree of risk;

(ii)    My investment in the Shares is not readily transferable; it may not be possible for me to liquidate my investment.

(iii)    The financial statements of the Corporation have merely been compiled, and have not been reviewed or audited.

(iv)    There are substantial restrictions on the transferability of the Shares registered under the Securities Act and the securities laws of the appropriate jurisdictions; and

(v)    No federal or state agency has made any finding or determination as to the fairness of the Offering or the Shares for public investment nor any recommendation or endorsement of the Shares.

(vi)    The purchase of the Shares is for investment for my own account and without any view to the sale or distribution thereof.

(K)    Except as set forth in the Memorandum, none of the following information has ever been represented, guaranteed, or warranted to me expressly or by implication, by any broker, the Corporation, or agents or employees of the foregoing, or by any other person:

(i)    The appropriate or exact length of time that I will be required to hold the Shares;

(ii)    The percentage of profit and/or amount or type of consideration, distribution, profit, or loss to be realized, if any, as a result of an investment in the Shares; or

(iii)    That the past performance or experience of the Corporation, or associates, agents, affiliates, or employees of the Corporation or any other person, will in any way indicate or predict economic results in connection with the purchase of Shares;

(iv)    The amount of royalties available or distributions that the Corporation will make.

30

(L)    I have not distributed the Memorandum to anyone, no other person has used the Memorandum, and I have made no copies of the Memorandum.

(M)    I hereby agree to indemnify and hold harmless the Corporation, its managers, directors, and representatives from and against any and all liability, damage, cost or expense, including reasonable attorneys fees, incurred on account of or arising out of:

(i)    Any inaccuracy in the declarations, representations, and warranties set forth above;

(ii)    The disposition of any of the Shares by me which is contrary to the foregoing declarations, representations, and warranties; and

(iii)    Any action, suit or proceeding based upon (1) the claim that said declarations, representations, or warranties were inaccurate or misleading or otherwise cause for obtaining damages or redress from the Corporation; or (2) the disposition of any of the Shares.

(N)    By entering into this Subscription Agreement, I acknowledge that the Corporation is relying on the truth and accuracy of my representations. The foregoing representation and warranties are true and accurate as of the date hereof, shall be true and accurate as of the date of the delivery of the funds to the Corporation and shall survive such delivery. If, in any respect, such representations and warranties are not true and accurate prior to delivery of the funds, I will give written notice of the fact to the Corporation, specifying which representations and warranties are not true and accurate and the reasons therefor.

**5. I understand that I may sell or otherwise transfer the securities only if registered under the Securities Act or I provide the Corporation with an opinion of counsel acceptable to the Corporation to the effect that such sale or other transfer may be made in absence of registration under the Securities Act. I have no right to cause the Corporation to register the securities. Any certificates or other documents representing my securities will contain a restrictive legend reflecting this restriction, and stop transfer instructions will apply to my securities.**

6.    I understand the meaning and legal consequences of the representations and warranties contained herein, and I will indemnify and hold harmless the Corporation, its officers, directors, and representatives involved in the offer or sale of the Shares to me, as well as each of the managers and representatives, employees and agents and other controlling persons of each of them, from and against any and all loss, damage or liability due to or arising out of a breach of any representation or warranty of mine contained in this Subscription Agreement.

7.    I will not cancel, terminate or revoke this Subscription Agreement or any agreement made by me hereunder and this Subscription Agreement shall survive my death or disability.

8.    If this subscription is rejected by the Corporation, then this Subscription Agreement shall be null and void and of no further force and effect, no party shall have any rights against any other party hereunder, and the Corporation shall promptly return to me the funds delivered with this Subscription Agreement.

9.    Miscellaneous.

(A)    THIS AGREEMENT REQUIRES THAT ALL INVESTORS ARBITRATE ANY DISPUTE ARISING OUT OF THEIR INVESTMENT IN THE Shares IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION. YOU FURTHER AGREE THAT THE ARBITRATION WILL BE BINDING AND HELD IN NEW YORK COUNTY, NY. YOU AGREE THEREBY TO WAIVE ANY RIGHTS TO A JURY TRIAL. OUT OF STATE ARBITRATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO ARBITRATE A

31

SETTLEMENT OF A DISPUTE. IT MAY ALSO COST YOU MORE TO ARBITRATE IN FLORIDA THAN IN YOUR HOME STATE. The arbitrator may award attorney fees to the winning party.

(B)    This Subscription Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only in writing and executed by all parties.

(C)    By Purchasing the Shares I hereby agree to the terms and provisions of the securities as included in the Memorandum.

B. I have hereby read and understand the Memorandum and understand how the corporation functions as a corporate entity.

10.  Ownership Information. Please print here the total number of Shares to be purchased, and the exact name(s) in which the Shares will be registered.

Total Shares Subscribed For: 60,000/#102,000

Total Subscription Price: $ 1.70

Registered Name(s): BRIAN A. BULFER

X  Single Person
_____ Husband and Wife, as community property
_____ Joint Tenants (with right of survivorship)
_____ Tenants in Common
_____ A Married Person as separate property
_____ Corporation or other organization
_____ A Partnership
_____ Trust
_____ IRA
_____ Tax-Qualified Retirement Plan

       (i)  Trustee(s)/ Custodian _____
       (ii)  Trust Date_____
       (iii)  Name of Trust_____
       (iv)  For the Benefit of_____

       Other:_____
              (please explain)

Social Security or Tax I.D.#: ███████████

Residence Address:

                  ████████████

Street Address:

████████████████████████████████

City                State                Zip

Mailing Address:  *(Complete only if different from residence)*

_____

Street Address  (If P.O.Box, include address for surface delivery if different than residence)

_____

City                         State                         Zip

Phone Numbers:

Home: ( ███████████████

Business: ( ███████████

Facsimile: ( _____ ) _____

Dated: 7 | 27 | 2012

Purchaser Name: BRIAN A BULFER

Purchaser Signature: _____

Accepted: NATIONWIDE PHARMASSIST CORP.

By: _____ Date: Aug 10, 12

33

<u>EXHIBIT A</u>

FORM OF NOTE

# NATIONWIDE PHARMASSIST CORP.

EIGHT (8%) PERCENT CONVERTIBLE NOTE

IN THE PRINCIPAL AMOUNT OF $ *200,000*

ISSUE DATE: *FEBRUARY 18, 2013*

MATURITY DATE: *FEBRUARY 17, 2015*

THIS CERTIFICATE, acknowledges that *Debra Ann Leue* , with an address at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (hereinafter the "Owner") has on the Issue Date above written purchased from Nationwide PharmAssist Corp. (the "**Company**") a Florida Corporation with its principal office at 1011 S.W. 30th Ave. Deerfield Beach, FL 33442, a Eight (8%) Per Cent Convertible Note (the "**Note**") in the principal amount stated above, and is the true and lawful owner thereof, subject to the following terms and conditions:

1. **Interest and Payments.** The Company shall pay interest on the Principal Amount at the rate of Eight (8%) Percent per annum compounded and accrued, commencing on the Issue Date and terminating on the Maturity Date, as stated above. Payment shall begin six months after the Issue Date, and continue thereafter quarterly on a calendar basis. All payments shall be made to the Owner of record with the Company and be forwarded by first class mail to the last address on its books. In the event any payment due hereunder shall not be paid on the date when due, such payment will add to principal upon which additional interest shall accrue from the date when such payment was due until paid. This paragraph shall not be deemed to extend or otherwise modify or amend the date when such payments are due hereunder. The obligations of Company under this Note are subject to the limitation that payments of interest shall not be required to the extent that the charging of or the receipt of any such payment by the Owner would be contrary to the provisions of law applicable to the Owner limiting the maximum rate of interest which may be charged or collected by the Owner.

2. **Covenants.** The Company covenants and agrees with the Owner that, so long as any amount remains unpaid on the Note, the Company shall deliver to Owner and otherwise comply with the following:

    a. promptly after the Company shall obtain knowledge of the occurrence of any Event of Default (as hereinafter defined) or any event which with notice or lapse of time or both would become an Event of Default (an Event of Default or such other event being a "Default"), a notice specifying that such notice is a 'Notice of Default" and describing such Default in reasonable detail, and, in such Notice of Default or as

**EXHIBIT "B"**

soon thereafter as practicable, a description of the action the Company has taken or proposes to take with respect thereto;

b.  in no event shall the Company incur any indebtedness senior to this Note, other than trade debt incurred in the ordinary course of business, unless the Company shall have notified the Owner in writing (the "Financing Notice") of its intention to seek such additional indebtedness and that 60% of the Owners of the Notes shall consent to such indebtedness, or that all amounts due under this Note will be paid from the proceeds of such financing, within ten (10) business days after the completion of such financing.

3.  **Events of Default.**

a.  The occurrence of any of the following events shall constitute an event of default (an "Event of Default"):

b.  A default in the payment of the principal amount of the Notes, when and as the same shall become due and payable.

c.  A default in the performance, or a breach, of any of the covenants of the Company contained in the Note.

d.  Any representation, warranty, or certification made by the Company pursuant to the Notes shall prove to have been false or misleading as of the date made in any material respect.

e.  The entry of a decree or order by a court having jurisdiction adjudging the Company a bankrupt or insolvent, or approving a petition seeking reorganization, arrangement, adjustment, or composition of, or in respect of, the Company, under federal bankruptcy law, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency, or other similar law, and the continuance of any such decree or order unstayed and in effect for a period of 60 days; or the commencement by the Company of a voluntary case under federal bankruptcy law, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency, or other similar law, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under federal bankruptcy law or any other applicable federal or state law, or the consent by it to the filing of such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, or similar official as to the Company or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of action by the Company in furtherance of any such action.

4.  **Remedies Upon Default.**

a.  Upon the occurrence of an Event of Default referred to in Section 3, the principal amount then outstanding of, and the accrued and unpaid interest on, this Note shall automatically become immediately due and payable without presentment, demand,

[SIGNATURE PAGE TO CONVERTIBLE NOTE SUBSCRIPTION AGREEMENT]

protest, or other formalities of any kind, all of which are hereby expressly waived by the Company.

b. The Owner may institute such actions or proceedings in law or equity as they shall deem expedient for the protection of their rights and may prosecute and enforce their claims against the Company, and, in connection with any such action or proceeding, the Owners of the Notes shall be entitled to receive in the aggregate from the Company payment of the outstanding principal amount of the Notes plus accrued and unpaid interest to the date of payment plus reasonable expenses of collection, including, without limitation, attorneys' fees and expense.

## 5. Sale and Transfer.

a. The Company shall have a right of first refusal ("Right of First Refusal") to purchase or redeem any Note or the securities issuable upon conversion (together, the "Securities") issued under this Subscription Agreement prior to its sale or transfer to any third party not originally the Investor. If any Investor should decide to sell or transfer their Securities to a third party, they must first provide notice ("Notice of Sale") to the Company of such Bona Fide offer to purchase by the third party, including the price and terms of such transaction. The Company will have 30 days from the date the Notice of Sale is received to either purchase the Securities from the Investor on the same terms and conditions as offered by the third party, or to redeem the Securities for accrued interest and principal, as well as any shares converted at the conversion price. If the Company decides not to purchase or redeem the Securities, the Investor is deemed authorized to make the transfer provided it is done on the basis disclosed to the Company in the Notice of Sale. If such transfer is made on different terms than those disclosed to the Company, such transfer authorization is revoked, and the Securities may not be purchased by a third party.

b. The Notes and the securities issuable upon conversion (together, the "Securities") will be restricted as to transferability under state and federal laws regulating securities. The issuance of the Securities will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), or any other similar state statutes, in reliance upon exemptions from the registration requirements contained therein. Accordingly, the Securities will be "restricted securities" as defined in Rule 144 of the Securities Act. As "restricted securities," an investor must hold them indefinitely and may not dispose or otherwise sell them without registration under the Securities Act and any applicable state securities laws unless exemptions form registrations are available. Moreover, in the event an investor desires to sell or otherwise dispose of any of the Securities, the investor will be required to furnish the Company with an opinion of counsel acceptable to us that the transfer would not violate the registration requirements of the Securities Act or applicable state securities laws. Any certificate or other document evidencing the Securities will be imprinted with a conspicuous legend stating that the Securities have not been registered under the Securities Act and state securities laws, and referring to the restrictions on transferability and sale of the Securities. In addition, the Company's records concerning the Securities will include "stop transfer notations" with respect to such Securities.

[SIGNATURE PAGE TO CONVERTIBLE NOTE SUBSCRIPTION AGREEMENT]

6.    Investors. Each Investor is required to be "accredited" as such term is defined under Securities and Exchange Commission Rule 501 of Regulation D. Each Investor will be required to execute a Note Purchase Subscription Agreement and an Accredited Investor Questionnaire and provide any other documentation which may be required for the Company to comply with securities laws. In addition, Investors should have funds other than those invested in the Company adequate to meet their personal needs and contingencies and must be knowledgeable and experienced in financial and business matters generally. The Chief Executive Officer of the Company may, in his sole discretion, decline to admit any prospective Investor regardless of whether such person meets the foregoing suitability requirements.

7.    **Right of Conversion into Shares.**

   a.    As of the date of issue of this Convertible Note the Company has 100,000,000 Shares of Common Stock authorized of which 8,413,110 Shares are issued and outstanding.

   b.    At the Owners sole option, at anytime following the Issue Date but prior to the close of business on the Maturity Date the entire Principal Amount of $200,000 and all accrued interest, may be converted into fully-paid an non-assessable Shares of Common Stock of the Company. The conversion price shall be at the rate of two dollars ($2.00) per-share. Such conversion option exercised by the Owner shall be effective upon the completion, signing and delivering to the Company of a written Election to Convert. The entire Principal Amount and accrued interest may only be converted in its entirety and not in fractional or proportional amounts.

   c.    The Shares acquired by the Owner through the conversion option set forth in Section 7 (b) herein shall be "restricted securities" as that term is defined under the Act and an opinion of counsel acceptable to the Company will be required in order to affect the sale or transfer of the Shares.

8.    **Term and Right to Accelerate Termination.**  The term of this Note shall begin on the Issue Date and shall end on the Maturity Date set forth above. However, the Company reserves the right, in its sole discretion at any time after the end of the 6th month following the Issue Date, to accelerate the Maturity Date and redeem this Note as of the close of business on a date certain (the "Redemption Date") which shall not be less than 60 days following the mailing as hereinafter provided to the Owner of a notice (the "Notice of Redemption") setting forth such election by the Company. The Notice of Redemption shall be mailed to the Owner of record at that date, shall be sent via certified or registered mail, return receipt requested, if to an address within the United States or outside the United States where such mailing with return receipt can be made, or by such other means as reasonably assures delivery to the Owner with proof thereof to the Company. Such Notice of Redemption shall specify (i) date on which the redemption will be effective; (ii) the instructions for the return of this Note instrument and the procedure for payment of the redemption amount (iii) a statement of the Owners right to convert the Entire Principal Amount as provided for in Section 7 (b) above by delivery to the Company of a written Election to Convert, which delivery must be made at the offices of the Company at anytime up to 5:00PM New York Time on the Redemption Date; (iv) a statement that any Election to Convert received after 5:00PM New York Time on the Redemption Date will be void and of no effect; and (v) a statement advising the owner that following 5:00PM New York Time

[SIGNATURE PAGE TO CONVERTIBLE NOTE SUBSCRIPTION AGREEMENT]

on the Redemption Date his sole right will be to receive the return of the Principal Amount being redeemed plus any accrued interest thereon through the Redemption Date.

9. **Dedicated Use of Funds.** Development of infrastructure; purchase of equipment and supplies, sales and marketing initiatives, technology advancements and working capital

10. **Collateral.** The Notes are the general corporate obligation of the Company who shall be responsible for the repayment of the Principal Amount at the Maturity Date or such earlier Redemption Date. The obligation to pay the interest when due, and to repay the principal at maturity, shall be the general obligation of the Company

11. **Governing Law, Saving Clause and Adverse Declarations.** This Note is being issued in the state of Florida and the domestic laws of Florida hereof shall govern its validity, interpretation, performance and enforcement. In case any one or more of the provisions contained in this Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Note, and this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein, except that, should any such declaration of invalidity, illegality or unenforceability (the "Declaration") be of such a nature as to adversely restrict the Company's intended use of the proceeds here from, then, in any of such events, the Maturity Date shall be deemed to be accelerated to the date of such Declaration regardless of any limitation to the contrary contained herein and the Company's sole obligation shall be to cancel this Note and repay to the Owner the Principal Amount plus any accrued interest to such accelerated Maturity Date. Should such Declaration occur at a time when the Owner shall have elected the conversion option set forth in Sec. 7 (b) herein and should such Declaration, in the sole opinion of counsel for the Company, be of a nature that could result in a violation of any applicable federal or state securities laws then, in such event, the parties agree that the Company's sole obligation shall be to rescind such conversion by the Owner and to pay to the Owner the entire Principal Amount, plus interest from the Issue Date to the date of such Declaration.

12. **Due Authorization.** The issuance of this Note according to the terms stated herein has been duly approved by all required corporate action on the part of the Company and has been duly approved by the Board of Directors of the Company as the valid and binding obligation of the Company.

**General Provisions.**

13. Company consents that Owner at any time may extend the time of payment of all or any part of the indebtedness secured hereby, or may grant any other indulgences.

14. Any notice or demand required or permitted to be made or given hereunder shall be deemed sufficiently made and given if given by personal service or by the mailing of such notice or demand by certified or registered mail, return receipt requested, addressed, if to Company, at Company's business address, or if to Owner, at such address as may be provided to Company from time to time. Either party may change its address by like notice to the other party.

[SIGNATURE PAGE TO CONVERTIBLE NOTE SUBSCRIPTION AGREEMENT]

15. This Note may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change, modification, termination, waiver, or discharge is sought.

WHEREFORE, the Company has duly issued this Note on the Issue Date first above written.

NATIONWIDE PHARMASSIST CORP.

Attest:

By: _Stephen F. Molinari_          By: _____

Name: _STEPHEN F. MOLINARI_     Name: _____

Title: _Chairman & CEO_              Title: _____

2-18-13

[SIGNATURE PAGE TO CONVERTIBLE NOTE SUBSCRIPTION AGREEMENT]

EXHIBIT A

FORM OF NOTE

NATIONWIDE PHARMASSIST CORP.

EIGHT (8%) PERCENT CONVERTIBLE NOTE

IN THE PRINCIPAL AMOUNT OF $ *50,000*

ISSUE DATE: *MAY 29 2013*

MATURITY DATE: *May 28, 2015*

THIS CERTIFICATE, acknowledges that _____ *LESLIE E EMERSON* with an address at ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (hereinafter the "Owner") has on the Issue Date written above, purchased from Nationwide PharmAssist Corp. (the "Company"), a Florida Corporation with its principal office at 1011 S.W. 30th Ave. Deerfield Beach, FL 33442, an Eight Per Cent (8%) Convertible Note (the "Note") in the principal amount stated above, and is the true and lawful owner thereof, subject to the following terms and conditions:

1. **Interest and Payments.** The Company shall pay interest on the Principal Amount at the rate of Eight Percent (8%) per annum compounded and accrued, commencing on the Issue Date and terminating on the Maturity Date, as stated above. Payment shall begin six months after the Issue Date, and continue thereafter quarterly on a calendar basis. All payments shall be made to the Owner of record with the Company and be forwarded by first class mail to the last address on its books. In the event any payment due hereunder shall not be paid on the date when due, such payment will add to principal upon which additional interest shall accrue from the date when such payment was due until paid. This paragraph shall not be deemed to extend or otherwise modify or amend the date when such payments are due hereunder. The obligations of Company under this Note are subject to the limitation that payments of interest shall not be required to the extent that the charging of or the receipt of any such payment by the Owner would be contrary to the provisions of law applicable to the Owner limiting the maximum rate of interest which may be charged or collected by the Owner.

2. **Covenants.** The Company covenants and agrees with the Owner that, so long as any amount remains unpaid on the Note, the Company shall deliver to Owner and otherwise comply with the following:

   a. Promptly after the Company shall obtain knowledge of the occurrence of any Event of Default (as hereinafter defined) or any event which with notice or lapse of time or both would become an Event of Default (an Event of Default or such other event being a "Default"), a notice specifying that such notice is a 'Notice of

**EXHIBIT "C"**

Default" and describing such Default in reasonable detail, and, in such Notice of Default or as soon thereafter as practicable, a description of the action the Company has taken or proposes to take with respect thereto;

b.  In no event shall the Company incur any indebtedness senior to this Note, other than trade debt incurred in the ordinary course of business, unless the Company shall have notified the Owner in writing (the "Financing Notice") of its intention to seek such additional indebtedness and that 60% of the Owners of the Notes shall consent to such indebtedness, or that all amounts due under this Note will be paid from the proceeds of such financing, within ten (10) business days after the completion of such financing.

3.  **Events of Default.**

a.  The occurrence of any of the following events shall constitute an event of default (an "Event of Default"):

b.  A default in the payment of the principal amount of the Notes, when and as the same shall become due and payable.

c.  A default in the performance, or a breach, of any of the covenants of the Company contained in the Note.

d.  Any representation, warranty, or certification made by the Company pursuant to the Notes shall prove to have been false or misleading as of the date made in any material respect.

e.  The entry of a decree or order by a court having jurisdiction adjudging the Company a bankrupt or insolvent, or approving a petition seeking reorganization, arrangement, adjustment, or composition of, or in respect of, the Company, under federal bankruptcy law, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency, or other similar law, and the continuance of any such decree or order unstayed and in effect for a period of 60 days; or the commencement by the Company of a voluntary case under federal bankruptcy law, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency, or other similar law, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under federal bankruptcy law or any other applicable federal or state law, or the consent by it to the filing of such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, or similar official as to the Company or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of action by the Company in furtherance of any such action.

[SIGNATURE PAGE TO CONVERTIBLE NOTE SUBSCRIPTION AGREEMENT]

4. **Remedies Upon Default.**

    a. Upon the occurrence of an Event of Default referred to in Section 3, the principal amount then outstanding of, and the accrued and unpaid interest on, this Note shall automatically become immediately due and payable without presentment, demand, protest, or other formalities of any kind, all of which are hereby expressly waived by the Company.

    b. The Owner may institute such actions or proceedings in law or equity as they shall deem expedient for the protection of their rights and may prosecute and enforce their claims against the Company, and, in connection with any such action or proceeding, the Owners of the Notes shall be entitled to receive in the aggregate from the Company payment of the outstanding principal amount of the Notes plus accrued and unpaid interest to the date of payment plus reasonable expenses of collection, including, without limitation, attorneys' fees and expense.

5. **Sale and Transfer.**

    a. The Company shall have a right of first refusal ("Right of First Refusal") to purchase or redeem any Note or the securities issuable upon conversion (together, the "Securities") issued under this Subscription Agreement prior to its sale or transfer to any third party not originally the Investor. If any Investor should decide to sell or transfer their Securities to a third party, they must first provide notice ("Notice of Sale") to the Company of such Bona Fide offer to purchase by the third party, including the price and terms of such transaction. The Company will have 30 days from the date the Notice of Sale is received to either purchase the Securities from the Investor on the same terms and conditions as offered by the third party, or to redeem the Securities for accrued interest and principal, as well as any shares converted at the conversion price. If the Company decides not to purchase or redeem the Securities, the Investor is deemed authorized to make the transfer provided it is done on the basis disclosed to the Company in the Notice of Sale. If such transfer is made on different terms than those disclosed to the Company, such transfer authorization is revoked, and the Securities may not be purchased by a third party.

    b. The Notes and the securities issuable upon conversion (together, the "Securities") will be restricted as to transferability under state and federal laws regulating securities. The issuance of the Securities will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), or any other similar state statutes, in reliance upon exemptions from the registration requirements contained therein. Accordingly, the Securities will be "restricted securities" as defined in Rule 144 of the Securities Act. As "restricted securities," an investor must hold them indefinitely and may not dispose or otherwise sell them without registration under the Securities Act and any applicable state securities laws unless exemptions form registrations are available. Moreover, in the event an investor desires to sell or otherwise dispose of any of the Securities, the investor

[SIGNATURE PAGE TO CONVERTIBLE NOTE SUBSCRIPTION AGREEMENT]

will be required to furnish the Company with an opinion of counsel acceptable to us that the transfer would not violate the registration requirements of the Securities Act or applicable state securities laws. Any certificate or other document evidencing the Securities will be imprinted with a conspicuous legend stating that the Securities have not been registered under the Securities Act and state securities laws, and referring to the restrictions on transferability and sale of the Securities. In addition, the Company's records concerning the Securities will include "stop transfer notations" with respect to such Securities.

6. **Investors.** Each Investor is required to be "accredited" as such term is defined under Securities and Exchange Commission Rule 501 of Regulation D. Each Investor will be required to execute a Note Purchase Subscription Agreement and an Accredited Investor Questionnaire and provide any other documentation which may be required for the Company to comply with securities laws. In addition, Investors should have funds other than those invested in the Company adequate to meet their personal needs and contingencies and must be knowledgeable and experienced in financial and business matters generally. The Chief Executive Officer of the Company may, in his sole discretion, decline to admit any prospective investor regardless of whether such person meets the foregoing suitability requirements.

7. **Right of Conversion into Shares.**

   a. As of the date of issue of this Convertible Note the Company has 100,000,000 Shares of Common Stock authorized of which 8,413,110 Shares are issued and outstanding.

   b. At the Owners sole option, at anytime following the Issue Date but prior to the close of business on the Maturity Date the entire Principal Amount of $ 50,000 and all accrued interest, may be converted into fully-paid an non-assessable Shares of Common Stock of the Company. The conversion price shall be at the rate of two dollars ($2.00) per-share. Such conversion option exercised by the Owner shall be effective upon the completion, signing and delivering to the Company of a written Election to Convert. The entire Principal Amount and accrued interest may only be converted in its entirety and not in fractional or proportional amounts.

   c. The Shares acquired by the Owner through the conversion option set forth in Section 7 (b) herein shall be "restricted securities" as that term is defined under the Act and an opinion of counsel acceptable to the Company will be required in order to affect the sale or transfer of the Shares.

8. **Term and Right to Accelerate Termination.** The term of this Note shall begin on the Issue Date and shall end on the Maturity Date set forth above. However, the Company reserves the right, in its sole discretion at any time after the end of the 6th month following the Issue Date, to accelerate the Maturity Date and redeem this Note as of the close of business on a date certain (the "Redemption Date") which shall not be less than

[SIGNATURE PAGE TO CONVERTIBLE NOTE SUBSCRIPTION AGREEMENT]

to the Owner the entire Principal Amount, plus interest from the Issue Date to the date of such Declaration.

12. **Due Authorization.** The issuance of this Note according to the terms stated herein has been duly approved by all required corporate action on the part of the Company and has been duly approved by the Board of Directors of the Company as the valid and binding obligation of the Company.

General Provisions.

13. Company consents that Owner at any time may extend the time of payment of all or any part of the indebtedness secured hereby, or may grant any other indulgences.

14. Any notice or demand required or permitted to be made or given hereunder shall be deemed sufficiently made and given if given by personal service or by the mailing of such notice or demand by certified or registered mail, return receipt requested, addressed, if to Company, at Company's business address, or if to Owner, at such address as may be provided to Company from time to time. Either party may change its address by like notice to the other party.

15. This Note may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change, modification, termination, waiver, or discharge is sought.

WHEREFORE, the Company has duly issued this Note on the Issue Date first above written.

NATIONWIDE PHARMASSIST CORP.

Attest:

By: _____

Name: STEPHEN F. MOLINARE

Title: Chairman & CEO

[SIGNATURE PAGE TO CONVERTIBLE NOTE SUBSCRIPTION AGREEMENT]

EXHIBIT A

FORM OF NOTE

# NATIONWIDE PHARMASSIST CORP.

## EIGHT (8%) PERCENT CONVERTIBLE NOTE

IN THE PRINCIPAL AMOUNT OF $ 65,000

ISSUE DATE: FEBRUARY 13 2013

MATURITY DATE: FEBRUARY 12, 2015

THIS CERTIFICATE, acknowledges that BRIAN BULFER
with an address at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ hereinafter the "Owner")
has on the Issue Date above written purchased from Nationwide PharmAssist Corp. (the
"Company") a Florida Corporation with its principal office at 1011 S.W. 30th Ave. Deerfield
Beach, FL 33442, a Eight (8%) Per Cent Convertible Note (the "Note") in the principal amount
stated above, and is the true and lawful owner thereof, subject to the following terms and
conditions:

1. **Interest and Payments.** The Company shall pay interest on the Principal Amount at the rate
of Eight (8%) Percent per annum compounded, accrued and paid quarterly, commencing on the
Issue Date and terminating on the Maturity Date, as stated above. All payments shall be made to
the Owner of record with the Company and be forwarded by first class mail to the last address on
its books. In the event any payment due hereunder shall not be paid on the date when due, such
payment shall bear interest at the lesser of 18% or the highest lawful rate permitted under
applicable law, from the date when such payment was due until paid. This paragraph shall not
be deemed to extend or otherwise modify or amend the date when such payments are due
hereunder. The obligations of Company under this Note are subject to the limitation that
payments of interest shall not be required to the extent that the charging of or the receipt of any
such payment by the Owner would be contrary to the provisions of law applicable to the Owner
limiting the maximum rate of interest which may be charged or collected by the Owner.

2. **Sale and Transfer.** The Notes and the securities issuable upon conversion (together, the
"Securities") will be restricted as to transferability under state and federal laws regulating
securities. The issuance of the Securities will not be registered under the Securities Act of 1933,
as amended (the "Securities Act"), or any other similar state statutes, in reliance upon
exemptions from the registration requirements contained therein. Accordingly, the Securities
will be "restricted securities" as defined in Rule 144 of the Securities Act. As "restricted
securities," an investor must hold them indefinitely and may not dispose or otherwise sell them
without registration under the Securities Act and any applicable state securities laws unless
exemptions form registrations are available. Moreover, in the event an investor desires to sell or
otherwise dispose of any of the Securities, the investor will be required to furnish the Company



**EXHIBIT "D"**

with an opinion of counsel acceptable to us that the transfer would not violate the registration requirements of the Securities Act or applicable state securities laws. Any certificate or other document evidencing the Securities will be imprinted with a conspicuous legend stating that the Securities have not been registered under the Securities Act and state securities laws, and referring to the restrictions on transferability and sale of the Securities. In addition, the Company's records concerning the Securities will include "stop transfer notations" with respect to such Securities.

3. Investors: Each Investor is required to be "accredited" as such term is defined under Securities and Exchange Commission Rule 501 of Regulation D. Each Investor will be required to execute a Note Purchase Subscription Agreement and an Accredited Investor Questionnaire and provide any other documentation which may be required for the Company to comply with securities laws. In addition, Investors should have funds other than those invested in the Company adequate to meet their personal needs and contingencies and must be knowledgeable and experienced in financial and business matters generally. The Chief Executive Officer of the Company may, in his sole discretion, decline to admit any prospective investor regardless of whether such person meets the foregoing suitability requirements.

4. Right of Conversion into Shares.

4.1 As of the date of issue of this Convertible Note the Company has 100,000,000 Shares of Common Stock authorized of which 8,413,110 Shares are issued and outstanding.

4.2 At the Owners sole option, at anytime following the Issue Date but prior to the close of business on the Maturity Date the entire Principal Amount of $ 65,000 and all accrued interest, may be converted into fully-paid an non-assessable Shares of Common Stock of the Company. The conversion price shall be at the rate of two dollars ($2.00) per-share. Such conversion option exercised by the Owner shall be effective upon the completion, signing and delivering to the Company of a written Election to Convert. The entire Principal Amount and accrued interest may only be converted in its entirety and not in fractional or proportional amounts.

4.3 The Shares acquired by the Owner through the conversion option set forth in Section 4.2 herein shall be "restricted securities" as that term is defined under the Act and an opinion of counsel acceptable to the Company will be required in order to affect the sale or transfer of the Shares.

5. Term and Right to Accelerate Termination. The term of this Note shall begin on the Issue Date and shall end on the Maturity Date set forth above. However, the Company reserves the right, in its sole discretion at any time after the end of the 6th month following the Issue Date, to accelerate the Maturity Date and redeem this Note as of the close of business on a date certain (the "Redemption Date") which shall not be less than 60 days following the mailing as hereinafter provided to the Owner of a notice (the "Notice of Redemption") setting forth such election by the Company. The Notice of Redemption shall be mailed to the Owner of record at that date, shall be sent via certified or registered mail, return receipt requested, if to an address within the United States or outside the United States where such mailing with return receipt can



be made, or by such other means as reasonably assures delivery to the Owner with proof thereof to the Company. Such Notice of Redemption shall specify (i) date on which the redemption will be effective; (ii) the instructions for the return of this Note instrument and the procedure for payment of the redemption amount (iii) a statement of the Owners right to convert the Entire Principal Amount as provided for in Section 4.2 above by delivery to the Company of a written Election to Convert, which delivery must be made at the offices of the Company at anytime up to 5:00PM New York Time on the Redemption Date; (iv) a statement that any Election to Convert received after 5:00PM New York Time on the Redemption Date will be void and of no effect; and (v) a statement advising the owner that following 5:00PM New York Time on the Redemption Date his sole right will be to receive the return of the Principal Amount being redeemed plus any accrued interest thereon through the Redemption Date.

**6. Dedicated Use of Funds.**  Development of infrastructure; purchase of equipment and supplies, sales and marketing initiatives, technology advancements and working capital

**7. Collateral.** The Notes are the general corporate obligation of the Company who shall be responsible for the repayment of the Principal Amount at the Maturity Date or such earlier Redemption Date. The obligation to pay the interest when due, and to repay the principal at maturity, shall be the general obligation of the Company

**8. Governing Law, Saving Clause and Adverse Declarations.** This Note is being issued in the state of Florida and the domestic laws of Florida hereof shall govern its validity, interpretation, performance and enforcement.  In case any one or more of the provisions contained in this Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Note, and this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein, except that, should any such declaration of invalidity, illegality or unenforceability (the "Declaration") be of such a nature as to adversely restrict the Company's intended use of the proceeds here from, then, in any of such events, the Maturity Date shall be deemed to be accelerated to the date of such Declaration regardless of any limitation to the contrary contained herein and the Company's sole obligation shall be to cancel this Note and repay to the Owner the Principal Amount plus any accrued interest to such accelerated Maturity Date. Should such Declaration occur at a time when the Owner shall have elected the conversion option set forth in Sec. 4.2 herein and should such Declaration, in the sole opinion of counsel for the Company, be of a nature that could result in a violation of any applicable federal or state securities laws then, in such event, the parties agree that the Company's sole obligation shall be to rescind such conversion by the Owner and to pay to the Owner the entire Principal Amount, plus interest from the Issue Date to the date of such Declaration.

**9. Due Authorization.** The issuance of this Note according to the terms stated herein has been duly approved by all required corporate action on the part of the Company and has been duly approved by the Board of Directors of the Company as the valid and binding obligation of the Company.



10. General Provisions.

10.1 Company consents that Owner at any time may extend the time of payment of all or any part of the indebtedness secured hereby, or may grant any other indulgences.

10.2 Any notice or demand required or permitted to be made or given hereunder shall be deemed sufficiently made and given if given by personal service or by the mailing of such notice or demand by certified or registered mail, return receipt requested, addressed, if to Company, at Company's business address, or if to Owner, at such address as may be provided to Company from time to time. Either party may change its address by like notice to the other party.

10.3 This Note may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change, modification, termination, waiver, or discharge is sought.

WHEREFORE, the Company has duly issued this Note on the Issue Date first above written.

NATIONWIDE PHARMASSIST CORP.

Attest:

By: _____          By: _____

Name: STEPHEN F. MOLINARE            Name: _____

Title: Chairman & CEO                 Title: _____

**EXHIBIT "B"**

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION
Case No: 06-2014-003891-XXXXCE

NORMA JENNINGS, an individual;
PATRICE COLES, an individual;
DEBRA LEUE, an individual;
LESLIE EMERSON, an individual;
NORMA MOBLEY, an individual; and
BRIAN BULFER, an individual,
     Plaintiffs,

v.

NATIONWIDE PHARMASSIST CORP., a Florida corporation;
MTM HEALTHCARE SOLUTIONS, INC., a Florida corporation;
STEPHEN F. MOLINARI, an individual;
PETER MOLINARI, an individual;
FREDERICK SCHLOSSER, an individual;
WARREN K. TROWBRIDGE, an individual;
MARY JO THIBOULT, an individual;
VAR CONSULTANTS, INC., a Florida corporation;
and VIJAY RAMSARRAN, an individual,
     Defendants.

_____/

## FINAL JUDGMENT AGAINST
## AGAINST DEFENDANTS STEPHEN F. MOLINARI AND PETER MOLINARI

THIS MATTER came before the Court upon the consent motion of Plaintiffs, NORMA

JENNINGS, an individual; PATRICE COLES, an individual; DEBRA LEUE, an individual;

LESLIE EMERSON, an individual; NORMA MOBLEY, an individual; and BRIAN BULFER, an

individual (collectively referred to as "Plaintiffs"), for entry of a Final Judgment against Defendants

STEPHEN F. MOLINARI, an individual; and PETER MOLINARI, an individual ("the Molinari

Defendants"). After having reviewed the pleadings submitted on behalf of Plaintiffs, having further

noted the Molinari Defendants' consent, confession, and agreement to entry of this Final Judgment

as memorialized and evidenced by the Molinari Defendants' execution of the parties' March 12,

attachments, and serve it on the judgment creditor's attorney, or the judgment creditor if the judgment creditor is not represented by an attorney, within forty five (45) days from the date of this final judgment, unless the final judgment is satisfied or post-judgment discovery is stayed.

6.    Jurisdiction of this case is retained to enter further orders that are proper to compel the judgment debtor(s) to complete Form 1.977, including all required attachments, and serve it on the judgment creditor's attorney, or the judgment creditor if the judgment creditor is not represented by an attorney.

7.    The Court further reserves jurisdiction to execute this judgment and to jointly and severally enter against the Molinari Defendants an award of reasonable attorneys' fees pursuant to the parties' Settlement Agreement.

8.    The Clerk will not close this case, enter final disposition of this case, or require Plaintiffs to pay a re-open fee for post-judgment matters until post-judgment matters are complete or the Final Judgment is paid in full.

DONE AND ORDERED in Chambers at Fort Lauderdale, Broward County, Florida, this _____ day of October 2015.

_____
MARINA GARCIA-WOOD
CIRCUIT COURT JUDGE

Copies furnished to:

David C. Silver, Esq., Scott L. Silver, Esq., and Jason S. Miller, Esq.
  SILVER LAW GROUP, 11780 W. Sample Road, Coral Springs, Florida 33065
  *Counsel for Plaintiffs, Norma Jennings, Patrice Coles, Debra Leue, Leslie Emerson, Norma Mobley, and Brian Bulfer*

Geoffrey M. Cahen, Esq.,
  CAHEN LAW, P.A., 150 E. Palmetto Park Road - Suite 700, Boca Raton, FL 33432-4829
  *Counsel for Defendant, Nationwide PharmAssist Corp.*

Case No: CACE-14-003891 Division 18

Stephen A. Mendelsohn, Esq.
GREENBERG TRAURIG, P.A., 5100 Town Center Circle – Suite 400, Boca Raton, FL 33486
*Counsel for Defendant, MTM Healthcare Solutions, Inc.*

Dolores K. Sanchez, Esq.
4701 N. Federal Highway, Suite 316, Box B-1, Lighthouse Point, FL 33064
*Counsel for Defendants, Steven F. Molinari, Peter Molinari, and Frederick Schlosser*

## Judgment Creditor(s)'s Last Known Address
Norma Jennings
1873 NW 93rd Way, Plantation, FL 33322

Patrice Coles
2080 NW 82nd Avenue, Pembroke Pines, FL 33024

Leslie E. Emerson
27315 Shady Hills Landing Lane, Spring, TX 77386

Debra Leue
11106 Delta Circle, Boca Raton, FL 33428

Norma Mobley
4041 Bowman Blvd. #301, Macon, GA 31210

Brian Bulfer
9101 N.E. 2nd Street, Miami Shores, FL 33138

## Judgment Debtor(s)'s Last Known Address
Stephen F. Molinari
5513 N. Military Trail - Apt. 706, Boca Raton, FL 33496
Social Security No.: xxx-xx-3475

Peter Molinari
233 S. Federal Highway - Apt. 915, Boca Raton, FL 33432
Social Security No.: xxx-xx-7355

- 4 -

Electronically signed by Judge GARCIA-WOOD, MARINA on 2015/10/13 11:57:40 EST

**EXHIBIT "C"**

# 2013 FOR PROFIT CORPORATION REINSTATEMENT

**FILED**
Nov 07, 2013
**Secretary of State**

DOCUMENT# P11000071399

**Entity Name:** NATIONWIDE PHARMASSIST CORP.

**Current Principal Place of Business:**

1011 S.W. 30TH AVE.
DEERFIELD BEACH, FL 33442

**New Principal Place of Business:**

**Current Mailing Address:**

1011 S.W. 30TH AVE.
DEERFIELD BEACH, FL 33442

**New Mailing Address:**

FEI Number: 45-2956966      FEI Number Applied For ( )      FEI Number Not Applicable ( )      Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**

MOLINARI, PETER
1011 S.W. 30TH AVE
DEERFIELD BEACH, FL 33442     US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:  PETER MOLINARI
_____                    _____
         Electronic Signature of Registered Agent                                Date

## OFFICERS AND DIRECTORS:

Title:        PS
Name:         MOLINARI, PETER
Address:      1011 S.W. 30TH AVE.
City-St-Zip:  DEERFIELD BEACH, FL  33442

Title:        CFO
Name:         FREDERICK, SCHLOSSER
Address:      1011 SW 30TH AVE.
City-St-Zip:  DEERFIUELD BEACH, FL  33442

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE:  FREDERICK SCHLOSSER                    CFO              11/07/2013
_____                    _____
         Electronic Signature of Signing Officer or Director                        Date

**EXHIBIT "D"**

# Electronic Articles of Incorporation
# For

P13000099427
FILED
December 13, 2013
Sec. Of State
msolomon

MTM HEALTHCARE SOLUTIONS INC.

The undersigned incorporator, for the purpose of forming a Florida
profit corporation, hereby adopts the following Articles of Incorporation:

## Article I
The name of the corporation is:
    MTM HEALTHCARE SOLUTIONS INC.

## Article II
The principal place of business address:
    1011 S.W. 30TH AVE.
    DEERFIELD BEACH, FL. US  33442

The mailing address of the corporation is:
    1011 S.W. 30TH AVE.
    DEERFIELD BEACH, FL. US  33442

## Article III
The purpose for which this corporation is organized is:
    ANY AND ALL LAWFUL BUSINESS.

## Article IV
The number of shares the corporation is authorized to issue is:
    100,000,000

## Article V
The name and Florida street address of the registered agent is:
    PETER F MOLINARI
    1011 S.W. 30TH AVE.
    DEERFIELD BEACH, FL.   33442

I certify that I am familiar with and accept the responsibilities of
registered agent.

Registered Agent Signature:   PETER F. MOLINARI

P13000099427
FILED
December 13, 2013
Sec. Of State
msolomon

## Article VI

The name and address of the incorporator is:

PETER F. MOLINARI
1011 S.W. 30TH AVE.

DEERFIELD BEACH, FL 33442

Electronic Signature of Incorporator:   PETER F. MOLINARI

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:  P, S
PETER F MOLINARI
1011 S.W. 30TH AVE.
DEERFIELD BEACH, FL.  33442  US

Title:  CFO
FREDERICK  SCHLOSSER
1011 S.W. 30TH AVE.
DEERFILED BEACH, FL.  33442  US

## Article VIII

The effective date for this corporation shall be:

12/13/2013

**EXHIBIT "E"**



Right Med.   Right Time.   Every Time

Year-end Progress Report - 2012

Dear Valued Shareholder,

I could not be more excited about the progress here at Nationwide PharmAssist, and want
to bring you up-to-date on the many milestones achieved over the past year. Our
Management Team has more than proven their worth through these accomplishments –
testimony to their extraordinary talents and abilities. As we close the chapter on 2012 and
look forward to what lies ahead, we are optimistic that we can deliver even better results
in 2013 as we actually head into dispensing and revenue producing.

To quote Larry Merlo, the President & CEO of CVS Caremark "The current health care
landscape presents a number of challenges that we see as opportunities. Among them,
overall health care costs will continue to increase, a scenario that will be intensified by an
aging population. Exacerbating this problem is an insufficient focus on lower-cost
solutions such as preventive care and prescription drug adherence. Consumers also are
taking on greater accountability for their health care, as direct-to-consumer markets grow
and employers shift more and more costs onto their employees".

It is comforting/validating to hear that the biggest pharmacy operation in the world sees
the same opportunities as we do. And that is, an aging population, insufficient
prescription drug adherence, greater accountability for personal health care as direct-to-
consumer markets grow. We feel we offer "THE" solution to accommodate these needs,
therefore helping to improve adherence and lower over all health care costs. This is
critical because non-adherence – that is, not taking the right meds at the right time and/or
not refilling prescriptions or not refilling them on time – costs the U.S. health care system
an estimated $300 billion annually in avoidable health care costs.

The following are a few of the key milestones achieved in 2012:

**First-of-its-kind AmerisourceBergen Partnership Secured:**  Primarily because of their
belief in our business model and our outstanding Management Team, the one hundred
billion dollar pharmaceutical wholesale giant, *AmerisourceBergen ("ABC")*, has entered
into a first-of-it's-kind partnering arrangement with Nationwide PharmAssist to provide
staffing, management, technology and equipment needs for our complete pharmacy
operations. Our arrangement permits us to pay for machinery, equipment, and staffing
based on a per pack produced metric. Most importantly, it commits ABC to providing

Nationwide PharmAssist Corp.        1011 SW 30th Avenue        Deerfield Beach, Florida    33442

these resources over five years sufficient to meet our needs regardless of how rapidly we grow. This substantially reduces upfront capital investment and significantly reduces scaling risk. Two EXP technology systems are enroute to our Corporate Offices and staffing recruitment is underway by AmerisourceBergen with a first quarter, 2013 launch date targeted. In addition, ABC has taken on an expanded roll with the execution of many of the job duties/responsibilities upon the departure of Keith Trowbridge and Mary Jo Thiboult.

**Initial Direct to Consumer (DTC) Strategy Adopted:** In part, as a result of our unique relationship with ABC, we now have the capacity to manage the larger, more easily targeted DTC customer who is taking multiple medications, multiple times per day. As such, we are moving forward with marketing strategies to capture this sizeable audience prior to our Extended Care Facility (ECF) product launch, which we anticipate will be executed no later than the forth quarter of 2013.

**Over-the-Counter, Vitamin and Supplement Product Line Additions Have Been Added:** As a first step towards additional product offerings, we will now offer OTC, Vitamin and Supplement's as part of our packaged options, an addition that was unanimously confirmed in our consumer focus groups. These higher margin items will add to our bottom line and make our overall product offering even better for our multiple audiences. And this category vastly expands our customer base. We are exploring/negotiating contracts with several major wholesalers for the provision of this important additional product line.

**Pharmacy/License Purchased – 90% PBM Coverage Expansion:** We have purchased and are in the process of moving our pharmacy licenses and operations to our new Corporate Office location. Included in the licensing process is the joining of ABC's 11,000 member *Good Neighbor Pharmacy* organization, which speeds the recognition process with 4,000 of the nation's Pharmacy Benefit Management organizations (PBMs). We have also begun the application process for a national footprint of reciprocal state pharmacy and pharmacist licenses, based on our Florida pharmacy operation.

**Pharmacy Drug Acquisition:** Contracts are being negotiated with drug wholesalers to achieve best prices on both Generic and Branded pharmaceuticals. This is a key element to our profitability as it is the largest segment of our Cost of Goods line item on our spreadsheets.

**Corporate Offices – Build-out, Furnishing, Equipment, Staffing:** We have secured the contract for, and moved into our new 20,000+ square foot office space in Deerfield Beach, Florida. Initial construction modifications are complete and ready for rollout. Furnishings and equipment needs are defined, budgeted, and starting to be purchased and delivered. Staffing recruitment is underway based on our projected organizational structure and appropriate job descriptions developed by our Management Team. ABC and we have interviewed extensively for the last several months for our Director of Pharmacy, who will be responsible for the pharmacy operations. We believe we have identified a candidate and are in the process of extending an offer. Timelines for completion of each of these steps have been established to accomplish our projected first quarter, 2013 start date.

**Marketing Initiatives Underway:** A three-day Branding Session has been completed with resulting strategies and tactical objectives set and underway. We have enlisted the support services of *Daniels + Roberts*, an analytics driven marketing agency with unique pharmaceutical client experience, as we move forward with these branding objectives. Trademark application has been initiated, paid media creative is under development, product placement testing has been accomplished, plus additional branding efforts through logo and print collateral development have been finalized. Two white papers on the industry have been produced and unpaid PR promotions are prepared and ready for distribution. Our ongoing Social Media efforts continue to build anticipation for our product launch through targeted efforts with industry and affinity group leaders around the nation. These efforts have already generated over one million exposures with these influential audiences during 2012.

**Customer Expectations Confirmed/Expanded through Focus Group Studies:** In conjunction with our advertising agency, we have recently completed an extensive customer focus group research headed by Peter Fondulas (*Fondulas Strategic Research*), a nationally known research consulting organization with client credentials of Time, Inc., Verizon, AT&T, DIRECTTV, NBC, National Geographic, American Express, Capital One and Liberty Mutual, to name but a few. We studied two customer target groups (65+ adults taking 5 or more prescribed medications a day, and Caregivers – primarily female - 45+ also taking 5 or more medications a day). Through this exhaustive process we have been able to prioritize key product attributes with our target audiences and apply that information to our paid and un-paid media campaigns currently under development.

**Customer Service Center Development:** We have selected *Authority Software* in Fort Lauderdale, Florida as our primary consultant in the development of all Customer Service Center software, hardware, phones/equipment and furniture acquisitions. Multiple software components are being tied together through Authority Software's customized CRM solution. And other individual consultants are now on-board in the management of in-house and outside call center operations and Human Resources and Training/Scripting for our customer support centers. The utilization of outside call center support will allow us to meet our immediate needs, permit us staffing flexibility tailored to rapid growth, and permit us to more efficiently manage our working capital by not committing it to up-front overhead. Finally, we have – in conjunction with Authority Software – selected our IT solutions staffing and are in the process of transitioning those key employees in-house.

**Daszkal Bolton LLP Retained - Accounting Firm:** We have retained the accounting firm Daszkal Bolton, one of Florida's award winning certified public accounting and financial consulting firms for tax preparation as well as general accounting and certified audit services.

**Greenberg Traurig Retained –Law Firm:** We have retained the global law firm Greenberg Traurig, consistently ranked as one of the top law firms in the country for healthcare and general corporate & securities law guidance and advice.

**Investment/Capital Raise Efforts:** We are in continued discussions with many high net-worth individuals, angel investment groups and several institutional investment firms in regard to a $10,000,000 capital raise (4,000,000 shares being offered at $2.50 per share).

Nationwide PharmAssist Corp.        1011 SW 30th Avenue        Deerfield Beach, Florida        33442

The response from such investors has been very encouraging and we anticipate a sizable investment in the first quarter 2013 of at least $3,000,000. *For all existing shareholders, we are still offering shares at $1.70 per share thru January 25, 2013.*

As you can see, we have been very busy with the many steps necessary to establish our exciting new company during the past year and getting the infrastructure properly prepared to handle the onslaught of business we believe we will see in the coming year not to mention the 32 million more Americans that will have health insurance come 2014. Nationwide PharmAssist is poised to capture the leadership position in this unique category of business - on a national basis.  I couldn't be more pleased with the results to date by our amazing Management Team, coupled with the guidance and support from ABC and our extraordinary list of specialty consultants.

After our first year, I am even more confident that we will make a real difference in the way pharmacy products are packaged and delivered in this country in the coming years. By capitalizing on our innovative dispensing solution we will reinvent pharmacy for better health ... and better shareholder value.

Please do not hesitate to give me a call if I can provide more detail on these exciting developments.  Together, we have an exciting future in 2013, in large part thanks to your investments and continued support of Nationwide PharmAssist.

Very Sincerely,


Stephen F. Molinari
Founder, Chairman & CEO
Nationwide PharmAssist, Corp.
1011 SW 30th Ave.
Deerfield Beach FL, 33442
Tel: 800.801.4358 ● Cell: 561.305.6161

**EXHIBIT "F"**

REDACTED

| | |
|---|---|
| **From:** | Forrest, Terry <TForrest@abc-sg.com> |
| **Sent:** | Wednesday, January 28, 2015 3:22 PM |
| **To:** | REDACTEDREDACTED |
| **Cc:** | |
| **Subject:** | RE: NationwideAssist Corporation 3rd Party Subpoena |

REDACTED
REDACTED will let you know as much as I know. We did enter into an agmt whereby we were to provide consulting, technology, staffing and mgmt. of the operations. However, Nationwide PharmAssist (NPA) would own the pharmacy, inventory, etc. To my knowledge, they never operated even one day. We certainly did not operate on their behalf. Nonetheless, the CEO, Steve Molinari, was charged and convicted of wire fraud and maybe other things and this "deal" effectively died after that. I don't believe we formally terminated as we really didn't have anything actively underway at the time. His partner, Fred Schlosser, continued to contact us claiming he was raising money to stay the course under another name, MTM. We never signed anything with him and frankly would not be interested in signing with him.

We can discuss more as needed.

# REDACTED

# REDACTED

# REDACTED

# REDACTED